GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
By:     ROBERT WILLIAM YALEN
        MÓNICA P. FOLCH
        JACOB LILLYWHITE
        TALIA KRAEMER
        SHARANYA MOHAN
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:    (212) 637-2800
Fax:    (212) 637-2702
Email:  robert.yalen@usdoj.gov
        monica.folch@usdoj.gov
        jacob.lillywhite@usdoj.gov
        talia.kraemer@usdoj.gov
        sharanya.mohan@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                            :
UNITED STATES OF AMERICA,                                   :
                                                            :
                         Plaintiff,                         :          COMPLAINT
                                                            :
                  v.                                        :          18 Civ. 5213
                                                            :
NEW YORK CITY HOUSING AUTHORITY,                            :
                                                            :
                         Defendant.                         :
                                                            :
------------------------------------------------------------X

        Plaintiff the United States of America (the "United States"), by its attorney, Geoffrey S.

Berman, United States Attorney for the Southern District of New York, alleges as follows:

## INTRODUCTION

1.      The New York City Housing Authority ("NYCHA") violates basic health and safety regulations of the U.S. Department of Housing and Urban Development ("HUD").  These regulations require NYCHA to protect children from the lead paint that is present within apartments in roughly thirty percent of NYCHA developments and, more generally, to provide residents decent, safe, and sanitary housing.  NYCHA has repeatedly made false statements to HUD and the public regarding these issues, and has deceived HUD inspectors.

2.      The people who suffer as a result of NYCHA's misconduct are its residents, including lead-poisoned children; elderly residents without heat in winter; asthma sufferers whose condition is worsened by moldy and pest-infested apartments; and disabled residents without functioning elevators.

3.      Lead is toxic, and there is no safe level of exposure; in children, lead can have devastating effects.  The most common cause of lead poisoning in children is exposure to deteriorated lead paint.  NYCHA knows that there is lead paint within apartment units in roughly thirty percent of its developments, but has failed—and continues to fail—to protect its residents from that paint when it peels and crumbles.  NYCHA has for years failed to follow key HUD lead paint safety regulations including, among other things, by failing to find and remediate peeling lead paint in its developments and failing to ensure that NYCHA's workers use lead-safe work practices to avoid disturbing lead paint that might injure residents.  Since at least 2011, NYCHA senior managers have known that NYCHA was violating HUD lead paint requirements.  Beyond HUD's requirements, NYCHA has also violated lead paint safety regulations promulgated by the U.S. Environmental Protection Agency ("EPA").

4.      Children have been harmed as a result of NYCHA's failures.  Between 2010 and 2016 at least 19 lead-poisoned children were found to have been exposed to deteriorated lead

paint in their NYCHA apartments. These 19 children are at risk of lifelong neurological problems. But the 19 cases understate the true extent of lead poisoning likely to have been caused by crumbling lead paint at NYCHA. Many hundreds of additional children living at NYCHA have been reported to the New York City Department of Health and Mental Hygiene ("NYC DOH") as having tested at or above the Centers for Disease Control's "reference level"—the level at which public health actions should be initiated. But NYC DOH is only able to investigate a fraction of the cases reported to it to determine whether the children's apartments contain peeling lead paint. Moreover, NYC DOH's information is incomplete because it is based solely on reports from medical professionals who have tested children for lead, and does not include the many children living at NYCHA who have not been tested but nonetheless may have lead poisoning. There is every reason to believe the true number of children with lead poisoning is materially higher.

5.      Beyond lead paint, HUD regulations also require NYCHA to provide "decent, safe, and sanitary" housing. This "decent, safe, and sanitary" regulation requires not only that NYCHA comply with lead paint safety rules but also that it provide an environment free of mold and pest infestations and with adequate heat and functional elevators. Every year, NYCHA certifies that it is in fact complying with HUD's regulations, and HUD has paid NYCHA billions of dollars to operate in compliance with them.

6.      To enable HUD to determine whether public housing meets this basic standard, HUD created an inspection regime—the Public Housing Assessment System—to allow HUD to determine whether a housing agency is providing decent, safe, and sanitary housing. NYCHA has undermined HUD's inspections by disguising the true condition of its properties. This deception included turning off water to developments to prevent HUD inspectors from observing leaks;

posting "danger" signs to keep inspectors away from troubled areas; and temporarily hiding improperly stored hazardous materials.  NYCHA management even included a document with suggestions for deceiving inspectors in NYCHA's official training materials.  This cover-up "how-to" guide was only removed in Summer 2017, after this Office called its existence to the attention of NYCHA's outside lawyers.

7.     NYCHA's conduct undermined HUD's inspection regime and HUD's ability to use that regime to determine whether NYCHA complies with the "decent, safe, and sanitary" requirement.  In fact, living conditions at NYCHA are far from "decent, safe, and sanitary."  Mold grows unchecked at many NYCHA developments, often on a large scale.  Across the city, residents are provided inadequate heat in winter, leading to frigid apartment temperatures.  Pests and vermin infestations are common, and as senior New York City officials have acknowledged, NYCHA "has no idea how to handle rats."  Elevators often fail, leaving elderly or disabled residents trapped in their apartments or sleeping in building lobbies because they cannot return to their homes.  Leaks, peeling paint, and other deterioration are commonplace, but go unaddressed.

8.     NYCHA is well aware that disclosing its failure to protect residents from lead paint and its failure to provide decent, safe and sanitary housing would lead to unwanted regulatory scrutiny—including potential limitations on future HUD funding.  To avoid this, NYCHA hid conditions from inspectors and repeatedly made false statements to HUD and the public to cover up what can be covered up and minimize what cannot.  NYCHA's false statements have occurred both in formal submissions to HUD and in letters, emails, and press releases directed at HUD and the public.

9.     Numerous false statements are detailed in this complaint.  But some important examples are the following:

- Every year from 2011 until well after this Office's investigation began, NYCHA falsely certified to HUD that NYCHA will comply with HUD's lead paint safety regulations and also complies with other applicable regulations, including those requiring "decent, safe, and sanitary" housing. NYCHA made these false certifications as part of its applications to obtain billions of dollars in funding from HUD. But during this entire period, NYCHA was substantially out of compliance with these important regulations.

- In 2015 and 2016, NYCHA made false statements to HUD and the public regarding its lead paint compliance. Press reports in 2015 told the story of a child with dangerously high levels of lead in her blood, and articles in 2016 reported on this Office's investigation. To deflect the resulting scrutiny, NYCHA falsely told HUD and the public that NYCHA "complies with Federal, State, and City regulations concerning lead." But during this entire period, NYCHA was substantially out of compliance with important lead paint regulations.

- In 2012 and 2013, NYCHA made false statements to HUD and the public about its maintenance work order backlog. To fend off concerns by HUD, the media, and local politicians that NYCHA's large backlog of maintenance work was threatening living conditions at NYCHA, NYCHA began reporting reductions in its backlog, falsely claiming that the reductions resulted from "improved efficiency." But in fact much of this reduction resulted not from improved efficiency but from NYCHA's manipulation of the work order process so that it no longer reflected the work that NYCHA knew needed to be done.

When these false statements were made, senior NYCHA officials knew the true facts—directly contrary to the false statements.

10. These examples illustrate the culture at NYCHA. NYCHA's response to external inquiries is frequently to cover up or minimize problems that it knows to exist; and executives speaking for the agency (at best) fail to conduct basic diligence before providing HUD and the public false assurances of compliance. The problems at NYCHA reflect management dysfunction and organizational failure, including a culture where spin is often rewarded and accountability often does not exist. As NYCHA's former Chair and CEO (the "Chair") put it when confronted with an instance of NYCHA's maintenance failures, "This is more than there isn't any money. . . ."

11.     To ensure NYCHA's compliance with these critical regulations, to prevent further deceptive practices and to mitigate the ongoing effects of NYCHA's past misconduct, the United States brings this action for injunctive relief and appointment of a monitor, pursuant to Section 6(j)(3) of the U.S. Housing Act of 1937 ("U.S. Housing Act"), 42 U.S.C. §§ 1437d(j)(3), and the federal Anti-Fraud Injunction Act, 18 U.S.C. § 1345, and for equitable relief pursuant to the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2616(a)(1).

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, 15 U.S.C. § 2616, and 42 U.S.C. § 1437d(j)(3).

13.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (2), because the defendant resides in this district and because a substantial part of the events giving rise to the claims in this action occurred in this district.

## PARTIES

14.     Plaintiff is the United States of America.

15.     Defendant NYCHA is a municipal housing agency created under Section 401 of New York State's Public Housing Law.  NYCHA is run by a chairperson and six other members of a board, all appointed by the Mayor of the City of New York.

## BACKGROUND

**A.     Public Housing**

16.     Since 1937, the United States has provided funding to assist states and localities in making decent, safe, and sanitary public housing available for low-income families.  *See* U.S. Housing Act, Pub. Law 75-412, § 1.

17.     Today, approximately 1.2 million families live in public housing managed by roughly 2,900 housing agencies nationwide.  HUD will provide approximately $7.3 billion to fund public housing across the country during Fiscal Year 2018.

**B.     The New York City Housing Authority**

18.     NYCHA is by far the largest public housing agency in the United States, larger than the next eleven public housing agencies combined.  NYCHA operates 326 developments, consisting of 2,462 residential buildings with approximately 175,000 apartments, located throughout New York City.  NYCHA's operating budget for public housing is about $2.3 billion, roughly $900 million of which are public housing funds provided by HUD.  HUD also provides NYCHA more than $300 million per year in capital funding.

19.     NYCHA public housing is home to nearly 400,000 low- and moderate-income residents.

20.     Approximately 27% of NYCHA's residents are children.  Nearly 20% of residents are age 62 or older, and more than 37,000 NYCHA residents over 62 live alone.

**C.     Senior NYCHA Operations Management**

21.     NYCHA's Operations Department ("Operations") is in charge of building maintenance and repair at NYCHA developments and therefore has a key role in ensuring NYCHA's compliance with lead paint safety regulations and the "decent, safe, and sanitary" requirement.

22.     The head of Operations from 2010 to early 2014 was an Executive Vice President for Operations, at times called a "Deputy General Manager" (the "EVP for Operations").  The EVP for Operations reported to NYCHA's then-General Manager.  Between early 2014 and 2018, NYCHA did not have an EVP for Operations.

23.     Two principal operations executives reported to the EVP for Operations when that position was filled.  These individuals, originally serving as Vice-Presidents for Operations and subsequently given the titles Senior Vice-President for Operations ("SVP for Operations") and Senior Vice-President for Support Services ("SVP for Support Services"), were effectively in charge of most of the Operations Department from the departure of the EVP for Operations in 2014 until late 2017.[1]

24.     In recent years, the SVP for Operations was responsible for overseeing the day-to-day operations at many of NYCHA's developments. The SVP for Support Services was responsible for specialized groups such as the lead detection and abatement unit, heating operations unit, and elevators unit.  A third senior operations executive, with various titles including "Senior Vice President for NextGeneration Operations," joined the senior operations staff in late 2015 and departed voluntarily in mid-2017.  She oversaw certain operations at a subset of developments.

25.     Operations executives would regularly discuss information on operations matters among themselves, with the General Manager and Chair, and with other NYCHA executives.

26.     Among other things, every week, the SVP for Operations would meet with other senior NYCHA Operations executives, including the Borough Directors who supervise the developments, to discuss operations issues, including such matters as PHAS inspections, mold, leaks, and apartment inspections.  The SVP for Support Services would attend these meetings when agenda items related to his group.

---

[1] The same individuals held other titles at NYCHA between 2010 and 2017, although always retaining significant management responsibility over issues relevant to this Complaint.  For example, the SVP for Operations previously had titles including "Vice President of Operations for Support Services" and "Vice President for Operations."  The SVP for Support Services previously had titles including "Senior Director of Technical Services."

27.     Additionally, the General Manager would meet twice a week with the SVP for Operations, the SVP for Support Services and other senior executives to discuss operations issues. Until 2014, the SVP for Operations and SVP for Support Services would meet every week with the EVP for Operations to discuss similar issues.

28.     The NYCHA Chair also would regularly discuss operations issues with the General Manager, the SVP for Operations, and the SVP for Support Services.  The Chair communicated regularly with the General Manager on operations issues, including at a weekly meeting.  The Chair also would routinely discuss operations-related problems directly with the SVP for Operations and SVP for Support Services as they arose, including at regularly scheduled meetings with them every other week.  The agendas for meetings with the Chair included issues regarding lead-based paint, heating, elevator maintenance, mold remediation, work order reporting, and general development management.

29.     Other than the Chair, the General Manager, the EVP for Operations (when the position was filled), the SVP for Operations and the SVP for Support Services, other senior managers have played a significant role in monitoring and addressing living conditions, maintenance work orders, and regulatory compliance at HUD's developments, including the Director of Technical Services ("Director of Technical Services"), who was in charge of many aspects of NYCHA's lead paint program and reported to the SVP for Support Services until November 2017.[2]

---

[2] The same individual held other titles at NYCHA between 2010 and 2017, all relevant to NYCHA's lead paint compliance.

**NYCHA HAS LONG VIOLATED KEY LEAD PAINT SAFETY REGULATIONS
AND MADE FALSE STATEMENTS TO COVER UP ITS NONCOMPLIANCE**

30.     Since at least 2010, NYCHA has failed to comply with core lead paint safety

regulations.  Senior NYCHA officials have known of these violations, yet NYCHA executives

have repeatedly, and falsely, reassured HUD and the public of NYCHA's compliance.

**A.     Lead Poisoning and the Lead Paint Safety Regulations**

31.     Lead is toxic.

32.     Lead poisoning in children has particularly devastating consequences.  Studies

show that even very low levels of lead exposure can cause irreversible neurological problems,

including learning disabilities, reduced attention spans, and behavioral problems.  No level of lead

exposure is safe.  Even for adults, ingestion of small amounts of lead can cause or exacerbate

serious health conditions, including cancer, hypertension, and kidney failure.

33.     Lead poisoning is entirely preventable.  The key is stopping children from coming

into contact with lead.

34.     The most common source of lead exposure is deteriorating lead paint in old

housing.[3]  Children are easily poisoned when they put peeling lead paint flakes in their mouths or

ingest lead paint dust, leading to neurological injuries that cannot be corrected.

35.     In 1992, Congress enacted the Residential Lead-Based Paint Hazard Reduction Act

to, among other things, "reduce the threat of childhood lead poisoning in housing . . . assisted by

the Federal Government."  42 U.S.C. § 4851a(6).  Pursuant to this statute, HUD in turn

promulgated the "Lead-Safe Housing Rule."  24 C.F.R. part 35, subparts B-R (Lead-Safe Housing

---

[3] The terms "lead paint" and "lead paint hazards" as used in this Complaint shall have the same meaning as the terms "lead-based paint" and "lead-based paint hazards," respectively, as defined in section 35.110 of the Lead Safe Housing Rule, 24 C.F.R. § 35.110.

Rule).  The Lead-Safe Housing Rule "establish[es] procedures to eliminate as far as practicable

lead-based paint hazards" in federally funded housing, including public housing such as NYCHA.

24 C.F.R. § 35.1100.

36.     In 2008, pursuant to the Toxic Substances Control Act, 15 U.S.C. § 2616(a)(1),

EPA promulgated the Renovation, Repair, and Painting Rule ("RRP Rule") to reduce the risk of

lead exposure in the course of certain renovations. 40 C.F.R. part 745, subpart E.

37.     EPA has also promulgated regulations regarding "Lead-Based Paint Activities"

including the abatement of lead paint (the "Abatement Rule").  *See* 40 C.F.R. part 745, subpart L.

38.     Additionally, HUD and EPA also promulgated substantively identical versions of a

"Lead Disclosure Rule," which requires landlords like NYCHA to inform most tenants in housing

built prior to 1978 of known lead paint and lead paint hazards, and to disclose related reports and

information.  24 C.F.R. part 35, subpart A (HUD's Lead Disclosure Rule); 40 C.F.R. part 745,

subpart F (EPA's Lead Disclosure Rule).

39.     As applied to public housing, these rules set forth a comprehensive regime

intended to protect public housing residents from lead poisoning.

**1.     The Lead-Safe Housing Rule**

40.     Under the Lead-Safe Housing Rule, housing agencies like NYCHA must conduct

lead paint inspections to determine whether and where lead paint exists in their developments.  24

C.F.R. § 35.1115(a).  In certain circumstances, HUD permits housing agencies to use a sampling

method that allows them to inspect a subset of apartments and extrapolate the results to the

remaining apartments.

41.     To the extent that lead paint is found in these inspections, the housing agency must

ultimately abate it.  24 C.F.R. § 35.1120(a).  Until such time as abatement occurs, the housing

agency must put in place "interim controls" designed to prevent deterioration of lead paint and protect residents from lead poisoning.  24 C.F.R. § 35.1120.

42.     The process of ensuring that interim controls are in place includes performance of a "risk assessment" to identify lead paint hazards.  24 C.F.R. § 35.1115(b).  A lead paint hazard is "any condition that causes exposure to lead from dust-lead hazards, soil-lead hazards, or lead-based paint that is deteriorated or present in chewable surfaces, friction surfaces, or impact surfaces, and that would result in adverse human health effects."  24 C.F.R. § 35.110.  Thus, for example, peeling lead paint is a lead paint hazard because a child could ingest loose flakes of paint.  Similarly, lead paint on a portion of a window that is subject to abrasion or friction from repeated opening and closing is a lead paint hazard because it is likely to produce lead dust that a child may ingest.

43.     Once lead paint hazards are identified, "interim controls" must be put in place. Interim controls are measures that temporarily reduce the risk of exposure to lead paint, such as painting over lead paint or rehanging doors to minimize friction.  24 C.F.R. § 35.1330.  Interim controls must be put in place by specially trained employees, using safe work practices and taking steps to protect residents.  24 C.F.R. § 35.1330(a)-(e).

44.     Because interim controls are inherently temporary and do not eliminate the risk of lead exposure, a housing agency must monitor and maintain those controls and respond to any breakdown.  The regulations include four core requirements:

45.     *First*, the housing agency must conduct *risk assessment reevaluations* every two years to identify any new or reappearing lead paint hazards in developments with lead paint, unless two consecutive reevaluations separated by at least two years demonstrate the absence of such hazards.  24 C.F.R. § 35.1355(b)(4).

46.     *Second*, the housing agency must also conduct a *visual assessment* of every apartment with lead paint *every year*, as well as at unit turnover, to look for visual evidence of "deteriorated paint . . . and the failure of any hazard reduction measures."  24 C.F.R. § 35.1355(a)(2).

47.     *Third*, the housing agency must respond urgently when a child under six living in the building is reported to have a blood lead level that is greater than or equal to the "Environmental Intervention Blood Lead Level" or "EIBLL."  *See* 24 C.F.R. §§ 35.110, 1130 (prior to amendment by 82 Fed. Reg. 4151 (Jan. 13, 2017)).[4]  In response, the housing agency must not only contain hazards in the child's apartment, but also perform a new risk assessment of the entire building if the building had previously been determined to be free of lead paint or lead paint hazards.  24 C.F.R. § 35.1130(f) (prior to amendment by 82 Fed. Reg. 4151 (Jan. 13, 2017)).[5]  The housing agency is also required to notify HUD that a child living at NYCHA has been found to have an EIBLL.  24 C.F.R. § 35.1130(e)(2).

48.     *Fourth*, the housing agency must make sure its workers do not themselves create lead paint hazards when working in apartments, by requiring workers to use safe work practices

---

[4] The relevant regulations have recently been modified to lower the blood lead level that requires the actions described in this paragraph, as well as to change certain terminology and modify the actions to be taken.  For most of the period relevant to this complaint, the blood lead level requiring NYCHA's immediate response was defined as 20 micrograms per deciliter, or 15-19 micrograms per deciliter in two tests taken at least three months apart, and was known as the "Environmental Intervention Blood Lead Level."  24 C.F.R. §§ 35.110, 1130 (prior to amendment by 82 Fed. Reg. 4151 (Jan. 13, 2017)).  Beginning in July 2017, a standard of 5 micrograms per deciliter has applied.  Under the new standard, the terminology for the urgent action level is "Elevated Blood Lead Level."  82 Fed. Reg. 4151 (Jan. 13, 2017).  For the purpose of consistency in this Complaint, the Government will use only the term EIBLL, but in doing so should be understood to refer to the applicable blood lead level requiring such actions at a given point in time.

[5] Subsequent to the recent amendments, the regulations instead require a new risk assessment for all apartments containing or expected to contain children under six years old.  24 C.F.R. § 35.1130(f)(1).

when performing any maintenance or renovation work that may disturb lead paint beyond a two square foot *de minimis* level.  24 C.F.R. §§ 35.1345, 35.1350, 35.1355(a)(4).  These lead-safe work practices requirements include warning residents about work to be performed and ensuring that they are not present in the worksite; preparing the worksite to prevent the release of lead dust and contain lead paint dust and other debris; and using safe paint removal and worksite cleaning methods.  *Id.* §§ 35.1345, 35.1350.  Employees performing this work must be specifically trained in the use of lead-safe work practices.

### 2. The RRP Rule

49.     EPA's RRP Rule is a second regulation requiring that NYCHA employ lead-safe work practices when conducting work that disturbs lead paint.  The RRP Rule governs residential "renovations," defined broadly to mean "modification of any existing structure, or portion thereof, that results in the disturbance of painted surfaces," provided that (*i*) the work disturbs more than six square feet per room of interior painted surfaces, more than twenty square feet of exterior painted surfaces, *or* (regardless of size) involves performing window replacements or demolition of painted surface areas, 40 C.F.R. § 745.83; (*ii*) the work is "for compensation," 40 C.F.R. §§ 745.80; and (*iii*) the building is "target housing," which generally means housing built prior to 1978 where the surface in question has not been tested and found lead-based paint free, 15 U.S.C. § 2681(17); 40 C.F.R. § 745.82.  Work by NYCHA employees is "for compensation" in that NYCHA charges rent to residents and pays wages to its employees.

50.     The substantive requirements of the RRP Rule are similar to the safe work practices elements of HUD's Lead-Safe Housing Rule.  As an entity performing "renovations," NYCHA must, among other things, have (*i*) have at least one trained "Certified Renovator" performing or directing the work, 40 C.F.R. §§ 745.81(a)(3), 745.89(d)(2), & 745.90(a); (*ii*) ensure that other workers are trained in lead-safe work practices, 40 C.F.R. §§ 745.81(a)(3) &

745.89(d)(1); (*iii*) follow safe work-practice requirements before, during, after the renovation, 40 C.F.R. §§ 745.85, 745.89(d)(3); (*iv*) provide notice to individuals in the vicinity of the work area, 40 C.F.R. §§ 745.84(a) 745.85(a)(1), 745.89(d)(3), 745.89(d)(4); and (*v*) document compliance with the safe work practice requirements, 40 C.F.R. §§ 745.86(b)(6), 745.89(d)(5).

### 3.     EPA's Abatement Rule

51.     The Abatement Rule requires that anyone engaged in the abatement of lead paint is appropriately trained by an EPA accredited program and certified in carrying out the specific abatement activities.  40 C.F.R. part 745, subpart L.  The Abatement Rule also establishes work practice standards for abatement activities.  *Id.*  EPA's abatement work practice standards require, among other things, that the entity performing lead abatement (*i*) notify EPA before any abatement activities are conducted; (*ii*) develop an occupant protection describing all measures and management procedures to be taken to protect building occupants from exposure to any lead-based paint hazards; and (*iii*) follow post-abatement clearance procedures, including random sampling of other residential units in a multi-family dwelling and the preparation of a final abatement report..  *See* 40 C.F.R. §§ 745.227(e)(1), (5)(i), (8), (9), (10).  The Abatement Rule further identifies practices and methodologies appropriate for use in the course of abatement, which provide instructions for notifying and warning residents, containing lead dust and debris, and cleaning the site after abatement.  *See* 40 C.F.R. § 745.227(a)(3) (incorporating, among other standards, those of the U.S. Department of Housing and Urban Development Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing, Ch. 12, *available at* https://www.hud.gov/sites/documents/ch12_abatement_121212.pdf).

### 4.     The Lead Disclosure Rule

52.     The Lead Disclosure Rule requires landlords—including public housing agencies—to provide tenants information about the presence of lead paint or lead paint hazards in

their apartments when they sign a new (or, in some cases, renewal) lease in most housing built prior to 1978.  24 C.F.R. part 35, subpart A; 40 C.F.R. part 745, subpart F.  The information that must be provided includes "any . . . information available concerning the known lead-based paint and/or lead-based paint hazards, such as the basis for the determination that lead-based paint and/or lead-based paint hazards exist, the location of the lead-based paint and/or lead-based paint hazards, and the condition of the painted surfaces."  24 C.F.R. § 35.88(a)(2); 40 C.F.R. § 745.107(a)(2).  It also requires landlords to provide tenants all records or reports regarding lead paint, including building-wide evaluations.  24 C.F.R. § 35.88(a)(4); 40 C.F.R. § 745.107(a).

**B.     For Years, NYCHA Has Failed to Comply With Key Lead Paint Safety Regulations**

53.     NYCHA has repeatedly violated these key lead paint safety regulations.

54.     Although NYCHA has said publicly that lead paint was "not widely applied in NYCHA" or that "the vast majority of NYCHA developments do not have lead paint," this is simply untrue.  NYCHA's own documents show that, in fact, more than half of NYCHA's developments have lead paint somewhere, and at least 92 developments have lead paint in apartment units.  NYCHA has found lead paint on walls, floors, ceilings, windows, doors, radiators, pipes, and other locations within apartments.

55.     In the early 2000s, NYCHA conducted lead paint inspections throughout the many developments built before lead paint was banned in 1978.  For each such development, NYCHA selected a random sample of apartment units to inspect and applied those results to other apartments in the development.  Based on this sampling method, NYCHA claimed that approximately 76,000 apartments in certain developments contained lead-based paint, and that others were lead-based paint free.  NYCHA further claims to have reduced the number of apartments containing lead paint from 76,000 to approximately 48,000 through inspections and abatements.

56.     However, there is ample reason to question NYCHA's determinations as to the number of units with lead paint.  Eight of the 19 children found by NYC DOH inspectors to have been exposed to lead paint hazards in NYCHA apartments between 2010 and 2016 lived in developments NYCHA had deemed to be lead free.  More recently, New York State health inspectors have found lead paint in at least three other developments NYCHA has deemed to be lead free.  And New York City's Department of Housing Preservation and Development has called into question NYCHA's claim that it confirmed the absence of lead paint in at least 4,000 NYCHA apartments.

57.     Even accepting NYCHA's numbers means that lead paint has been determined to exist, today, in approximately 51,000 apartments in at least 1,200 buildings in at least 92 NYCHA developments.[6]  Approximately 173,000 residents—including approximately 11,500 children under six years old—live in these developments.

58.     Peeling paint is pervasive in NYCHA developments.  NYCHA's data shows that in 2016 alone, residents logged more than 38,000 complaints related to paint and plaster issues at developments containing lead paint.

59.     In light of these facts, one would expect a heightened attention to lead paint safety at NYCHA.  But, to the contrary, NYCHA broadly fails to follow lead paint safety regulations.

60.     *Risk Assessment Reevaluations*:  Since at least 2010, NYCHA has violated HUD's requirement that it perform periodic risk assessment reevaluations of apartment units and common areas in developments containing lead paint.  24 C.F.R. § 35.1355(b)(4).  Under this requirement, NYCHA must have licensed or certified risk assessors inspect developments for lead paint hazards every two years and propose methods of containing or abating those hazards.  *Id*.

---

[6] The developments are listed in the attached Exhibit A.

The two-year cycle continues until a particular development is determined to be lead-based paint free or has two reevaluations in a row showing no lead paint hazards.  As a result of this two-year cycle, from 2010 to 2017, NYCHA would be expected to have conducted at least four risk assessment reevaluations in each of the at least 92 developments that NYCHA concedes contain lead paint in apartments, for a total of at least 368 risk assessment reevaluations.  But NYCHA conducted less than 25% of the required reevaluations in those eight years.  At 50 developments known to contain lead paint in apartment units, NYCHA conducted *zero* risk assessment reevaluations from 2010 to 2017.

61.     NYCHA's failure to conduct regular risk assessment reevaluations undermines the entire structure of HUD's lead paint safety regulations:  If a public housing agency does not immediately abate all of its lead paint and chooses instead to use temporary methods to prevent exposure, the public housing agency must closely monitor the lead paint to head off exposure risks.  NYCHA, however, ignores the risks and exposes its residents to lead paint.

62.     *Visual Assessments*:  Since at least 2010, NYCHA has also violated the regulations requiring it to have trained inspectors conduct annual visual assessments of every apartment unit and common area determined to contain lead paint to identify deteriorated paint, unusual amounts of dust, and paint-related debris on or around lead paint surfaces, as well as structural problems that may be causing those conditions.

63.     As with risk assessment reevaluations, visual assessments are critical to identifying and addressing lead paint hazards before a resident or employee is exposed.  And yet NYCHA deliberately disregarded this obligation year after year, putting residents at risk.

64.     Prior to 2012, NYCHA claims that it conducted visual assessments as part of its annual inspections of apartments.  However, those inspections did not include proper visual assessments for lead paint hazards as required by HUD regulations and related local laws.

65.     NYCHA concedes that it stopped performing even these annual inspections in 2012 and has yet to come into compliance with the visual assessment requirement.

66.     It was not until May 2016—half a year after this Office first sought information from NYCHA about its compliance with HUD's lead paint safety regulations—that NYCHA began conducting the visual assessments required by HUD's regulations.  Even then, NYCHA limited these visual assessments to approximately 4,200 apartment units where children under six years old lived, rather than inspecting all apartments determined to have lead paint, as required by HUD's regulations.  And NYCHA has since acknowledged that even this small number of visual assessments were conducted by NYCHA employees who were not trained to perform the inspections.

67.     Nonetheless, the results of NYCHA's partial 2016 effort at visual assessments demonstrate its overall failure to properly protect children from lead poisoning:  The 4,000 visual assessments in apartments NYCHA has determined to contain lead paint generated approximately 3,900 work orders for repairs of failing interim controls in approximately 1,500 apartments inhabited by children under the age of six.  Approximately 2,200 of these work orders described surfaces that had "peeling, flaking, chalking, alligatored, [and] chipping [paint] or appeared to have been chewed on."  And roughly 600 of them were for "[d]oors and windows including frames molding and jambs" that were "sticking or rubbing together or have markings such as denting or chipping[,] indicating damage by repeated sudden force."

68.     In 2017, NYCHA performed visual assessments in almost 9,000 additional apartments.  More than 80% of these apartments were found to have potential lead paint hazards.

69.     *Lead-Safe Work Practices*:  Since at least 2010, NYCHA has violated HUD's and EPA's lead-safe work practice requirements, including requirements that NYCHA prevent residents from going into the work area; seal doors, windows, and vents with protective sheeting; and thoroughly clean the work area after the work has been completed.  24 C.F.R. §§ 35.1330, 35.1345(a), & 35.1350; 40 C.F.R. part 745, subpart E.

70.     NYCHA fails to comply with these requirements.  Instead, NYCHA sends workers into developments containing lead paint to demolish walls, scrape paint, clean mold, or perform other work that will disturb paint without even checking whether those surfaces contain lead. NYCHA does not consider whether those surfaces have lead paint before sending the workers; and it does not tell the workers about the surfaces that do have lead paint.

71.     Moreover, even if NYCHA gave its workers information about lead paint surfaces, the vast majority of workers could not make use of that information because they are not trained to use lead-safe work practices.  24 C.F.R. §§ 35.1330(a)(4) & 35.1350(d) (requiring trained workers or supervisors); 40 C.F.R. § 745.89(d)(1), 745.89(d)(2), 745.90(b)(2) (requiring certified renovators and trained workers).  NYCHA has no system in place to ensure that only trained workers are assigned to jobs requiring lead-safe work practices.  And until August 2017, NYCHA had last trained its workers on lead-safe work practices in 2008.

72.     As a result, maintenance work is routinely performed in developments with lead paint by NYCHA employees who do not know where the lead paint is.  Beyond that, even if they learned that a particular job involved a lead paint surface, few of them have been trained to handle the work safely.  At the Williamsburg Houses in Brooklyn, for example, where NYCHA's own

testing showed that 91 percent of all apartments tested have lead paint, there were 1,800 paint and plaster-related jobs in 2016 alone.  Yet only six percent of the workers performing this work were trained in lead-safe work practices.  Similarly, at the Bronx River Houses, where 98 percent of apartments tested have lead paint, there were nearly 1,900 paint and plaster-related jobs in 2016, only twelve percent of which were performed by trained workers.  Similarly, at Harlem River Houses in Manhattan, where NYCHA itself concedes that there was "systematic application" of lead paint on walls and other surfaces, there were more than 700 paint and plaster-related jobs in 2016, only eleven percent of which were performed by trained workers.

73.     NYCHA's records show repeated violations of these regulations.  For example, at the Williamsburg Houses, which were built in the 1930s and where NYCHA believes that it is "likely" that apartment ceilings and walls (and other locations) contain lead paint, NYCHA sent a worker to paint a peeling kitchen ceiling in December 2016.  This worker was not trained in lead-safe work practices.

74.     And in Harlem River Houses, which were also built in the 1930s, NYCHA sends employees untrained in lead safe work practices to perform work on surfaces that NYCHA itself has acknowledged had "systematic application" of lead paint.  For example:

- In January 2016, NYCHA completed a work order that indicated that the entire bathroom required "demo[lition]" and painting in a Harlem River apartment.  NYCHA failed to use trained workers to perform the demolition and painting work on surfaces that NYCHA believes had "systematic application" of lead paint.

- In October 2015, NYCHA performed work in a Harlem River apartment that, according to NYCHA's work order database, required "demoli[tion]" and "paint[ing]" for plumbing repairs.  NYCHA did not use trained workers to perform any of the work, even though NYCHA's own testing shows that the walls demolished and repaired "likely" contained lead paint.

- In April 2015, NYCHA sent workers to a Harlem River apartment to repair a "badly damaged" bedroom wall that "likely" contained lead paint. None of the workers sent to repair the damaged wall were trained to perform the work.

75. NYCHA fails to comply with lead-safe work practices under the Lead-Safe Housing Rule and the RRP Rule in performing this work. As a result, on these and numerous other occasions, workers will have performed work without providing the necessary warnings to residents, preparing the worksite to protect residents against exposure, or performing safe work practices and necessary clearance procedures, and without having the appropriate training or (in the case of work covered by the RRP Rule) assigning a certified renovator to direct the work.

76. *EIBLL Reporting*: NYCHA also violates the requirement that it "report each known case of a child under [the] age of six with an environmental intervention blood lead level" to HUD. 24 C.F.R. § 35.1130(e)(2). From at least 2010 until 2016, NYCHA failed to provide HUD *any* information regarding children living at NYCHA with EIBLLs, despite the existence of numerous such cases.

77. From 2010 until 2015, NYC DOH informed NYCHA of at least 68 children living in NYCHA with elevated blood lead levels. Because NYC DOH's age and blood lead level criteria for reporting lead poisonings differ from HUD's reporting criteria, the fact that NYC DOH reported these 68 cases to NYCHA does not automatically mean that NYCHA was obligated to report them all to HUD. But NYCHA could have sought additional information from its own files or from NYC DOH to ascertain which of the 68 cases of lead poisoning NYCHA was required to report to HUD. NYCHA did not take that approach, nor did it attempt to determine whether it needed to report these poisoned children to HUD. Rather, NYCHA did not report these cases to HUD until after this Office's investigation began.

78.     *EIBLL Risk Assessments*:  NYCHA has also violated HUD's (pre-July 2017) requirement to conduct a risk assessment of a development that was previously assumed to be lead-based paint free if a child with an EIBLL is found in an apartment in the development with lead paint hazards.  24 C.F.R. § 35.1130(f).  The reason for this requirement is obvious:  the lead poisoning of a child and identification of lead paint hazards in that child's apartment demonstrate that the development does, in fact, have lead paint and lead paint hazards.

79.     Of the children with EIBLLs between 2010 and 2015, at least four lived in developments that NYCHA has determined to be lead-free.[7]  None of these developments has had a subsequent risk assessment performed.  Thus, NYCHA has continued to treat these four developments as if they are lead paint free and lead paint hazard free, when the evidence shows they are not.

80.     *Lead Abatement:*  NYCHA also fails to comply with the Abatement Rule, including by failing to employ lead safe work practices in the course of abatement work.  On multiple occasions, NYC DOH inspectors have observed "[abatement] work being done unsafely," and uncontained "visible construction dust or debris" at NYCHA.  And on one occasion, a NYC DOH inspector noted NYCHA's failure to follow lead abatement practices, even when NYCHA workers refused to allow access to the apartment.  In March 2015, a NYC DOH inspector visited an apartment undergoing abatement in the Sumner Houses, a development that contains lead paint inside apartments, including on walls.  The inspector noticed ongoing construction work, but NYCHA workers "wouldn't allow her in, even after she identified herself and showed her badge and [identification]."  Still, the NYC DOH inspector was able to "observe[] no safety rules being followed," including "no warning signs posted" and "no proper . . .

---

[7] These developments are listed in the attached Exhibit B.

enclosure[s]."  She also observed "stripped paint shavings on the floor which had no plastic

covering."  When NYC DOH followed up with a senior NYCHA manager, the manager

suggested that the inspector may have been denied access because the inspector did not have her

own safety equipment.  But the inspector did not accept that explanation: "I highly doubt myself

that it was a safety issue, as the workers made no mention of it.  I just think they (NYCHA) had

enough time to think about it and come back with a plausible rebuttal.  It's all a learning

experience!!!!!!"

82.      *Disclosure of Lead Information*:  Although NYCHA developments do make some

of the disclosures required by the Lead Disclosure Rule, NYCHA management knows that they

do not consistently comply fully with the regulation.  24 C.F.R. part 35, subpart A; 40 C.F.R. part

745, subpart F.  For example, before one HUD inspection, NYCHA managers discovered an

entire development without the required documents.   NYCHA management has also found that

the developments generally fail to maintain and disclose risk assessment reevaluations reports as

required.

82.      *Public Health Consequences of NYCHA's Violations.*  NYCHA's violations have

serious public health consequences.  At least 19 children had elevated blood lead levels while

living in NYCHA apartments found to have lead paint hazards.  But this number understates the

true extent of the harm likely caused by NYCHA's violations.

83.      NYC DOH's data shows that many hundreds of additional children living in

NYCHA housing have been found to have blood lead levels of 5 micrograms per deciliter or

more.  Studies have found that blood lead levels of even 5 micrograms per deciliter in children are

associated with brain function deficits, including learning disabilities and behavioral problems.

Indeed, 5 micrograms per deciliter is the current reference level at which the Centers for Disease

Control and Prevention recommends public health actions be initiated.  However, NYC DOH generally has not conducted environmental investigations for blood lead levels below 10 or 15 micrograms per deciliter (depending on the child's age), nor has it reported such cases to NYCHA; as a result, neither NYCHA nor NYC DOH has investigated whether the vast majority of children with elevated blood lead levels were exposed to lead paint in their NYCHA apartments.

84.     Between 2010 and 2015, NYC DOH identified 202 children living in NYCHA with elevated blood lead levels of 10 micrograms per deciliter or more.  NYC DOH inspected the homes of 121 of these children, and did not inspect the homes of 81 of these children.

85.     Of the 121 children with elevated blood lead levels whose homes were inspected, NYC DOH found peeling lead paint in the homes of 68 children, and issued corresponding orders to NYCHA to abate the lead paint.  But it is NYCHA policy to contest each and every NYC DOH order to abate lead paint.  NYCHA's process for contesting the lead paint finding is to send its own employees to retrieve a sample of the paint that NYC DOH identified to be positive for lead, and send that sample to a third-party laboratory to test for lead.  As a result of this contestation process, NYC DOH retracted its findings of lead paint in the NYCHA homes of 50 children, leaving 18 confirmed cases.  In 2016, NYC DOH confirmed one more case.

86.     Success in the contestation process does not answer the question whether the child was poisoned by lead paint in the home.  For example, one lead poisoned child lives in Red Hook Houses in Brooklyn.  In July 2013, the child was found to have a blood lead level of 12 micrograms per deciliter at the age of four.  When NYC DOH inspected the child's NYCHA apartment, it found four wall surfaces with disturbed paint that tested positive for lead.  NYC DOH also "observed a huge hole on wall #4 of the apt foyer and wall #2 of the kitchen with

25

severe chipping paint resulting in gross dust from the paint." NYC DOH noted that the "holes in the walls and severe chipping paints [were] the result of a burst pipe in the wall," which "was fixed but not the holes." (During the same inspection, NYC DOH observed "an infestation of roaches in every room of the apartment.") Approximately a week later, NYC DOH issued an order requiring NYCHA to abate the lead paint.

87. However, consistent with NYCHA's policy to contest every NYC DOH order to abate lead paint, NYCHA immediately contested NYC DOH's testing results. NYCHA conducted its own testing, which showed results contradicting NYC DOH's. Ultimately, NYC DOH agreed to withdraw its order to abate. But in a follow-up inspection, NYC DOH again found that the child's apartment contained lead "exceeding allowable limits," this time as revealed by dust wipes. NYCHA was ordered to "immediately remove such nuisance" by cleaning the dust off the surfaces. One week later, NYCHA complied.

88. For yet another reason, these numbers likely understate the number of affected children at NYCHA. NYC DOH's information comes from doctor reported blood lead test results. And according to NYC DOH's data, only fifty-one percent of children in New York City receive lead testing at the recommended ages of one and two. Even those tests would not identify a child exposed to lead paint for the first time at three years old, when exposure can still cause irreversible brain damage.

89. Whether the total is 19 poisoned children or a larger number, it is critical that NYCHA comply with applicable lead paint regulations to protect the public health, a fact well known to NYCHA's management. As a NYCHA executive explained in an email expressing concern about delay in commencing NYCHA's visual assessments:

> [A]ny delay to make safe an [apartment] that has a child under 6 and we have
> identified a potential hazard leaves us open to possibly extend an exposure period
> that we can remediate relatively simply.

90.     He added, recognizing not just the potential health consequences but also how the

public would view the moral gravity of the situation:

> If [the press] show up and the resident shows a surface with defective paint, that we
> have already identified as such, then shows a disclosure stating that the failed
> coating is presumed to contain lead but we are waiting before we remediate to do
> further testing knowing a child resides in the apt, we are toast.

## C.     NYCHA Has Repeatedly Made False Statements to Cover Up Its Failure to Follow Lead Paint Safety Regulations

91.     NYCHA has repeatedly made false statements to HUD and the public about its

failure to comply with federal law mandating lead paint safety.

92.     Every year since at least 2010 through 2016, NYCHA has submitted certifications

to HUD stating that NYCHA will comply with HUD's lead paint safety regulations.  Moreover, in

the same certifications and other filings with HUD, NYCHA asserts its compliance with all

applicable HUD regulations, including both the lead paint safety regulations and the "decent, safe,

and sanitary" regulation that incorporates the lead paint requirements.  In addition, every year,

NYCHA submits a statement to New York City for inclusion in New York City's Consolidated

Plan to HUD, falsely stating that "NYCHA complies with Federal, State, and City regulations

concerning lead and executes HUD directives regarding lead-based paint (LBP)."  It has made

similar statements in response to outreach from HUD.

93.     But NYCHA has been in violation of the regulations all along, and NYCHA

managers knew it.

1.      **NYCHA's Senior Operations Managers Were Aware That NYCHA Violates HUD's Lead Paint Safety Regulations**

94.      High-level NYCHA officials were aware that NYCHA was not in compliance with HUD's lead paint safety regulations.

95.      *Risk Assessment Reevaluations*.   NYCHA senior Operations managers have known for many years that NYCHA is in violation of the risk assessment reevaluation requirement:  In 2011, an email between two senior Operations managers explained that although risk assessment reevaluations are "supposed to take about 2 years between cycles, with staffing and contractor issues that has historically not been possible."  At that time, one of these individuals relayed the information to a more senior NYCHA executive.  Approximately, one year later two NYCHA senior Operations officials again discussed NYCHA's failure to conduct required risk assessment reevaluations.  In 2016, a NYCHA executive raised the issue again with another senior executive, telling him that NYCHA was not conducting risk assessment reevaluations as required, and requesting funding to conduct additional reevaluations.  But the funding request was denied, allowing matters to get worse.

96.      *Visual Assessments.*   NYCHA senior Operations managers have also been aware that NYCHA was failing to conduct visual assessments for lead paint, which in many cases are required under both HUD regulations and City law.  A NYCHA executive has acknowledged that he was aware as early as 2013 that NYCHA was failing to conduct required visual assessments, and that he raised the problem with the senior executive to whom he then reported.  Separately, internal NYCHA emails from 2015 show that NYCHA considered—but rejected—conducting visual assessments in a pilot inspection program.  In July 2015, an email was sent to NYCHA Operations executives and senior managers by a NYCHA manager with the subject line "Apartment Inspections – Need to incorporate Lead."  The email "remind[ed] everyone" that

"while we agreed" that "we would not concern ourselves" with lead inspections required by City law in connection with rolling out a pilot program of Operations Department inspections at that time, "we said . . . when we build out the [inspections] program, we would incorporate this need."

97.     Approximately nine months later, the NYCHA Chair learned that NYCHA had failed to perform the visual assessments required under local law, and thereafter learned that NYCHA's failure violated federal law.

98.     NYCHA did not begin conducting visual assessments in apartments determined to contain lead paint until May 2016, and still has failed to conduct even one visual assessment at tens of thousands of covered apartments.

99.     *Lead-Safe Work Practices*.  NYCHA managers were also aware that NYCHA was in violation of HUD's lead-safe work practices requirement.  Senior NYCHA officials knew that NYCHA never had—and still does not have—a system to notify maintenance workers when their work would impact lead paint surfaces, triggering the need for lead-safe work practices.  In 2015, for example, at least two NYCHA officials considered sending lead paint information to those developments with widespread lead paint, but did not do so.  Additionally, on at least two separate occasions, senior NYCHA personnel discussed the possibility of integrating information about the location of lead paint into NYCHA's maintenance work order systems, but this was not done.

100.     Beyond that, NYCHA management knew that even if it notified workers about the presence of lead paint, few workers had been trained on lead-safe work practices.  Before this Office's investigation began, the last time NYCHA had trained a significant number of workers to follow lead-safe work practices was in 2008.  At least two senior Operations officials knew that this shortfall of trained workers grew more extreme with the passage of time.  Indeed, in a May

29

2016 email, one senior NYCHA manager overseeing properties in Brooklyn advised a NYCHA senior Operations executive that "there [were] only 33 paint[ers]/paint supervisors trained in lead safe practices" working in Brooklyn developments—developments in which NYCHA had determined that at least 12,000 apartments could contain lead paint.

101.    *Children with Environmental Intervention Blood-Lead Levels.*  Senior NYCHA managers also knew that NYCHA was required to report children with environmental intervention blood lead levels to HUD and that it was not doing so.  Between 2010 and 2013, NYCHA received at least 54 violation notices from NYC DOH informing NYCHA that children living in NYCHA apartments with deteriorated lead paint tested positive for high concentrations of lead.  Though there are technical differences between NYC DOH's and HUD's thresholds for reportable lead levels, NYCHA took no steps to determine which of these children met HUD's reporting thresholds.  NYCHA failed to report any to HUD.  Further, when HUD asked NYCHA in 2013 to provide the number of children with environmental intervention blood lead levels living in NYCHA housing, NYCHA failed to provide any information.  In fact, NYCHA did not send HUD any information about children with elevated blood lead levels until after this Office's investigation began.  In addition, a NYCHA senior Operations manager admitted in a 2017 interview that he knew that, under the regulations, NYCHA was required to conduct a new risk assessment reevaluation in developments thought to be lead-free if a child with an environmental intervention blood lead level was exposed to a lead paint hazard in that development.  NYCHA should have conducted risk assessment reevaluations in at least three NYCHA developments where children with environmental intervention blood lead levels lived.  To date, it has failed to do so.

102.    *Disclosure of Lead.*  Senior NYCHA managers also knew that NYCHA was deficient in complying with the Lead Disclosure Rule.  When HUD asked to visit a development to check its "lead disclosure documents" in 2010, NYCHA Operations staff decided they should "pick a small development . . . managed well."  They picked the Straus Houses, and a senior Operations manager asked that someone "reach out to [the development's] Manager and have a staff member go over the documents they should have on hand and in the residents folders," emphasizing that "everything as far as lead must be on point."  But it was not.  Another senior Operations manager reported that "none of the resident folders had [lead paint] acknowledgement forms or any other [lead paint] info within."  Similarly, in 2013, in preparation for another HUD inspection, a NYCHA manager requested that NYCHA's Lead Paint Program Unit provide the developments with copies of the latest risk assessment reevaluation report, even though the developments should have had such documents on site and made them available for review in connection with disclosures.  As a senior Operations manager explained, "[u]nfortunately, nobody ever keeps [the risk assessment reevaluation reports] like [they are] supposed to."

**2.    NYCHA Repeatedly Made False Statements About Lead Paint**

103.    With full knowledge of NYCHA's violations of HUD's lead paint safety regulations, NYCHA has repeatedly made false statements to HUD and the public.

104.    Every year, since at least 2010 and through 2016, NYCHA has submitted certifications to HUD falsely representing that NYCHA "will comply with [federal lead paint safety regulations]."

105.    In 2015 and 2016, NYCHA found itself under intense scrutiny, after public reports of a young girl living in NYCHA housing with dangerously high levels of lead in her blood stream, the crisis in Flint, Michigan, regarding the presence of lead in the water, and this Office's

investigation of lead paint issues at NYCHA.  Instead of putting systems in place to protect residents from lead exposure, NYCHA opted to falsely reassure HUD and the public.

106.    For example, on April 17, 2015, in response to news articles about a lead-poisoned toddler living in NYCHA housing, NYCHA managers drafted a letter on behalf of NYCHA's Chair to elected officials in New York City, falsely stating that "NYCHA pays close attention to lead paint risks" and that NYCHA "complies with Federal, State, and City regulations concerning lead."  This same letter was sent to resident leaders in NYCHA developments.  At that time, at least two of the senior Operations managers involved in drafting the letter to elected officials and residents knew that NYCHA had long failed to conduct mandatory visual assessments of apartments presumed to contain lead paint.

107.    The following month, NYCHA and NYC DOH held meetings with residents and NYCHA employees.  The NYCHA presentation, drafted by high-level NYCHA officials, told residents and NYCHA employees that the "vast majority of NYCHA developments" do not have lead paint and that NYCHA takes "extra safeguards" in the developments that do.  At that time, at least two senior NYCHA managers involved in drafting the presentation knew that more than half of NYCHA developments had been confirmed to have at least some lead paint on the premises, and roughly thirty percent of those NYCHA developments had been confirmed to have lead paint in apartments.  The senior NYCHA managers also knew that NYCHA had failed to perform annual visual assessments and risk assessment reevaluations for years.

108.    On August 31, 2015, NYCHA submitted to HUD, via New York City's 2014 Consolidated Plan, a statement drafted by senior NYCHA officials that "NYCHA complies with Federal, State, and City regulations concerning lead and executes HUD directives regarding lead-based paint (LBP)."  At that time, the senior NYCHA officials who drafted NYCHA's statement

of compliance knew not only about the lack of visual assessments and risk assessment reevaluations, but also that NYCHA was assigning untrained maintenance workers to disturb lead paint surfaces without telling them that there was lead paint or that they were required to use lead-safe work practices.

109.    On October 12, 2015, NYCHA submitted to HUD its certification falsely representing that NYCHA "will comply with [federal lead paint regulations]" and currently is in compliance with applicable regulations.  At that time, senior NYCHA officials knew not only about the noncompliance with respect to visual assessments and risk assessment reevaluations and lead-safe work practice requirements, but also that NYCHA often failed to provide residents with required disclosures regarding the existence of lead in their developments.

110.    In a February 2016 email, NYCHA management responded to lead-related questions posed by HUD, again falsely assuring HUD that NYCHA "complies with Federal, State, and City regulations concerning lead paint hazards and executes HUD directives regarding lead-based paint."

111.    On March 28, 2016, after this Office's investigation of lead paint issues at NYCHA became public, the NYCHA Chair testified before the New York City Council that NYCHA regularly conducted inspections of apartments with lead paint as required by New York City law.  At the time of these statements, at least two NYCHA executives knew that, for many years, NYCHA had failed to conduct visual assessments (as required by HUD or by local law) or risk assessment reevaluations as required by HUD's regulations.

112.    On June 12, 2016, NYCHA and NYC DOH issued a joint press release titled "Lead-Based Paint and New York City Housing Authority (NYCHA): Facts."  This press release falsely stated that NYCHA has done "rigorous work" to "remediate any lead-based paint

whenever [NYCHA] find[s] it."  It further stated that NYCHA "performs annual inspections of units for lead-based paint," without disclosing that those inspections had just started the month before.  In addition to these false and misleading statements, NYC DOH added its own "fact": "Prevention and abatement efforts at NYCHA properties are an unqualified success."  At that time, senior NYCHA officials knew that NYCHA had failed to conduct mandatory visual assessments under federal and local law.  In addition, senior NYCHA officials knew that NYCHA's prevention efforts were far from "success[ful]."

113.    In September 2016, NYCHA made a presentation to senior HUD management addressing lead paint at NYCHA.  During that presentation, NYCHA finally admitted that it had failed to conduct annual visual assessments of NYCHA apartments with lead paint.  However, NYCHA failed to disclose its other violations of HUD's lead paint safety regulations.  Instead, NYCHA continued minimizing the problems, falsely telling HUD that "[o]nly two developments (less than .0001% of sample) have lead-based paint on the walls," when NYCHA's own data reveals that more than 25 developments have tested positive for lead paint on walls.

114.    On October 12, 2016, NYCHA again falsely certified to HUD that NYCHA "will comply with [federal lead paint safety regulations]."

115.    And on December 16, 2016, NYCHA again submitted a statement to HUD in a New York City Consolidated Plan that falsely stated that "NYCHA complies with Federal, State, and City regulations concerning lead and executes HUD directives regarding lead-based paint (LBP)."

116.    All of these statements by NYCHA were false:  Lead paint exists at hundreds of NYCHA developments; NYCHA does not have the procedures in place to monitor lead paint hazards; NYCHA has failed to disclose important information to HUD, its residents, and the

public about lead paint hazards at the developments; and NYCHA was violating core provisions of federal lead paint regulations even as it was making the false statements.

117.    NYCHA's repeated false statements about its lead compliance allowed NYCHA to avoid HUD scrutiny and remain noncompliant for years.

### NYCHA COVERS UP ITS FAILURE TO PROVIDE THE DECENT, SAFE, AND SANITARY HOUSING REQUIRED BY LAW

118.    NYCHA's failure to comply with lead paint safety regulations is just one element of the environmental health crisis at NYCHA.  More broadly, NYCHA fails to provide "decent, safe, and sanitary" housing because of systemic lead-paint violations, pervasive mold, widespread lack of heat in winter, infestations of rats, mice, and roaches, and chronic elevator outages in high-rise buildings.  And NYCHA has concealed these conditions from HUD, by undermining HUD inspections and thereby rendering the inspection results unreliable.

**A.    Decent, Safe, and Sanitary Regulations**

119.    Public housing's central purpose is to provide decent, safe, and sanitary housing to lower-income families.  Therefore, Congress directed HUD, in the U.S. Housing Act, as amended, to promulgate "housing quality standards . . . that ensure that public housing dwelling units are safe and habitable."  42 U.S.C. § 1437d(f)(2).  HUD in turn imposed a core regulatory requirement that all public housing "be decent, safe, sanitary, and in good repair."  24 C.F.R. § 5.703 (the "decent, safe, and sanitary" regulations); *see also* 24 C.F.R. Part 902.  This requirement is also reflected in the Annual Contributions Contract that governs certain HUD payments to NYCHA.

120.    HUD regulations not only set an overarching mandate for "decent, safe, and sanitary" housing, but also impose specific requirements designed to protect the public health.  Among other things, housing agencies must:

35

- Comply with HUD's lead paint safety regulations.  24 C.F.R. § 5.703(f).

- Ensure that "dwelling units and common areas . . . have proper ventilation and be free of mold."  24 C.F.R. § 5.703(f).

- Prevent "infestation by rats, mice, or other vermin."  24 C.F.R. § 5.703(f).

- Maintain heating and elevator systems that are "functionally adequate, operable, and in good repair."  24 C.F.R. § 5.703(c).

121.    HUD conducts annual Public Housing Assessment System ("PHAS") inspections to assess physical conditions (and certain other matters) at housing agencies.  *See generally* 24 C.F.R. Part 902.  At large housing agencies, HUD inspects a randomly generated subset of apartments at each development, plus building common areas, and scores the housing agency based on its findings.  Excessive deficiencies can lead to adverse consequences ranging from more frequent inspections to the appointment of a receiver to take over the housing agency.  24 C.F.R. §§ 902.13, 902.73, 902.75, 902.83.

**B.     NYCHA Deceives HUD's Inspection Program**

122.    NYCHA is keenly aware that HUD is the principal agency funding NYCHA and may impose limitations on HUD funding if NYCHA fails to comply with applicable regulations. Moreover, HUD has the authority to appoint a receiver to replace NYCHA management. NYCHA's 2015 "NextGeneration" plan—a reform plan that nonetheless has failed to address core deficiencies in operations and environmental health—expressly acknowledges the potential for a federal receivership.

123.    In order to ward off consequences for failing to maintain proper living conditions, NYCHA management has repeatedly misled both HUD and the public regarding the true living conditions at NYCHA.

124.    A key way that NYCHA has deflected HUD scrutiny of its living conditions, since before 2010, has been to hide conditions from HUD inspectors.

### 1.    HUD's Public Housing Inspections

125.    Every year, HUD assesses living conditions at NYCHA through PHAS inspections.  HUD uses PHAS inspections as an important means to evaluate NYCHA's performance.  *See generally* 24 C.F.R. Part 902.

126.    PHAS inspections evaluate four components: NYCHA's physical conditions, financial condition, management, and capital funding.  The result of a PHAS inspection is a "PHAS score" of up to 100 points.  24 C.F.R. § 902.9.

127.    A housing agency's overall "PHAS score" is based on its separate scores for the four components of the PHAS inspection.  A housing agency's overall PHAS score, taken in combination with the housing agency's scores on the four separate components of the PHAS inspection, determines whether the housing agency will be designated as a "high performer," a "standard performer," a "substandard performer," or a "troubled performer."  24 C.F.R. §§ 902.9, 902.11.

128.    HUD gives the most weight to the physical conditions component of PHAS inspections.  24 C.F.R. § 902.9.  "The objective of the physical condition [assessment] is to determine whether a [public housing agency] is meeting the standard of decent, safe, sanitary housing in good repair."  24 C.F.R. § 902.20(a).  To achieve this, HUD inspects common areas and a sample of apartments at each NYCHA development or group of developments, generally every year.  24 C.F.R. § 902.22.

129.    A passing score on the physical conditions component is 60 percent, although higher scores can result in additional, positive consequences for NYCHA.  24 C.F.R. §§ 902.11,

902.25.  For example, low scores can result in HUD-imposed corrective action plans, whereas high scores can lead to relief from certain reporting requirements.  24 C.F.R. § 902.11.

130.    Each development has its own incentive to score as many points as possible.  If a property receives a physical condition score of less than 80 points, HUD will inspect the property again the following year.  But if a property scores between 80 and 90 points, HUD will inspect the property every two years.  And if a property scores 90 points or more, the property will skip two years of HUD inspections in a row.  24 C.F.R. § 902.13.

131.    NYCHA staff know that if they can find ways to earn extra PHAS points, then they can ward off further HUD scrutiny.  In one case, after a development passed its PHAS inspection, a Deputy Director emailed staff to congratulate them on a passing score.  Nonetheless, he instructed that they should look for any and all ways that the development might appeal to HUD to get back any points that were deducted during the inspection.  He added with emphasis: "[W]e only need two points back to get a year off [from inspection]."  Any extra points are also important to NYCHA as a whole, even if those points do not make the difference for the individual development, because each property's score will affect NYCHA's score overall, and may therefore affect whether NYCHA is classified as a high, standard, substandard, or troubled performer.  24 C.F.R. § 902.25.

132.    But HUD can only rely on the physical condition assessment process if housing agencies participate in good faith.  Thus, although NYCHA has been scored a "standard" performer since 2010, its score is not reliable because NYCHA has systematically deceived HUD's inspectors by concealing the true condition of NYCHA housing during those years.

**2.      NYCHA's Pre-PHAS "Magic"**

133.    Just before a PHAS inspection, NYCHA management and staff focus on maximizing PHAS scores.  Management circulates dossiers on individual inspectors to enable

staff to target the conditions for which each inspector is known to deduct points.  NYCHA diverts

"quality assurance" staff—typically responsible for verifying work after it is performed by

NYCHA maintenance workers—to scout for problems to be corrected at the to-be-inspected

developments.  And it shifts staff and resources from developments not scheduled for inspection

to perform emergency efforts to make the inspected developments "PHAS ready."

134.    In its PHAS preparation, NYCHA goes to great lengths to mask problems that

otherwise exist year-round.  The contrast is not lost on NYCHA residents.  In December 2015,

one NYCHA residents association complained to NYCHA after being told that it would take four

months to repair a broken door that the residents believed to be a fire hazard:

> Let's treat it like Phas and get a magic carpenter up there to change the door
> like we've been seeing since last week to fake for the inspector.  These actions
> show that management doesn't care about their residents unless it is an
> inspection, a special visit from downtown or a tragedy.

135.    Or, as a resident in Pomonok Houses put it in 2015, in an email forwarded to

NYCHA's senior management: "PHAS came and . . . just like children Pomonok hid[] all the

trash under the bed."

### 3.    NYCHA Hides Housing Conditions from Inspectors

136.    NYCHA's PHAS preparations include hiding conditions from inspectors.

137.    Some of the starkest misconduct occurs around leaks, a major PHAS point

deduction as well as a cause of mold, pests, and other conditions.

138.    For example, former NYCHA Directors in Brooklyn and the Bronx have

confirmed that development staff would shut off a building's water supply just before the PHAS

inspector arrived to inspect common areas in order to temporarily stop ongoing leaks that would

otherwise be visible.  Once the PHAS inspector left the building, the water supply would be

restored.  Deputy Directors at NYCHA knew of this practice.

139.    NYCHA uses other techniques to hide leaks as well.  When a standpipe began leaking two days before a 2013 PHAS inspection at the Frederick Douglass Houses, a NYCHA senior manager, copying a NYCHA administrator, pressed others at NYCHA on whether there was a "clamp or something we can put on this to cover up the leak."  Because the shape of the pipe would not permit a clamp, the NYCHA administrator suggested attaching a piece of insulation on the morning of the inspection to absorb the leaking water.  They ultimately decided to cover the pipe with material from an oil spill kit for the inspection.

140.    According to one former maintenance worker, the management at NYCHA developments would instruct workers to put tape over holes in pipes before the PHAS inspections, to prevent HUD from seeing the holes.

141.    During a 2013 PHAS inspection at a development in Brooklyn, a boiler room leak led to a 10-point deduction and a failing score.  A NYCHA manager in Brooklyn explained that the point deduction was just "[b]ad timing," because there was not much his staff "could have done to stop or hide it."  A senior Operations manager then forwarded this email to an Operations executive explaining: "FYI - Big hit that literally happened as the inspector was walking in.  Must have cleaned what was holding it together off."

142.    What is true of leaks is also true of ventilation:   NYCHA has made efforts to hide its ventilation problems from HUD inspectors, leading to better PHAS scores and depriving HUD of important knowledge relevant to mold and other living conditions.

143.    In 2014, when HUD was scheduled to inspect the Bronxchester development, managers focused on the fact that two roof fans were out of order.  To cover this up for the inspection, a senior manager proposed—in an email copied to a senior executive—that NYCHA "swap out 2 fans from [another development] for this Inspection."

144.    A former NYCHA Deputy Director explained a trick he personally used to make a broken-down roof fan appear to be functioning for a PHAS inspection:  He put a refrigerator motor inside the inoperative roof fan.  In this way, he fooled the PHAS inspector into thinking that the roof fan had a functioning motor.

145.    Beyond leaks and ventilation, NYCHA often covers up holes in walls and ceilings, which (in addition to being point deductions) are hiding places for cockroaches and other pests in apartments.  According to a former manager, it was a common practice to stuff holes in the walls with newspaper and cork and then paint over the holes, to conceal them from PHAS inspectors. A former NYCHA manager from Manhattan directed maintenance workers, in advance of PHAS inspections, to use a foam spray to disguise holes in the wall that needed plastering.

146.    NYCHA property managers often direct maintenance workers to *literally* cover up broken doors in common areas for PHAS inspections, according to one former property manager. That is, instead of fixing the door, the maintenance workers will remove it, cover the area with plywood, and paint over it, so that the inspector will not know that there is a broken door at all.

147.    In the same vein, a former NYCHA caretaker has explained how her superintendent would instruct staff before PHAS inspections to lock the doors of basement rooms with dangerous or unsanitary conditions and post a sign reading "Danger: Do Not Enter," to keep the inspectors out.  After the inspections were completed, the signs would be removed and staff would continue to use those rooms in carrying out their daily responsibilities.  Another former maintenance worker reported that NYCHA staff would build false walls out of a single layer of plywood to conceal dilapidated rooms from PHAS inspectors.

148.    Certain NYCHA staff openly discussed hiding conditions from PHAS inspectors. In 2013, a NYCHA superintendent emailed a group of NYCHA staff to say, "We're hiding four

big pails of oil behind your containers for our PHAS inspection today. We'll get them after it's

over." The superintendent then forwarded his email to a NYCHA senior manager, to request

assistance in eventually disposing of the oil.

    **4.**    **NYCHA Trains Its Staff to Undermine the PHAS Program**

149.    The intentional nature of NYCHA's misconduct with respect to the PHAS

inspection program is illustrated by the fact that NYCHA actually trained its staff on how to

deceive HUD inspectors. NYCHA's internal guidelines on PHAS inspections expressly

encourage staff to use subterfuge of this kind. For a decade, NYCHA provided its staff with a list

of "Quick Fix Tips" that served as a how-to manual for misleading inspectors.

150.    Many of NYCHA's "Quick Fix Tips" revolve around using paint and plywood (or

a 2x4 or cardboard) to cover over the problematic condition during the inspection. Thus, the

Quick Fix Tips include the following (all emphases added):

- **Ceiling Tiles:** Tiles, including those in community facilities, that are damaged or stained need to be replaced or painted. *Painted cardboard can be used instead.*

- **Drain Covers:** Ensure all drains and cleanout covers are in place. *Plywood cut and painted can be a good substitute.* Drill holes for drainage.

- **Fencing:** Missing fence sections are not deficiencies if there are no means to attach additional sections. *Remove brackets and any sign of attachment. A piece of 2x4 can be attached to the end and painted black if necessary.*

- **Mailboxes:** If any doors are missing, replace. *If parts are an issue, temporarily cover them up for the day.*

.

- **Improperly Stored Flammables:** Flammable aerosol cans should be placed out of sight. On the day of inspection, remove all gasoline powered equipment to an outside area.

151.     These "Quick Fix" materials were standard NYCHA guidance to staff for over a decade.  These techniques were included in annual trainings instructing NYCHA staff how to prepare for PHAS inspections.  Borough-level management circulated a link to these tips widely to development leadership in "Round Robin" emails.  Senior Operations managers were often copied on emails circulating information on the Quick Fix Tips.  Just before this investigation began, in 2015, a NYCHA borough director emailed the Quick Fix Tips to a senior Opreations executive and notified him that these tips would be sent to developments to "remind staff on how to correct/abate deficiencies."

152.     Indeed, NYCHA's "Quick Fix Tips" were long maintained on NYCHA's intranet as reference material for staff.  It was only removed in 2017, after this Office questioned senior NYCHA executives about the document in front of NYCHA's attorneys.

**5.     NYCHA Front-Runs Inspectors**

153.     In addition to concealing defects from HUD, NYCHA undermines the integrity of PHAS inspections by improperly sending personnel ahead of inspectors to repair deficiencies during inspections.

154.     For example, NYCHA sends teams of elevator mechanics to stay one step ahead of PHAS inspectors.  In a September 2013 email, an elevator supervisor confirmed to NYCHA's elevator chief that a "team [of elevator mechanics] ha[d] been instructed to stay one building ahead of the PHAS inspector, during the inspections."  The next year, a senior manager emailed a dozen NYCHA employees, including a senior Operations executive, that "the site team [of elevator mechanics] or assigned staff will lead the PHAS inspection team by 2 buildings to ensure no[-]service conditions are abated," to ensure no points were lost for elevators.  He went further, advising that "Mandated DOB [Department of Building] inspections will be rescheduled as not to impact scoring."  In 2015, two NYCHA managers, copying two other NYCHA executives,

reiterated that a "team of elevator mechanics should be on site for any unforeseen elevator outages" during PHAS inspections.

155.    Maintenance staff take the same approach.  One maintenance worker employed by NYCHA through 2016 explained that a maintenance worker would be given a single electric panel cover and tasked with running ahead of the inspector to fit that single cover on each uncovered electrical box before the inspector arrived.

156.    More broadly, NYCHA creates a culture in which staff feel compelled to obtain high PHAS scores, no matter the cost.  A senior NYCHA executive would monitor each development's PHAS scores and how scores change over time.  Managers and staff know that they are expected to address or cover up problems before the PHAS inspector arrives.  As one Borough Director instructed her borough's property managers and supervisors, in an email attaching the Quick Fix Tips:  "[Y]ou must take ownership in this process and understand that you are the development supervisors and are responsible for the outcome of these inspections."

## C.    NYCHA Fails to Provide Decent, Safe, and Sanitary Housing

157.    By subverting the PHAS inspection process, NYCHA has concealed from HUD its failure to meet the decent, safe, and sanitary requirement of 24 C.F.R. § 5.703 and other related requirements.  *E.g.*, Annual Contribution Contract § 5 (requiring NYCHA to develop and operating housing "in compliance with . . . all applicable . . . regulations").

158.    At NYCHA, lead paint safety rules are often violated.  Leaks are common and peeling paint frequently goes unaddressed.  NYCHA's own maintenance procedures often are not followed.  Many categories of repairs that should be quickly addressed instead take weeks or months.

159.    Serious public health problems abound, above and beyond those relating to lead paint:  Recurring mold growth infects thousands of apartments because of leaks and poor

ventilation, a particular health risk for residents with asthma.  NYCHA often fails to provide

sufficient heat in winter, leading to frigid indoor temperatures that threaten residents' health.  Pest

infestations are common, fostered by NYCHA's failure to fix leaks and provide basic sanitation,

again affecting tenants with asthma.  Elevators frequently fail to work, stranding elderly and

disabled tenants.

160.    NYCHA's failures have lead residents to unsafe self-help:  Residents scrape large

mold patches from their bathroom ceilings; use potentially dangerous pesticides; and heat

apartments with ovens or stoves.  They climb unlit, hazardous stairwells when the elevators do

not work.

161.    And NYCHA's problems with lead, mold, heat, elevators, and pests are not the

whole story.  In recent years, the New York City Department of Investigation has found that

NYCHA fails to properly conduct key safety checks of items like smoke and carbon monoxide

detectors in its apartments, and the New York City Comptroller has found that the majority of

NYCHA's playgrounds have "substandard and visibly hazardous conditions."  A March 2018

report by the New York State Department of Health found that 83% of inspected NYCHA units

contained a condition that could pose a health hazard to tenants.  All told, NYCHA does not

provide its residents with housing that is decent, safe, and sanitary.

### 1.    NYCHA Fails to Comply with Lead Paint Requirements

162.    As described above, NYCHA has systematically failed to comply with HUD's lead

paint safety rules, notwithstanding the "decent, safe, and sanitary" regulation requiring that

"housing must comply with all requirements related to the evaluation and reduction of lead-based

paint hazards."  24 C.F.R. § 5.703(f).

### 2.      NYCHA Has Widespread, Recurring Mold

163.    Mold often grows unchecked at NYCHA, notwithstanding HUD's requirement that public housing "be free of mold."  24 C.F.R. § 5.703(f).

164.    Mold at NYCHA is widespread.  From 2013 to 2016, NYCHA residents made between 18,000 and 28,000 complaints about mold growth every year, and that number has been generally increasing.  Nearly 28,000 mold complaints were made in 2016 alone.  And the mold growth in NYCHA units is substantial, according to NYCHA's own data.  Of the mold complaints between 2014 and 2016 for which size data is available, 60% involve mold growth covering 10 or more square feet, as confirmed by NYCHA's maintenance staff.  Nearly 300 mold complaints have involved mold growth covering more than 100 square feet, again, according to NYCHA employees.

165.    Mold threatens residents' health.  When mold grows in a home, it can release toxins and allergens linked to significant respiratory problems, including asthma attacks.  Asthma is also a significant public health problem for adults in NYCHA housing.  According to data from NYC DOH, between 2012 and 2014, the rate of asthma hospitalizations for NYCHA residents aged 20 and above was four times higher than for the rest of New York City.

166.    Mold grows where there is sustained moisture, which is endemic at NYCHA as a result of leaks, flooding, and poor ventilation.  From 2013 to 2016, NYCHA residents complained about flooding or leaks from ceilings, walls, and pipes between 117,000 and 146,000 times each year, and again, those numbers have been increasing.  Ventilation at NYCHA is often broken, shut off, or too weak to be effective, leaving interior rooms unable to vent moisture.  According to NYCHA's own records, where such data is available, roughly 3 out of every 5 mold complaints are caused by leaks and poor building ventilation.

167.    One example of how mold and leaks affect residents is the case of a tenant from the Sheepshead Bay Houses.  This resident, who has three children—two of whom have been diagnosed with "persistent asthma"—had complained to NYCHA about mold and leaks numerous times between June 2013 and February 2015.  Yet NYCHA had denied the resident's request that her family be transferred to a new apartment as a reasonable accommodation based on her children's asthma.  A NYCHA staff member visited this resident's apartment in February 2015 and confirmed the presence of "mold and mildew throughout her apartment."

168.    In another instance, a family in the Long Island Baptist Houses experienced repeated leaks and mold, with over a dozen mold growths from 2013 to 2017.  The family repeatedly complained to NYCHA, which recorded numerous work orders with descriptions like "flooding" and "constant leaking," including one from November 2016 for "roof leaking above." But the problem was not addressed, and in 2017, the ceiling in the bathroom collapsed, the result of years of water damage.

169.    No one should have to live with mold like what NYCHA maintenance workers recorded in this apartment:



170.    Nor the mold recorded in this NYCHA unit:



171.    Worse, NYCHA has often proven unable to eliminate mold in response to

residents' complaints.  Although NYCHA eventually cleans the mold from the walls, the mold

grows back in many cases because NYCHA does not successfully address its root causes.  More

than 30% of the time, mold growth returns after NYCHA claims to have addressed it.

172.     Because of NYCHA's failure to adequately address persistent mold in NYCHA apartments, NYCHA residents are forced to try to fix even serious mold problems themselves. For example, one resident in the Baruch Houses reports that, for years, he has cleaned large patches of mold off his grandmother's bathroom ceiling every six months, but the mold always reappears.

173.     NYCHA's failures persist despite a 2014 settlement of a federal class action lawsuit brought by NYCHA residents with asthma, *Baez v. NYCHA*, No. 13 Civ. 8916 (WHP) (S.D.N.Y.).  As a term of this settlement, NYCHA committed to taking several steps intended to remediate the mold problem in NYCHA housing, including a promise that NYCHA would remediate mold growth within specified timeframes.  NYCHA touted its new mold efforts and claimed to be complying with the new mandated timeframes.  But in fact, NYCHA was just using misleading metrics to make it appear that NYCHA was in compliance.  Instead of reporting how long it took for NYCHA to remediate a mold problem, NYCHA broke up its remediation efforts into multiple subtasks, and then reported how long it took NYCHA, on average, to complete each subtask.  Since each mold remediation effort could require several subtasks, NYCHA's reporting made it appear that NYCHA was fixing residents' mold problems far quicker than it actually was.

174.     NYCHA failed to "compl[y] with the Consent Decree from the day it was entered," as the federal judge hearing the case subsequently found.  As he put it, "the attitude of NYCHA officials" toward its obligations under the Consent Decree "appear[ed] to be one of indifference."

175.     This attitude of indifference is apparent in NYCHA's handling of mold.  Residents report that NYCHA often closes mold work orders without ever addressing the mold problem.  According to former NYCHA maintenance workers, NYCHA regularly fails to repair broken roof

ventilation fans or turns off roof ventilation fans to save money.  And former maintenance workers report that NYCHA staff fail to address leak complaints where the leak is not apparent because, for example, it is no longer raining.

176.     NYCHA's top management knows that, despite the *Baez* consent decree, NYCHA is still failing to successfully control its mold and leak problems.  NYCHA concedes that mold returns in more than 30% of the apartments where NYCHA has responded to complaints.  In late 2015, NYCHA learned that a resident's bathroom ceiling had collapsed after months of persistent leaks.  A representative of City Hall asked by email, "How is this kind of thing still happening?" NYCHA's Chair agreed: "Ridiculous."

### 3.     NYCHA Fails to Provide Necessary Heat in Winter

177.     Apartment heating is essential in cold New York winters.

178.     HUD's "decent, safe, and sanitary" regulations require a public housing agency to provide a heating system that is "functionally adequate, operable, and in good repair," 24 C.F.R. § 5.703(c), (d)(1), and to comply with city building and maintenance codes related to heat, 24 C.F.R. § 5.703(g).  New York City long mandated that during winter, when outside temperatures fall below 55º during the day or 40º at night, NYCHA must maintain an indoor temperature of at least 68º during the day and 55º at night.  N.Y.C. Admin. Code § 27-2029(a).  Since October 2017, the standard has become even stricter overnight, requiring an indoor temperature of 62º at all times, regardless of outdoor temperatures.  N.Y.C. Admin. Code § 27-2029(a).

179.     NYCHA frequently fails to meet these standards.  At most NYCHA developments, the only record of apartment temperatures is created when NYCHA staff visit the apartment: They are required to manually record temperatures for each apartment they visit.  Although they mostly fail to do this, these employees have nonetheless recorded tens of thousands of heating violations between Winter 2011-2012 and Winter 2016-2017.  In fact, for nearly every day when

outside temperatures fell below 55° during the day, NYCHA employees recorded apartment temperatures below—and often five or ten degrees below—the legal minimum.

180.    At a handful of developments, NYCHA has collected more precise data, which confirms these violations.  At these developments, NYCHA has installed devices that electronically record temperatures every 15 minutes.  The resulting record is clear:  Of the approximately 2,800 apartments for which NYCHA provided comprehensive data for the winter of 2015-2016, at least 75% of apartments fell below legal limits at some point in the winter, and on average the apartments with violations fell below the legal limit on at least 21 separate days.

181.    Residents called in roughly 825,000 complaints of insufficient heat between 2011 and 2016.  In Winter 2015-2016 alone, nearly 43,000 residents called in more than 155,000 complaints of insufficient heat, with 25,000 residents having to call in a lack of heat at least twice.

182.    During the frigid weather between December 29, 2017, and January 8, 2018, thirty-two NYCHA developments had recurring heat outages.  More than 20,000 work orders for heating repair were generated by NYCHA during that ten-day period, with approximately one in four still unresolved as of January 8.  Many thousands of residents were impacted by NYCHA's inability to maintain this basic service when it was needed most.

183.    More than 323,000 residents—80% of the entire NYCHA population—suffered heat outages between October 1, 2017, and January 22, 2018, alone.  According to NYCHA, the average duration of these outages was 48 hours, a significant increase over the prior year.

184.    Lack of heat drives residents to unsafe self-help, including relying on ovens or stoves for heat.  For example, residents at 51 Manhattan Ave reported to NYCHA through their attorney that they were "sleeping with their gas ovens on for heat."  Another resident, at the Marlboro Houses, reports that her heat regularly does not turn on, even when the outside

temperature is freezing, and she routinely uses her stove to heat up her apartment.  Yet another resident at the Patterson Houses reports that she has many times left her oven on or boiled water for steam to heat her apartment.

185.    NYCHA's heat problems persist despite a 2015 lawsuit by New York City's Public Advocate challenging NYCHA's heating policies.  NYCHA settled the lawsuit in March 2016, offering some accommodations to the handful of residents who joined the Public Advocate in the suit, and otherwise falsely declaring that NYCHA's "heating policy at all times has complied with applicable law" and that "its procedures and practices for implementing the policy maintain or exceed the minimum temperatures the law requires."  As described above, NYCHA's own data show that these statements are false.

186.    Given this data, and residents' hundreds of thousands of complaints, NYCHA's top management is aware of NYCHA's persistent heating failures.  Moreover, NYCHA's heating department is beset by management and personnel problems.  In February 2017, NYCHA reported to this office that its Heating Service and Operation Department had to send disciplinary memos to more than 10% of its heating technicians over the preceding year, and during the same period it had demoted two heating managers and counseled another seven.

### 4.    NYCHA Fails to Provide Functional and Adequate Elevators

187.    In NYCHA's tall buildings, functioning elevators are essential; HUD's decent, safe and sanitary regulation requires them to be "functionally adequate, operable, and in good repair."  24 C.F.R. § 5.703(c).  But elevators at NYCHA are out of service far too often and far too long.

188.    Based on available outage data, NYCHA experienced an average of 94 outages per elevator between 2011 and 2016.[8]  More than one in eight of these outages lasted for more than 10 hours.

189.    In 2016, NYCHA elevators experienced an average of more than 13 outages per elevator.  Almost 40% of NYCHA residents live in buildings where an elevator was out of service more than 20 times in 2016.  The worst 20% of NYCHA elevators had 32 outages on average that year.  And the outage times are getting worse:  Over 20% of outages in 2016 lasted for more than 10 hours.

190.    Often, these outages take out of service the only elevator in the building, or all elevators in a building with multiple elevators.  In 2016, nearly 70% of NYCHA buildings with at least one elevator suffered through an outage during which all of the building's elevators were out.

191.    Not only are NYCHA's elevators often broken, but these breakdowns frequently occur when residents are *in* the elevators.  NYCHA work order data reflect that, in 2016, approximately 1,900 elevator outages involved a passenger who was stuck in the elevator during the outage.  It took NYCHA an average of two hours to resolve these situations, suggesting that many NYCHA passengers are stuck in elevators for significant periods of time.

192.    NYCHA management is aware of the disruption to residents' lives caused by the failure of its elevators.  For example, in 2016, a former resident of Holmes Towers whose family still resides there reached out to senior NYCHA management about "severe elevator issues" in that development.  The former resident reported that NYCHA had been "updating" its elevators in

---

[8] Because NYCHA's workorder data does not appear to clearly label all preventive maintenance for its elevators, and thus does not reflect all outages due to preventive maintenance, it is likely that the number of outages is even higher.

the building for several months, and the one elevator in service regularly broke down, forcing residents to choose between waiting "for hours in a lobby with no fan or air conditioning" or climbing the stairs.

193.    NYCHA's elevator failures are bad enough for any resident, but they are an extreme hardship for disabled and elderly residents.  For example, the president of a residents' association emailed NYCHA Operations executives and managers in 2013 reporting that a wheelchair-using senior resident at the Melrose Houses "was forced to sleep downstairs in her wheelchair [and] couldn't get home till Tuesday morning at 5:35 a.m."  This situation resulted from "a double header"—NYCHA's terminology for having all elevators in a multiple-elevator building down at once.

194.    In 2014, the residents' association president reported the same problem having hit his own family:  Copying senior NYCHA management, he wrote: "I think this is horrible that my family had to carry my little brother up 15 floors in a wheelchair" because of another double header.

195.    In 2015, a resident at the Carver Houses describes providing a fellow resident with water and a cool rag as they climbed the stairs to the fifteenth floor.  Three days later, the elevators were out of service again, leaving three elderly and one disabled resident stranded in the lobby.  In an email that reached a senior NYCHA Operations manager, the resident pleads, "[i]s there ever going to be any relief to this situation here once and for all"?  When the resident was finally informed that the elevators were restored, she wrote back that "some one higher up should see a bigger issue than just to send out repair men for what will become a TEMPORARY repair" and that "when shortcuts [are] taken [they] become dangerous to innocent people."  She pleaded

that NYCHA investigate the cause of the outages "and solve it once and for all" to ensure the safety of herself and her family.  This email, too, made its way to senior NYCHA management.

196.    Even when NYCHA tries to upgrade its elevators, it subjects residents to prolonged service outages.  For example, in 2017, the sole elevator in a building in the Betances development in the Bronx was taken out of service for a lengthy period of modernization.  During that period, a fifth-floor resident of that building, who has difficulty using the stairs, had to call NYCHA each time she needed to leave or come back to her apartment so that NYCHA could provide her with a stair climber to help her up and down the stairs.  As a result, this resident was only able to leave her apartment for pre-scheduled medical appointments.

197.    NYCHA's elevator maintenance problems have consequences.  In December 2015, an 84-year-old resident of the Boston Road Plaza senior building was killed by a NYCHA elevator malfunction.  Due to a breakdown of basic communication, NYCHA senior management did not even learn of the incident and investigate it until four days after it had occurred.  A New York City Department of Investigation Report found that the death resulted from, among other things, poor maintenance and a failure to respond adequately to a resident's report of the problem.

198.    Despite significant public pressure on these issues, including a September 2012 settlement of a lawsuit (*Brito v. NYCHA*, No. 09 Civ. 1621) in which NYCHA agreed to institute a series of changes designed to improve elevator maintenance and performance, NYCHA has not corrected its failure to provide reliable and safe elevator service to its tenants.

### 5.    NYCHA Fails to Address Rats, Mice, and Other Vermin

199.    NYCHA has been unable to prevent "infestation by rats, mice, or other vermin." 24 C.F.R. § 5.703(f).

200.    According to NYCHA's work order data, NYCHA residents reported more than 280,000 roach complaints from 2010-2016, more than 130,000 mouse complaints, and nearly

15,000 rat complaints.  An average of more than 19,000 apartments reported roach problems

every year, and an average of nearly 10,000 reported mice.  NYCHA residents in more than 1,900

buildings complained about rat problems in that same period.

201.    The problem at NYCHA is significantly worse than normal pest problems present

in other rental housing in New York City.  According to the Census Department's 2014 Housing

and Vacancy Survey, residents in 14% of NYCHA units reported seeing 20 or more cockroaches

a day.  That is more than three times the percentage for all renter-occupied New York City

housing.  The same study showed that more than a quarter of NYCHA units reported a rodent

infestation in their building.

202.    The problem is getting worse.  NYCHA's internal data shows that resident roach

complaints more than doubled between 2010 and 2016.  NYCHA's work order data also indicates

that the number of apartments reporting mice and rat complaints have been increasing since

2013.

203.    Pests harm residents' health.  Roach saliva and droppings exacerbate asthma; as

described above, asthma is widespread at NYCHA.  Mice and rats directly transmit diseases, and

their droppings can contaminate food and water supplies.

204.    NYCHA's pest problems stem from poor sanitation and waste management

(providing food for the pests); widespread leaks (providing water); and a failure to address holes

in apartment walls (providing access and safe havens).  NYC DOH has brought these issues to

NYCHA's attention.  For example, in March 2016, NYC DOH notified NYCHA of "very active

rat conditions" its inspector found at the Wise Towers in Manhattan.  The NYC DOH inspector

reported finding "rubbish," "debris," and "[m]any bags of garbage" contributing to a rat problem

evidenced by "rat droppings" and at least 29 "rat burrows" on the property.

205.     Modern pest management methods, known as "Integrated Pest Management" (or "IPM"), take these causes into account.  As a study co-authored by a NYCHA executive put it, IPM is "an approach that primarily involves improving sanitary and structural conditions to deny pests food, water, harborage, and movement."  These techniques have been shown to reduce pests, including in a major study performed in NYCHA buildings.  Yet NYCHA fails to apply IPM in a meaningful way.  Instead, trash is widespread; leaks are common; and holes in walls are frequently unaddressed.

206.     In an April 2015 e-mail, a NYC DOH inspector explained the consequences of NYCHA's failure to use pest management methods like IPM.  On of one of his field visits to a NYCHA development, the inspector found "newly installed cabinets" that "quickly became a beautiful rat condo" because the installation "left gaps and harborage for roaches."  As the inspector noted, the installation of the cabinets "was not preceded by a pest management visit" to address the roach infestation in the apartment, therefore "[t]he existing roach population had no trouble moving in."

207.     When extermination is required, NYCHA also often fails.  According to one former NYCHA employee who worked in NYCHA's extermination services group and ultimately ran that group, NYCHA's exterminators work in an environment of "chaos":  At times, they lack the appropriate pesticides to do their work because NYCHA fails to pay its suppliers and adequately stock necessary supplies; they fail to follow a systematic and efficient procedure for scheduling extermination appointments; and they are asked by senior management to deviate from set policies and procedures.

208.     For many developments, the presence of pests morphs into full-blown infestations. In 2016, the basement of the Patterson Houses was discovered to have a labyrinth of rat burrows

and dozens of rats beneath it.  Unfortunately, these issues are not confined to basements and

public spaces.  A 2012 work order described the residents of an apartment in the Randolph

Houses as "overcome by rats."  Another work order from 2016 included a quote from a resident

in the Marcy Houses: "Too many mice. They climb on my baby crib and I have an asthmatic child

and it affects him."

209.    Moreover, around 2012, NYCHA abandoned routine extermination services.  Once

the routine exterminations stopped, only tenants who called to complain about pest issues were

provided with extermination services; however, tenants were never informed that the routine

exterminations had been stopped and that they needed to call and complain to get extermination

services.  Pest infestations "exploded" as a result.  Despite the frequency of infestations, routine

exterminations were not resumed until at least 2016.

210.    Another former NYCHA exterminator, described a culture where exterminators

were directed to "fake it."  This meant that exterminators would sometimes spray water instead of

pesticides when the necessary pesticides were in short supply.  Exterminators would also close

out work orders as "tenant not home" without confirming that was the case when they were given

too many orders in one day.  These practices were known, sanctioned, and encouraged by the

exterminator's supervisor.

211.    In the absence of reasonable pest management by NYCHA, residents are often

forced to resort to pesticides and insecticides that they purchase on their own.  For example, a

2016 work order from a resident in Marlboro Houses reflects that the resident was buying

"poison" to address bedbugs and roaches and repeatedly sprayed the ventilation units himself.

When residents are forced to purchase and use their own pesticides, there is a significant risk that

these potentially dangerous chemicals will not be used properly or that illegal pesticides will be used.

212.    The core of the problem lies with the failure of NYCHA's management.  For example, in 2015, the Manhattan Borough President accurately summarized the rat problem at a press conference, saying that NYCHA "has no idea how to handle rats."  In a subsequent email between NYC DOH and City Hall, the NYC DOH Commissioner explained that the Borough President "may be right."  She emphasized that NYCHA has "challenges in waste management," and that "it is not easy to get [NYCHA's] 'rat reservoirs' under control."

213.    Indeed, NYCHA senior management know that NYCHA residents live with pests as a part of their daily life, those officials and managers often fail to take action, except in response to public criticism.  One apartment in particular caught the eye of senior NYCHA management after an inquiry by the Mayor's office and a State Senator's office due to a rodent infestation in the apartment.  The resident had requested a transfer to another apartment, which was rejected by NYCHA.  A few weeks later, during an apartment inspection, the resident's son showed the inspector a video of a rat in the apartment's bathtub, despite previous efforts at extermination.  The issue was ultimately elevated to a senior NYCHA executive, among others, because of prior "significant media coverage."

214.    Similarly, in February 2016, a senior NYCHA executive was made aware by email of a resident who had been living with a water bug infestation for two years.  The resident had "put in tickets just to have them route to another trade just to be told that they don't plaster pipes."  The resident was reportedly forced to "discard furniture[,] food[,] and clothing because these water bugs are nesting in everything."  In response, the NYCHA executive forwarded the email to senior Operations executives, noting her concern that "Greg got the same email"—presumably

Greg Smith, a New York Daily News reporter—before asking for an investigation into the complaint.

## NYCHA MADE FALSE STATEMENTS TO HUD AND THE PUBLIC TO AVOID SCRUTINY OF MAINTENANCE WORK ORDER BACKLOGS

215.    NYCHA also misled HUD and the public about its efforts to reduce its massive work order backlog.

216.    From 2010 through 2012, NYCHA faced sharp public criticism for its failure to perform needed repairs in residents' apartments.  Newspapers published articles describing "[i]nterminable delays for repairs," which had "become the rule for NYCHA's 400,000 residents," as the result of a "backlog of . . . repairs [that] is staggering."[9]  One article recounted the story of a "gaping hole in [a] 7-year-old[']s . . . bedroom wall," which NYCHA created in May 2010 to address a leak but then left open while it attempted to schedule an appointment for a plasterer to close the hole.  Because of NYCHA's "three-year backlog," the first available date for a plasterer was fifteen months later, in August 2011.[10]  In the meantime, the child's mother "worrie[d] every night about the stench of mold coming from the hole . . . [and] the danger of rats getting in . . . ."[11]

---

[9] Juan Gonzalez, *Gonzalez: NYCHA's new fix system is years behind*, N.Y. DAILY NEWS, July 23, 2010; Langnee Barron & Jake Pearson, *Tenants hammered by overdue city repairs*, N.Y. DAILY NEWS, June 20, 2011; *see also, e.g.*, Larry McShane, *Letter to Mayor Bloomberg last year warned of NYCHA's failures*, N.Y. DAILY NEWS, Aug. 2, 2012; Editorial Board, *Mike's blind spot*, N.Y. DAILY NEWS, Aug. 3, 2012; Greg B. Smith, *Fix it? Sure, by 2014*, N.Y. DAILY NEWS, Aug. 17, 2012; Greg B. Smith, *Two reports expose NYCHA dysfunction*, N.Y. DAILY NEWS, Aug. 17, 2012.

[10] Juan Gonzalez, *Gonzalez: NYCHA's new fix system is years behind*, N.Y. DAILY NEWS, July 23, 2010.

[11] *Id.*

217.    NYCHA's work order backlog—roughly 400,000 work orders on its books at the end of each year—was identified in the press as a cause of these living conditions.  Reporting on NYCHA's "staggering volume of open requests for repairs," the press described "housing developments [that] are overrun by rodents," "mold-riddled apartments" that caused NYCHA's children to suffer asthma at "nearly three times [the rate of children] in private family houses," and elevators that were inoperable "[e]very other day."[12]

218.    Public criticism intensified in the summer of 2012.  On August 1, 2012, the cover of the *New York Daily News* read "SACK THEM ALL," below photographs of NYCHA's then-Chair and three other board members.[13]  Politicians, including the New York City Council Speaker and a Congresswoman, joined the fray, calling for NYCHA to release a report it had commissioned that found a backlog of hundreds of thousands of work orders.[14]

219.    HUD, too, began pressuring NYCHA, insisting that NYCHA come up with a plan to address these problems.

220.    In the face of this public and regulatory pressure, NYCHA promised HUD and the public that it would make efficiency and productivity improvements to eliminate the backlog, and ultimately claimed to have done so.  Instead, a significant portion of NYCHA's backlog reduction involved simply moving needed work off the books—principally by unlawfully suspending all

---

[12] Greg B. Smith, *Two reports expose NYCHA dysfunction*, N.Y. DAILY NEWS, Aug. 17, 2012.

[13] Editorial Board, *NYCHA's entire board of John Rhea, Emily Youssouf, Margarita Lopez and Victor Gonzalez must go*, N.Y. DAILY NEWS, Aug. 1, 2012; Larry McShane & Greg B. Smith, *NYCHA board sitting on nearly $1B in fed cash*, N.Y. DAILY NEWS, Aug. 1, 2012.  (Cover image available at http://www.nydailynews.com/blogs/dailypolitics/bloomberg-hide-nycha-report-blog-entry-1.1691861.)

[14] Tina Moore & Greg B. Smith, *Make $10 Million report on NYCHA public, Council Speaker Christine Quinn says*,  N.Y. DAILY NEWS, Aug. 14, 2012; Celeste Katz, *Document Drop Plus: The NYCHA Report, The Daily News Investigation, And The Fallout*, N.Y. DAILY NEWS, Aug. 16, 2012.

annual apartment inspections for two years—and finding other ways to manipulate its work order numbers.

**A.     NYCHA Indefinitely Suspended Annual Inspections to Avoid Generating New Work Orders**

221.    Annual apartment inspections, by design, generate new work orders for repairs that the inspectors identify as necessary.  At NYCHA, approximately 170,000 work orders had been generated by annual inspections in 2011.  As of August 2012, NYCHA was on pace to generate even more work orders through inspections in 2012.

222.    To artificially reduce backlog numbers, in late August 2012 NYCHA executives indefinitely suspended all annual apartment inspections.  NYCHA specifically intended the suspension of inspections to avoid the creation of large numbers of new work orders, as well as to free up personnel to work on backlog reduction projects.  As a top NYCHA executive acknowledged  when this suspension of inspections was disclosed to HUD in 2016, the reason for the suspension was "putting too much focus on work order numbers."

223.    This indefinite suspension of inspections was unlawful.  The U.S. Housing Act requires that all public housing agencies "make an annual inspection of each public housing project to determine whether units in the project are maintained in accordance with" the requirement that apartments be decent, safe, sanitary and in good repair.  42 U.S.C. § 1437d(f)(3); *see also* 24 C.F.R. § 5.703.  This statutory requirement allows housing agencies some flexibility on *how* to implement apartment inspections—for example, they may choose to inspect a representative sample rather than every unit.  But it does not allow housing agencies simply to suspend all annual apartment inspections.

224.    HUD had issued guidance and reviewed these requirements with NYCHA just months prior to NYCHA's suspension of inspections, and—well aware of the requirements—one

NYCHA executive voiced concerns to others at NYCHA about the proposal to suspend annual inspections.  He advised NYCHA officials that any suspension longer than a few months would violate HUD's requirements.

225.    The suspension of annual inspections in fact lasted two years, until the summer of 2014.  As time passed, the NYCHA executive reiterated to higher NYCHA management his concern that NYCHA was in violation of the annual inspection requirement.  He was ignored.

226.    Through this decision to suspend annual inspections, between August 2012 and the end of December 2013—when NYCHA declared that its backlog reduction efforts had been successful—NYCHA in fact moved an estimated 200,000 work orders off its books based on its prior rate of generating work orders from inspections.  It did not disclose this fact to HUD or the public.

227.    Suspending inspections did not eliminate the need for the work that the inspections would have found.  Rather, it just allowed NYCHA to avoid documenting needed work in its work order system—until some later date when a resident complained about conditions or inspections resumed.  During that time, problems would get worse, become more costly to fix, or (as in the case of leaks and pests) spread into additional apartments.

228.    When NYCHA resumed apartment inspections in 2014, its backlog promptly began to rise again.

**B.    October 2012 and March 2013: NYCHA Misled HUD at Backlog Meetings**

229.    In 2012, the then-Secretary of HUD directed NYCHA's senior executives to travel to Washington to explain NYCHA's efforts to solve the backlog problem.  At the resulting meetings, NYCHA misled HUD as to its plans.

230.    On October 18, 2012, NYCHA presented its backlog reduction plan to HUD. NYCHA walked through its backlog reduction plan, showing slides setting out how NYCHA

planned to eliminate its backlog through "Productivity Improvement."  NYCHA listed six areas in which it would improve its capacity to complete work or increase its efficiency: materials, planning and scheduling, process improvements, staffing, communication, and performance management.  All of the "Productivity Improvement Drivers" listed involved increasing NYCHA's capacity to complete work or the efficiency with which it did so.  At no point did NYCHA advise HUD that NYCHA had indefinitely suspended apartment inspections, let alone that NYCHA had done so expressly to reduce the backlog by keeping needed work off the books or that this would be a major driver of its backlog reduction.

231.    In February 2013, NYCHA met with HUD's regional office to discuss its recently announced Work Order Backlog Reduction Initiative.  NYCHA described this Initiative in a press release as intended to "eliminat[e] the entire backlog of outstanding repair requests by the end of 2013" "[b]y [h]iring [m]ore [w]orkers and [i]mproving [e]fficiencies."  During its meeting with HUD, NYCHA explained that the Initiative was the same plan that NYCHA presented to HUD in October 2012.  Again, NYCHA did not disclose the suspension of annual inspections.

232.    In March 2013, during a telephonic meeting with HUD during which NYCHA touted its progress in reducing its backlog, NYCHA again failed to disclose the suspension of inspections.

## C.    NYCHA Changed its Rules to Close Work Orders Without Work

233.    Beyond suspending apartment inspections, in February 2013 NYCHA restored a prior policy that allowed NYCHA staff to close work orders by reporting that the resident was not home when the worker arrived to perform the maintenance work.  This action was taken on the recommendation of a NYCHA executive who explained in an email that the change was being made specifically to reduce backlog numbers.

234. This change allowed NYCHA to close nearly 200,000 work orders in 2013 because staff reported that the resident was not home. If not for the new policy, those work orders would have remained in NYCHA's system until NYCHA actually addressed the underlying problems, resulting in backlog numbers higher than those reported by NYCHA.

235. NYCHA did not disclose this change in methodology to HUD when claiming success in backlog reduction.

**D.   NYCHA Claimed to Have Achieved Meaningful Backlog Reduction**

236. Each month from March 2013 through November 2013, NYCHA issued press releases trumpeting its backlog reduction efforts and claiming that these efforts resulted from efficiency improvements at NYCHA. For instance, in its first release, on March 11, 2013, NYCHA reported that it had "reduced the number of open work orders from a peak of over 420,000 to less than 350,000" and claimed that this "reduction is a result of NYCHA's Action Plan to improve its efficiency in responding to maintenance and repair work orders."

237. Similarly, throughout 2013, NYCHA's senior management met with HUD to discuss its backlog reduction plans and progress, and provided HUD updates. Through these updates, NYCHA reported to HUD the monthly reductions in its backlog numbers. In these meetings, NYCHA did not disclose its efforts to artificially reduce its backlog numbers.

238. On January 2, 2014, after years of criticism from the public and HUD, NYCHA announced that it had "successfully reduced its backlog" from 423,000 open maintenance work orders to only 106,000 work orders. NYCHA claimed that this reduction "has positively impacted the conditions in which our residents live."

239. NYCHA also made statements to HUD in its 2014 and 2015 Annual Plans, linking its backlog reduction to efficiency improvements.

240.    In none of these statements did NYCHA disclose the suspension of inspections that had led to a significant portion of the claimed reduction, nor did it disclose the other devices it used to make its numbers artificially look better than they were.

## NYCHA MADE FALSE STATEMENTS ABOUT LEAD PAINT COMPLIANCE AND HOUSING CONDITIONS IN CERTIFICATIONS, CONTRACT AMENDMENTS, AND FUNDING DRAWDOWNS

241.    NYCHA made false statements to HUD multiple times each year when it falsely certified its compliance with HUD requirements.

### A.    False Certifications

242.    At least twelve times between 2010 and 2016, NYCHA submitted false certifications to HUD concerning housing conditions.

243.    Each certification was submitted as a mandatory part of a Five-Year Plan or Annual Plan package, which in turn are required submissions for all public housing agencies seeking HUD funding, or as part of an Amended Annual Plan package. *See* 42 U.S.C. § 1437c-1; 24 C.F.R. Part 903, Subpart B.

244.    These false certifications, contained in Form HUD-50077, include certifications dated October 14, 2010; October 14, 2011; October 15, 2012; October 11, 2013; July 24, 2014; October 16, 2014; and May 1, 2015; October 12, 2015 (two certifications); May 13, 2016; and October 12, 2016.

245.    Each of these certifications was false for multiple reasons.

246.    *First*, in each Form HUD-50077, NYCHA certified that NYCHA "will comply with the Lead-Based Paint Poisoning Prevention Act, the Residential Lead-Based Paint Hazard Reduction Act of 1992, and 24 C.F.R. part 35"—that is, HUD's lead paint safety regulations.

247. This statement was false. As described above, at all times since at least 2010, NYCHA has been out of compliance with nearly all of these regulations and statutes, and would not be in compliance going forward.

248. That NYCHA was out of compliance with lead paint regulations was known to senior NYCHA management at the relevant times, as detailed above.

249. *Second*, in each Form HUD-50077, NYCHA certified that NYCHA "is in compliance with all applicable Federal statutory and regulatory requirements." This incorporates HUD's core "decent, safe, and sanitary" regulation. 24 C.F.R. § 5.703.

250. This statement was false. As described above, at all times since at least 2010, NYCHA has been in violation of its obligation to provide "decent, safe, and sanitary" housing, including because of non-compliance with lead paint requirements; pervasive leaks and unchecked mold; inadequate heat in winter; widespread pest infestations; and failed elevator service. 24 C.F.R. § 5.703.

251. This non-compliance was known to senior NYCHA management, who also knew that the non-compliance was being covered up through, among other things, misrepresentations relating to NYCHA's maintenance backlog reduction and PHAS inspections.

252. *Third*, two of the certifications, dated October 11, 2013, and July 24, 2014, are false for the additional reason that NYCHA had stopped performing the annual inspections of its developments required by the U.S. Housing Act. 42 U.S.C. § 1437d(f)(3). As discussed above, NYCHA intentionally suspended compliance with this statutory requirement in order to generate artificial reductions in its maintenance work order backlog.

**B.     False Annual Amendments to the Annual Contributions Contract**

253. Each year, in order to obtain funding from HUD's Capital Fund Program, NYCHA enters into an amendment to its "Annual Contributions Contract" with HUD.

254.    The Annual Contributions Contract, or ACC, is a contract between NYCHA and the United States, acting on behalf of HUD.  The current version of NYCHA's ACC was entered into on April 12, 2005.  In the ACC, in exchange for HUD subsidies, NYCHA agrees to "develop and operate" its developments in compliance with all provisions of the ACC, as well as "all applicable statutes, executive orders, and regulations issued by HUD," specifically including the provisions of Title 24 of the Code of Federal Regulations.

255.    NYCHA regularly enters into amendments to its ACC to obtain Capital Fund Program grants.  These amendments are a critical step in requesting and receiving such grants.

256.    Between July 2010 and March 2016, NYCHA entered into approximately twenty such amendments to the ACC.  Pursuant to these amendments, over $2 billion in Capital Fund Program grants were paid to NYCHA.  NYCHA continued to enter into such amendments after March 2016, and will do so in the future.

257.    In each amendment, NYCHA represents that it will "continue to operate each development"—or in some of the amendments, synonymously, "continue to operate each public housing project"—as low-income housing "in compliance with" the ACC.  The ACC requires compliance with regulations, including Title 24 of the Code of Federal Regulations.  This, in turn, incorporates HUD's lead paint safety regulations and core "decent, safe, and sanitary" regulations.  24 C.F.R. § 5.703.

258.    In each amendment, NYCHA's representation is false.  As described above, at all times since at least 2010, NYCHA has been in violation of the lead paint safety regulations and its obligation to provide "decent, safe, and sanitary" housing.  Additionally, the ACC amendments between about August 2012 and summer of 2014 were false because NYCHA had stopped

performing the annual inspections of its developments as required by the U.S. Housing Act.  42 U.S.C. § 1437d(f)(3).

259.    As discussed above, NYCHA senior management, and others, knew about NYCHA's non-compliance.

## C.    False Representations Through Drawdown of Operating Funds

260.    HUD issues periodic Obligation Letters to NYCHA, which notify NYCHA that it can draw down the Operating Fund subsidies HUD has made available to NYCHA for that funding period.

261.    Each Obligation Letter states that "[a]ll funds must be used in accordance with the Annual Contributions Contract and associated laws and regulations," which, as described above, includes Title 24 of the Code of Federal Regulations.  Each letter also notifies NYCHA that "[b]y drawing down the funds obligated in this letter, [NYCHA is] confirming agreement and compliance with . . . all terms and conditions of the Operating Fund program," which includes, but is not limited to, the requirements of the U.S. Housing Act and the ACC.

262.    Each year, HUD issues multiple such Obligation Letters to NYCHA, pursuant to which NYCHA draws down Operating Fund subsidies.  In 2016 alone, HUD issued to NYCHA nine Obligation Letters that obligated to NYCHA over $7.3 million in funds.  NYCHA will continue to draw down funds pursuant to such Operating Fund Obligation letters in the future.

263.    Each time NYCHA drew down Operating Funds pursuant to these Obligation Letters, NYCHA falsely confirmed its compliance with the ACC and the U.S. Housing Act.  As described above, at all times since at least 2010, NYCHA has been in violation of the lead paint safety regulations and its obligation to provide "decent, safe, and sanitary" housing.  Additionally, NYCHA's confirmations of compliance when it drew down funds between about August 2012

and summer of 2014 were false because NYCHA had stopped performing the annual inspections

of its developments as required by the U.S. Housing Act.  42 U.S.C. § 1437d(f)(3).

264.    As discussed above, NYCHA senior management and others knew about

NYCHA's non-compliance.

### NYCHA CAUSED NEW YORK CITY TO MAKE FALSE STATEMENTS ABOUT LEAD PAINT COMPLIANCE IN ITS ANNUAL "CONSOLIDATED PLANS" SUBMITTED TO HUD

265.    Every year, New York City must submit a "Consolidated Plan" to HUD.  The

Consolidated Plan "serves as [New York City's] comprehensive housing affordability strategy,

community development plan, and submissions for funding" under certain HUD grant programs.

24 C.F.R. § 91.5.

266.    Every year from at least 2011 through 2016, NYCHA has submitted the following

false statement to New York City, which New York City then incorporated into its Consolidated

Plan and submitted it to HUD:

> NYCHA complies with Federal, State, and City regulations concerning lead paint hazards and executes HUD directives regarding lead-based paint (LBP). NYCHA identifies hazards posed by paint, dust and soil, and implements programs designed to control or mitigate such hazards safely and efficiently.

267.    These statements were submitted to New York City by or at the direction of

NYCHA officials, who knew at the time of their submission that the statements were untrue.

### CLAIM FOR RELIEF

### COUNT ONE: SUBSTANTIAL DEFAULT

268.    The United States repeats and realleges the allegations in paragraphs 1 through

267.

269.    As described above, NYCHA has violated HUD regulations including the Lead-

Safe Housing Rule, 24 C.F.R. Part 35, Subparts (B-R), and its obligation to provide "decent, safe,

and sanitary" housing, 24 C.F.R. § 5.703; has engaged in deceptive conduct with respect to PHAS inspections; and has violated applicable terms of NYCHA's Annual Contributions Contract.

270.    These violations of federal law and the Annual Contributions Contract constitute a substantial default by NYCHA with respect to the covenants or conditions to which NYCHA is subject. *See* 42 U.S.C. § 1437d(j)(3)(A).

271.    Accordingly, the United States is entitled to an order providing for injunctive relief and appointment of a monitor under 42 U.S.C. § 1437d(j)(3), to remedy NYCHA's substantial default with respect to covenants or conditions to which NYCHA is subject.

## COUNT TWO: ANTI-FRAUD INJUNCTION ACT

272.    The United States repeats and realleges the allegations in paragraphs 1 through 271.

273.    The Anti-Fraud Injunction Act, 18 U.S.C. § 1345, authorizes the United States to commence a civil action to enjoin any ongoing or impending violation of certain specified predicate offenses and for related relief.  These predicate offenses include 18 U.S.C. § 1001.  *See* 18 U.S.C. § 1345(a)(1)(A).

274.    NYCHA has unlawfully, willfully, knowingly, or acting with deliberate ignorance and/or with reckless disregard of the truth, in matters within the jurisdiction of HUD, falsified, concealed, or covered up by tricks, schemes, and devices a material fact; made materially false, fictitious, or fraudulent statements and representations; and made and used false writings or documents knowing the same to contain materially false, fictitious, or fraudulent statements or entries, in violation of 18 U.S.C. § 1001.  Specifically, from at least 2010, NYCHA has unlawfully, willfully, knowingly, or acting with deliberate ignorance and/or with reckless disregard of the truth, (i) repeatedly made false statements (including through material omissions) to HUD regarding conditions at NYCHA and NYCHA's compliance with the U.S. Housing Act

and HUD regulations, (ii) repeatedly concealed and covered up conditions and NYCHA's noncompliance with the U.S. Housing Act and HUD regulations, and (iii) repeatedly made and used knowingly false writings and documents to deceive HUD regarding conditions at NYCHA and NYCHA's noncompliance with the U.S. Housing Act and HUD regulations.

275.    Without injunctive relief, NYCHA's deceptive conduct and its ongoing effects will continue.

276.    Accordingly, the United States is entitled to an order providing for injunctive relief and appointment of a monitor under 18 U.S.C. § 1345, to prevent NYCHA, its employees, and all those in concert with them from committing further violations of 18 U.S.C. § 1001 and to require NYCHA to mitigate the effects of prior violations.

## COUNT THREE: VIOLATIONS OF TSCA AND THE RRP RULE

277.    The United States on behalf of EPA repeats and realleges the allegations in paragraphs 1 through 276.

278.    NYCHA is a "firm" that performs "renovations" within the meaning of the RRP Rule.

279.    NYCHA has failed to comply with the requirements of the RRP Rule in performing such renovations, including but not limited to failing to ensure that a certified renovator is assigned to each such renovation and that its employees other than certified renovators are properly trained on safe work practices, in violation of 40 C.F.R. §§ 745.81(a)(3), 745.89(d)(1), and 745.89(d)(2); failing to follow safe work-practice requirements before, during, after the renovation, in violation of 40 C.F.R. §§ 745.85 and 745.89(d)(3); and failing to provide residents with required information and warnings, in violation of 40 C.F.R. §§ 745.84(a), 745.85(a)(1), 745.89(d)(3), and 745.89(d)(4).

280.    Violations of the RRP Rule are "prohibited acts" under TSCA.  15 U.S.C. § 2689.

281.    Without injunctive relief, NYCHA will continue to fail to comply with the RRP Rule and TSCA when performing work covered by the Rule.

282.    Accordingly, pursuant to sections 17 and 409 of TSCA, 15 U.S.C. §§ 2616 and 2689, the United States is entitled to an order enjoining NYCHA to comply with the RRP Rule and TSCA, and mitigate the effects of past violations.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that the Court:

    (i)    Order injunctive relief and appointment of a monitor under 42 U.S.C. § 1437d(j)(3), to remedy NYCHA's substantial default with respect to covenants or conditions to which NYCHA is subject;

    (ii)    Order injunctive relief and appointment of a monitor under 18 U.S.C. § 1345, to prevent NYCHA, its employees, and all those in concert with them from committing further violations of 18 U.S.C. § 1001 and to require NYCHA to mitigate the effects of prior violations.

    (iii)    Order NYCHA to comply with the RRP Rule and TSCA, and to mitigate the effects of past violations; and

    (iv)    Order such further relief as the Court may deem just and proper.

Dated: June 11, 2018
      New York, New York

GEOFFREY S. BERMAN
United States Attorney
*Attorney for the United States*


 /s/ Geoffrey S. Berman
ROBERT WILLIAM YALEN
MÓNICA P. FOLCH
JACOB LILLYWHITE
TALIA KRAEMER
SHARANYA MOHAN
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:   (212) 637-2800
Fax:   (212) 637-2702
Email: robert.yalen@usdoj.gov
      monica.folch@usdoj.gov
      jacob.lillywhite@usdoj.gov
      talia.kraemer@usdoj.gov
      sharanya.mohan@usdoj.gov

**EXHIBIT A**

**Developments Identified by NYCHA as Containing Lead Paint**

131 SAINT NICHOLAS AVENUE

344 EAST 28TH STREET

830 AMSTERDAM AVENUE

ALBANY

ALBANY II

AMSTERDAM

ASTORIA

BARUCH

BLAND

BREUKELEN

BREVOORT

BRONX RIVER

CASTLE HILL

CLAREMONT REHAB (GROUP 4)

CLASON POINT GARDENS

COOPER PARK

DYCKMAN

EAST RIVER

EASTCHESTER GARDENS

ELLIOTT

FHA REPOSSESSED HOUSES (GROUP I)

FHA REPOSSESSED HOUSES (GROUP II)

FHA REPOSSESSED HOUSES (GROUP III)

FHA REPOSSESSED HOUSES (GROUP IV)

FHA REPOSSESSED HOUSES (GROUP IX)

FHA REPOSSESSED HOUSES (GROUP V)

FHA REPOSSESSED HOUSES (GROUP VI)

FHA REPOSSESSED HOUSES (GROUP VII)

FHA REPOSSESSED HOUSES (GROUP VIII)

FHA REPOSSESSED HOUSES (GROUP X)

FIRST HOUSES

GLENMORE PLAZA

GLENWOOD

GRANT

GRAVESEND

GUN HILL

HAMMEL

HARLEM RIVER

HARLEM RIVER II

HIGHBRIDGE GARDENS

INDEPENDENCE

JOHNSON

KINGSBOROUGH

LEXINGTON

LINCOLN

LONG ISLAND BAPTIST HOUSES

MANHATTANVILLE

MANHATTANVILLE REHAB (GROUP 2)

MARBLE HILL

MARINER'S HARBOR

MARLBORO

MILL BROOK

MILL BROOK EXTENSION

MITCHEL

MONROE

NOSTRAND

PARKSIDE

PELHAM PARKWAY

POLO GROUNDS TOWERS

POMONOK

QUEENSBRIDGE NORTH

RANGEL

RAVENSWOOD

RED HOOK EAST

RED HOOK WEST

REHAB PROGRAM (DOUGLASS REHABS)

RICHMOND TERRACE

RIIS

RIIS II

SAINT NICHOLAS

SEDGWICK

SEWARD PARK EXTENSION

SMITH

SOUNDVIEW

SOUTH BEACH

SOUTH JAMAICA II

STAPLETON

STRAUS

SUMNER

SURFSIDE GARDENS

THROGGS NECK

TODT HILL

UNITY PLAZA (SITES 4-27)

VAN DYKE I

WALD

WEBSTER

WEEKSVILLE GARDENS

WILLIAMSBURG

WILSON

WISE TOWERS

WOODSIDE

WSUR (SITE A) 120 WEST 94TH STREET

**EXHIBIT B**

**Developments for Which Required**
**EIBLL Triggered Risk Assessment Was Not Performed**

EDENWALD
FORT INDEPENDENCE STREET-HEATH AVENUE
MARCY
MELROSE