UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                              Plaintiff,

                v.

NEW YORK CITY HOUSING AUTHORITY,

                              Defendant.

No. 18 Civ. 5213 (WHP)

---

## MEMORANDUM OF LAW IN SUPPORT OF TENANTS' MOTION TO INTERVENE

CLARICK GUERON REISBAUM LLP
Nicole Gueron
Emily Reisbaum
Melissa C. Holsinger
220 Fifth Avenue, 14th Floor
New York, New York 10001
Phone: (212) 633-4310
Fax: (646) 478-9484
Email: ngueron@cgr-law.com

*Attorneys for City-Wide Council
of Presidents, Inc. and At-Risk
Community Services, Inc.*

**Table of Contents**

Table of Authorities .................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

FACTS ......................................................................................................................... 2

    I.     NYCHA's Misconduct Is Pervasive and Well-Documented ................................ 2

    II.    The Proposed Intervenors Represent the Interests of All NYCHA
           Residents, and Have Brought Suit Against NYCHA in State Court ...................... 4

    III.   The Federal Government Conducted Its Own Investigation and Negotiated
           a Consent Decree Without Any Meaningful Input from the Tenants .................... 9

    IV.   The Consent Decree Is Inadequate ...................................................................... 11

ARGUMENT .............................................................................................................. 12

    I.     The Tenants Are Entitled to Intervene of Right ................................................. 13

           A. This Motion is Timely ................................................................................. 13

           B. The Tenants Have an Interest in this Litigation ......................................... 15

                1. CCOP's Interest ................................................................................. 15

                2. At-Risk's Interest ............................................................................... 18

           C. These Interests May Be Impaired By the Proposed Consent Decree ........ 19

                1. The Tenants' Interests Will be Impaired Because the Proposed
                   Monitor Will Oversee Significant Aspects of NYCHA's
                   Operations, and Federal Law Guarantees Tenants a Right to
                   Participate In Such Matters ................................................................ 19

                2. The Tenants' Interests Will Be Impaired by Spending on
                   "Parallel Machinery" ......................................................................... 22

           D. The Tenants' Interests Are Not Adequately Protected By the
              Parties to this Litigation ............................................................................. 23

    II.    Alternatively, the Tenants Satisfy the Requirements for Permissive
           Intervention ........................................................................................................ 25

    III.   The Tenants' Involvement Is Likely to Improve the Proposed Consent
           Decree and the Outcome of this Case ................................................................. 27

CONCLUSION ............................................................................................................ 29

## Table of Authorities

### Cases

*ADAPT of Phila. v. Phila. Hous. Auth.*,
    No. Civ. A. 98-4609, 2004 WL 1858345 (E.D. Pa. Aug. 10, 2004).........................................16

*Am. Farm Bureau Fed'n v. EPA*, 278 F.R.D. 98 (M.D. Pa. 2011) .............................................18

*Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123 (2d Cir. 2001)...............................................15, 17

*Catanzano v. Wing*, 103 F.3d 223 (2d Cir. 1996) .......................................................................14

*CBS Inc. v. Snyder*, 136 F.R.D. 364 (S.D.N.Y. 1991) ..........................................................19, 23

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 266 F.R.D. 369 (D. Ariz. 2010)....18

*Degrafinreid v. Ricks*, 417 F. Supp. 2d 403 (S.D.N.Y. 2006) ....................................................25

*Eddystone Rail Co., LLC v. Jamex Transfer Servs.*, 289 F. Supp. 3d 582 (S.D.N.Y. 2018)........24

*EEOC v. Local 638*,
    No. 71 Civ. 2877 (RLC), 2003 WL 21767772 (S.D.N.Y. July 30, 2003) ...................14, 15, 24

*EEOC v. N.Y. Times*, No. 92 Civ. 6548 (RPP), 2000 WL 307408 (S.D.N.Y. Mar. 24, 2000).....25

*Farmland Dairies v. Comm'r*, 847 F.2d 1038 (2d Cir. 1988) .....................................................14

*Floyd v. City of New York*, 770 F.3d 1051 (2d Cir. 2014) ..........................................................13

*Gautreaux v. Pierce*, 548 F. Supp. 1284 (N.D. Ill. 1982)...........................................................17

*In re Bank of N.Y. Derivative Litig.*, 320 F.3d 291 (2d Cir. 2003) .............................................26

*In re Tribune Co. Fraudulent Conveyance Litig.*, 291 F.R.D. 38 (S.D.N.Y. 2013) ....................13

*Louis Berger Grp., Inc. v. State Bank of India*, 802 F.Supp.2d 482 (S.D.N.Y. 2011) ................26

*NYPIRG v. Regents of the Univ. of the State of N.Y.*, 516 F.2d 350 (2d Cir. 1975) ....................24

*Patton Boggs LLP v. Chevron Corp.*,
    No. 12 Civ. 9176 (LAK), 2016 WL 7156593 (S.D.N.Y. Dec. 7, 2016)................................12

*Peterson v. Islamic Rep. of Iran*, 290 F.R.D. 54 (S.D.N.Y. 2013) .............................................26

*S&S Kings Corp. v. Westchester Fire Ins. Co.*,
    No. 16 Civ. 2016 (RA), 2017 WL 396741 (S.D.N.Y. Jan. 27, 2017).....................................13

*SEC v. Bear, Stearns & Co.*,
    No. 03 Civ. 2937 (WHP), 2003 WL 22000340 (S.D.N.Y. Aug. 25, 2003).............................29

*St. John's Univ. v. Bolton*, 450 F. App'x 81 (2d Cir. 2011) .......................................................26

*Tachiona ex rel. Tachiona v. Mugabe*, 186 F. Supp. 2d 383 (S.D.N.Y. 2002) ............... 12, 13, 16

*United States v. City of New York*, 198 F.3d 360 (2d Cir. 1999)............................................ 28, 29

*United States v. Columbia Pictures Indus., Inc.*, 88 F.R.D. 186 (S.D.N.Y. 1980)...................... 26

*United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968 (2d Cir. 1984) ....................... 23

*United States v. New York*, 820 F. 2d 554 (2d Cir. 1987)............................................................. 14

*United States v. Pitney Bowes, Inc.*, 25 F.3d 66 (2d Cir. 1994)................................................... 25

*United States v. Simmonds Precision Prods., Inc.*, 319 F. Supp. 620 (S.D.N.Y. 1970).............. 16

*United States v. Yonkers Bd. of Educ.*, 801 F.2d 593 (2d Cir. 1986)........................................... 13

*W. Energy All. v. Zinke*, 877 F.3d 1157 (10th Cir. 2017) ........................................................... 18

*Wilder v. Bernstein*, 645 F. Supp. 1292 (S.D.N.Y. 1986)...................................................... 27, 28

*Wilder v. Bernstein*,
  No. 78 Civ. 957 (RJW), 1994 WL 30480 (S.D.N.Y. Jan. 28, 1994) ....................................... 21

**Statutes**

12 U.S.C. § 1701u.................................................................................................................... 7, 19

12 U.S.C. § 1701u(b) .................................................................................................................... 7

12 U.S.C. § 1701u(c)(1)(A) .......................................................................................................... 8

42 U.S.C. § 1437c-1 ................................................................................................................. 8, 19

42 U.S.C. § 1437c-1(c)(2)(A) ....................................................................................................... 9

42 U.S.C. § 1437c-1(e)(2)............................................................................................................. 9

42 U.S.C. § 1437d.................................................................................................................... 7, 15

42 U.S.C. § 1437d(f)(2) ................................................................................................................ 7

42 U.S.C. § 4822 ........................................................................................................................... 7

42 U.S.C. § 4851 *et seq.*................................................................................................................ 7

2004 Local Law No. 1, N.Y.C. ADMIN. CODE § 27-2056-1 *et seq.*............................................. 7

## **Regulations**

24 C.F.R. Part 35 ................................................................................................... 7

24 C.F.R. Part 135 ................................................................................................. 7

24 C.F.R. Part 964 ............................................................................................. 5, 8

24 C.F.R. § 5.703 ............................................................................................. 7, 15

24 C.F.R. § 135. 30 ............................................................................................... 8

24 C.F.R. § 903.13(c) ........................................................................................... 9

24 C.F.R. § 964.18(a) ........................................................................................... 8

24 C.F.R. § 964.18(a)(8) ...................................................................................... 8

24 C.F.R. § 964.100 ......................................................................................... 8, 19

24 C.F.R. § 964.105(a) ......................................................................................... 8

24 C.F.R. § 964.135 ............................................................................................. 8

24 C.F.R. § 964.135(f) .......................................................................................... 8

## **Rules**

Fed. R. Civ. P. 24(a) ........................................................................................... 13

Fed. R. Civ. P. 24(b) ..................................................................................... 13, 25

Fed. R. Civ. P. 24(c) ........................................................................................... 12

The City-Wide Council of Presidents, Inc. ("CCOP") and At-Risk Community Services, Inc. ("At-Risk," and together with CCOP, the "Tenants") submit this Memorandum of Law in support of their Motion to Intervene in the above-captioned matter.

## PRELIMINARY STATEMENT

This moment has the potential to be a watershed for the more than 450,000 public housing residents in New York City:  the federal government, the City, the press, and the public have all finally woken up to the disgusting and dangerous conditions that NYCHA residents have been contending with for decades, including toxic lead in their homes, pervasive mold and moisture problems, broken elevators, pest infestations, contaminated water towers, and heat and hot water service that is inconsistent at best, all abetted by NYCHA, a beleaguered bureaucracy that has often seemed more interested in protecting its reputation than its residents.

But the promise that this moment holds will not—and cannot—be realized without the active participation of NYCHA residents themselves.  The residents are best situated to speak to the reality on the ground—that is, not to speak to NYCHA's past failures (which are well-documented), but to offer constructive and substantive input that will ensure a different outcome this time.  Moreover, they are entitled to this say:  federal law *guarantees* NYCHA residents an active role in the operation and management of their homes, and further assures that some of the employment and economic benefits from projects that NYCHA undertakes flow to the residents themselves.

The deal that the parties have struck—without any actual input from residents—does not provide for any of this.  Despite establishing the framework for a monitorship that will guide NYCHA's operations for years to come, the proposed Consent Decree all but excludes NYCHA residents from any substantive engagement in this process once a monitor has been selected, and

1

nowhere provides that NYCHA residents will reap any employment or economic benefit from the billions of dollars that are sure to be spent under the terms of the proposed Consent Decree.

The residents—acting through their duly-elected and recognized representatives in CCOP, and their dedicated advocates in At-Risk—ask this Court to bring them in to this process. CCOP and At-Risk do not wish to be spoilers here; they seek only to improve on the terms of the deal the parties have struck, to ensure that residents' interests are adequately protected, and to see the promise of this moment realized to the benefit of every NYCHA resident across the City.

## FACTS

## I.     NYCHA's Misconduct Is Pervasive and Well-Documented

NYCHA's deplorable conduct is profoundly harmful to its residents and is well-documented in the courts and in the press.  *See, e.g.*, Pet., *City-Wide Council of Presidents v. NYCHA*, No. 100283-2018 (Sup. Ct. N.Y. Cty.), Dkt. 3 (citing press reports and setting forth Tenants' allegations against NYCHA)[1]; Compl., *United States v. NYCHA*, No. 18 Civ. 5213 (S.D.N.Y.), ECF No. 1; Compl., *Baez v. NYCHA*, No. 13 Civ. 8916 (S.D.N.Y.), ECF No. 1.

As this Court well knows, NYCHA has failed to protect its residents from a host of dangerous conditions.  These conditions threaten the health and safety of every NYCHA resident, and include lead contamination, pervasive mold and moisture problems, a lack of heat and hot water, pest infestations, dangerous and malfunctioning elevators, power outages, broken doors and locks—and the list goes on.  *See* Tenants' Pet. at 6-7.  NYCHA's failure to remedy these intolerable conditions have led to deaths, injuries, and sickness, *see id.* at 7-8; criminal and

---

[1] The Verified Petition filed by the Tenants in *City-Wide Council of Presidents v. NYCHA*, No. 100283-2018 (Sup. Ct. N.Y. Cty.), is annexed as Exhibit 1 to the Declaration of Eliezer Hecht, dated August 9, 2018 ("Hecht Decl."), and is referred to herein as the "Tenants' Petition" or "Tenants' Pet."  Because the exhibits to the Tenants' Petition are so voluminous, we respectfully direct the Court and the parties to the electronic docket, where those exhibits are publicly available at Docket Nos. 4 through 61.  SUPREME COURT RECORDS ON-LINE LIBRARY, http://iapps.courts.state.ny.us/iscroll/ (last visited Aug. 9, 2018).

civil investigations and cases, *see id.*; and this Court's December 15, 2015 appointment of a monitor to address mold issues, *see* Mem. & Order, *Baez*, No. 13 Civ. 8916, ECF No. 88.

NYCHA has persistently hidden the scope of these problems and covered up its own culpability.  In late 2017, New York City's Department of Investigation concluded that NYCHA failed to conduct mandatory lead paint inspections *for years*, and falsely certified to the United States Department of Housing and Urban Development ("HUD") that it had complied with federal law requiring those inspections.  *See* Hecht Decl. Ex. 2.  Further, on July 25, 2018, NYCHA sent a letter to HUD blithely admitting "potential compliance gaps" in its operations, including noncompliance with "a number of federal regulations" providing tenant protections and with the requirements of consent decrees regarding mold and lead hazards.  *See id.* Ex. 3. This Court has observed that a previous effort by NYCHA to remedy its failures amounted to little more than "a temporary truce" permitting NYCHA to "maintain a façade of action without any definite obligations."  Mem. & Order at 3, *Baez*, No. 13 Civ. 8916, ECF No. 167.

Even in the few weeks since this lawsuit was filed and the proposed Consent Decree struck, more details about the problems at NYCHA have emerged.  The City announced that over 800 children under the age of 6 living in NYCHA apartments had elevated lead levels in their bloodstreams—many times more than the 19 cases previously acknowledged.  Luis Ferré-Sadurní, *820 Children Under 6 in Public Housing Tested High for Lead*, N.Y. TIMES (Jul. 1, 2018), https://www.nytimes.com/2018/07/01/nyregion/nycha-lead-paint-children.html.  The City also admitted that upwards of 130,000 NYCHA apartments might be contaminated with lead—nearly three times more than the 50,000 it previously claimed.  Rich Calder, *DeBlasio admits there could be up to 130K lead-tainted NYCHA apartments*, N.Y. POST (Jul. 9, 2018), https://nypost.com/2018/07/09/de-blasio-admits-there-could-be-up-to-130k-lead-tainted-nycha-

apartments/.  More evidence of NYCHA's brazen, self-serving manipulation of the public record has also come to light:  it was reported last week that NYCHA scrubbed evidence of contamination in its water tanks from reports it provided to health officials.  Frank G. Runyeon, *Inspectors reported contamination in water tanks. NYCHA had it erased.*, CITY & STATE (Jul. 31, 2018), https://www.cityandstateny.com/articles/politics/new-york-city/nycha-contamination-water-tanks.

Clearly, NYCHA's residents deserve a paradigm shift.  This case could provide that watershed moment, as various stakeholders seem galvanized to action, including the federal government, New York City, and perhaps even NYCHA itself.  *But the most important stakeholders of all are the Tenants*:  the elected leadership of the residents of NYCHA housing, and their dedicated advocates.  A consent decree and monitorship that fails to provide a role for the Tenants is patently inadequate.

## II.   The Proposed Intervenors Represent the Interests of All NYCHA Residents, and Have Brought Suit Against NYCHA in State Court

CCOP is the duly-elected body recognized by NYCHA as representing all NYCHA residents.  Declaration of Daniel Barber, dated August 9, 2018 ("Barber Decl.") ¶ 2.  As explained on NYCHA's website:

> Most NYCHA developments have resident associations, also known as tenant associations, resident councils, or tenant councils.  These democratic organizations are dedicated to improving the quality of life in NYCHA developments and the surrounding neighborhoods.  They work with NYCHA management at every level, giving residents a real voice in the operation of their developments.
>
> Each resident association's executive board is elected by association members and typically consists of a president, vice-president, secretary, treasurer, and sergeant-at-arms.
>
>  . . .
>
> Every president of a recognized resident association is a member of one of nine Citywide Council of Presidents (CCOP) districts in the city.  Resident association

presidents elect a Chair to represent their district.  Members of the CCOP automatically become members on the Resident Advisory Board, described below.  CCOP works with senior NYCHA staff on the issues affecting life in NYCHA developments, engaging with government at all levels (local, state, and federal).

*Engagement*, N.Y.C. HOUS. AUTH., https://www1.nyc.gov/site/nycha/residents/getting-involved-as-a-resident.page (last visited Aug. 9, 2018).  Accordingly, each NYCHA development elects a tenant leader, and those tenant leaders form nine resident District Councils across the city: Bronx North, Bronx South, Manhattan North, Manhattan South, Brooklyn East, Brooklyn West, Brooklyn South, Queens, and Staten Island.  Barber Decl. ¶ 3.  Each District Council elects a Chair, and those nine Chairs form CCOP.  *Id.* ¶ 4.

CCOP's purpose is to advocate for the concerns and interests of NYCHA residents so as to improve the quality of their lives.  *See id.* ¶¶ 5-6.  CCOP does so, in part, by serving as a liaison between residents and NYCHA, working in close conjunction with tenant leaders and District Council Chairs.  *See id.* ¶ 5.  When a resident has a problem—for example, a maintenance problem that is unresolved, a "work ticket" that has disappeared from the system, or work that has been done inadequately or improperly—the resident may bring that problem to their tenant leader, who may require further assistance from their District Council Chair, who may, in turn, escalate the problem to CCOP.  *Id.*  CCOP will try to resolve the problem by contacting NYCHA's borough offices, NYCHA's executive leadership, local elected officials, and the Mayor's office, as may be necessary.  *Id.*

Additionally, as the duly-elected and recognized resident council for NYCHA residents, CCOP has the ability and right, under federal law, to represent NYCHA residents in connection with operational and policy matters.  *See generally* 24 C.F.R. Part 964.  Although NYCHA has a history of ignoring CCOP's right to participate and undermining its ability to do so, CCOP

5

nevertheless attempts to represent residents' interest with respect to such matters. *See* Barber Decl. ¶ 6.

At-Risk is a non-profit corporation dedicated to "bringing human rights and economic justice to all residents of public housing in New York City" by "demand[ing] that NYCHA provide habitable living spaces and treat tenants with dignity and respect." *Mission*, AT-RISK COMMUNITY SERVICES, INC., http://atriskcommunityservices.org (last visited Aug. 9, 2018). To this end, At-Risk seeks to help NYCHA residents across the city secure safe and habitable living conditions, and to ensure that NYCHA complies with its obligations under federal law. *See id.*; Hecht Decl. ¶ 2. Specifically, At-Risk's attorneys and accountants help NYCHA residents navigate NYCHA's bureaucracy to address the deplorable living conditions with which so many NYCHA residents contend. Hecht Decl. ¶ 3. At-Risk also conducts trainings for NYCHA residents regarding their rights under federal law and provides free legal services to NYCHA residents and to CCOP. *Id.* ¶¶ 4-5. At-Risk's aim is to create an infrastructure of professionals working on residents' behalf, so that residents are on equal footing with NYCHA. *Id.* ¶ 3.

Earlier this year, consistent with their shared mission to improve living conditions for NYCHA residents city-wide, CCOP and At-Risk sued NYCHA in state court to demand recourse from NYCHA for its ongoing—and long-standing—failure to provide safe and decent housing to residents or to recognize the rights guaranteed to residents by law. Barber Decl. ¶¶ 7-8; *see generally* Tenants' Pet. The Tenants' Petition asserts four claims against NYCHA, including claims that

> (1) NYCHA failed to conduct lead inspections, report the results of inspections, or properly abate identified lead hazards;
>
> (2) NYCHA failed to ensure that apartments have adequate heat and hot water;
>
> (3) NYCHA failed to provide employment and economic opportunities to residents; and

(4) NYCHA failed to permit residents to participate meaningfully in decisions impacting policy and operations.

Tenants' Pet. ¶¶ 197-225.  The Tenants' Petition seeks injunctive relief, as well as the appointment of a monitor to ensure NYCHA's compliance with the law.  *Id.* at 58-59.  In April 2018, Supreme Court Justice Carol R. Edmead issued a preliminary injunction requiring NYCHA to take certain steps regarding lead paint inspections.  Hecht Decl. Ex. 4.

The rights the Tenants seek to enforce in their state-court suit arise under federal and local law.  Specifically, the claims regarding lead and heat and hot water arise under HUD's physical condition standards.  *See* 42 U.S.C. § 1437d; 24 C.F.R. § 5.703.  Under those provisions, a public housing authority that receives federal funding (such as NYCHA) must "ensure that public housing dwelling units are safe and habitable," 42 U.S.C. § 1437d(f)(2), and that housing is "decent, safe, sanitary and in good repair" and "free of health and safety hazards" including "lead-based paint," 24 C.F.R. § 5.703.  The Tenants' lead paint claim, additionally, arises under the federal Lead-Based Paint Poisoning Prevention Act, 42 U.S.C. § 4822, the federal Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. § 4851 *et seq.*, the federal Lead Safe Housing Rule, 24 C.F.R. Part 35, and the local Childhood Lead Poisoning Prevention Act, 2004 Local Law No. 1, N.Y.C. ADMIN. CODE § 27-2056-1 *et seq.*

The Tenants' claim regarding employment and economic opportunities arises under Section 3 of the Housing and Urban Development Act.  *See* 12 U.S.C. § 1701u; 24 C.F.R. Part 135.  Under that law, public housing authorities must direct "employment and other economic opportunities generated by Federal financial assistance" to "low- and very low-income persons, particularly those who are recipients of government assistance for housing."  12 U.S.C. § 1701u(b).  Consistent with this goal, housing authorities must make best efforts to provide low- and very low-income people training and employment opportunities generated by federal

funding, 12 U.S.C. § 1701u(c)(1)(A), and their compliance is evaluated by "minimum numerical targets" established by the implementing regulations, 24 C.F.R. § 135.30.  In their state-court pleading, the Tenants allege that NYCHA not only fails to ensure that a certain portion of its hires, contractors, and contracts are awarded to public housing recipients, but also that it actively undermines these goals by adopting restrictive labor practices.  Tenants' Pet. ¶¶ 139-79; 216-18.

Finally, the Tenants' claim regarding participation in management and decision-making arises under 42 U.S.C. § 1437c-1 and 24 C.F.R. Part 964.  These provisions guarantee the right of public housing residents—individually and through elected resident councils such as CCOP— to participate in the management and operations of public housing developments.  As an initial matter, these provisions require NYCHA to "officially recognize a duly elected resident council [such as CCOP] as the sole representative of the residents," 24 C.F.R. § 964.18(a), and to "recognize [a resident council such as CCOP] as the voice of authority-wide residents for input into housing authority policy making," 24 C.F.R. § 964.105(a).  These provisions also provide a host of specific vectors through which resident participation is assured.  For example, residents have a right to "actively participate through a working partnership with [NYCHA] to advise and assist in all aspects of public housing operations."  24 C.F.R. § 964.100.  Residents "shall be involved and participate in the overall policy development and direction of Public Housing operations," 24 C.F.R. § 964.135, and NYCHA "shall involve resident council officers and other interested residents at the development through education and direct participation in all phases of the budgetary process," 24 C.F.R. § 964.135(f).  NYCHA further "shall ensure open communication and frequent meetings between [NYCHA] management and resident councils," 24 C.F.R. § 964.18(a)(8), and must meaningfully "consult with" and "consider the recommendations" of resident councils when drafting its Annual Plan and Five-Year Plan, 42

U.S.C. § 1437c-1(c)(2)(A); 42 U.S.C. § 1437c-1(e)(2); *see also* 24 C.F.R. § 903.13(c).  The

Tenants' Petition alleges that NYCHA has failed to comply with these provisions by making

unilateral decisions without any resident input at all, holding meaningless resident forums when

a decision on a given subject has already been made, failing to provide residents with sufficient

timely information to provide input on a particular matter, and disregarding resident comments

and concerns in any event.  Tenants' Pet. ¶¶ 190-96, 223.

**III.     The Federal Government Conducted Its Own Investigation and Negotiated a
           Consent Decree Without Any Meaningful Input from the Tenants**

The United States Attorney's Office for the Southern District of New York (the

"Government") brought this suit—and filed the proposed Consent Decree purporting to resolve

it—on June 11.  The negotiations that led to the Consent Decree had been ongoing for nearly a

year at that point.  Indeed, at a court conference on July 10, 2018, the Government acknowledged

that "initial negotiations" on the proposed Consent Decree began in August 2017, and became

"more in depth and productive" in approximately February 2018.  Tr. at 6-7, *Baez*, No. 13 Civ.

8916, ECF No. 187 [hereinafter "July 10 Tr."].

Obviously, the Government had ample opportunity to involve residents in this vital work

in a meaningful, ongoing way, as required by federal law.  But it did not.  Instead, it took a page

from NYCHA's playbook and brought residents in for a single, perfunctory meeting at the

eleventh hour, inviting CCOP and At-Risk to participate in a meeting on May 29, 2018, mere

days before the Government intended to file the proposed Consent Decree.  *See* Barber Decl. ¶ 9;

Hecht Decl. ¶¶ 10, 13.  At that meeting, the Government did not provide the Tenants with a copy

of the proposed Consent Decree, even in draft.  Barber Decl. ¶ 11; Hecht Decl. ¶ 14.  Rather, the

Government merely explained the broad issues that the Consent Decree was aimed at

remediating, such as lead paint, mold, and vermin, and advised the Tenants that the Government intended to seek the appointment of a monitor.  Barber Decl. ¶ 10; Hecht Decl. ¶¶ 11-12.

Even with this limited information, the Tenants had a number of concerns about the Government's plan.  *See* Barber Decl. ¶¶ 11-12; Hecht Decl. ¶¶ 15-18.  The Tenants expressed some of those concerns at the meeting, and urged the Government to bring the Tenants into the substantive negotiations.  *See* Barber Decl. ¶ 13; Hecht Decl. ¶ 19.  The Government demurred, assuring the Tenants that their concerns were misplaced and that they would be "significant stakeholders" under the terms of the proposed Consent Decree.  Barber Decl. ¶ 13; Hecht Decl. ¶ 20.

The Tenants subsequently followed up with emails setting out their concerns in detail, and making certain preliminary suggestions for improving on the terms of the Consent Decree (as it had been described to them and reported in the press).  *See* Hecht Decl. ¶¶ 21-22, Exs. 5 & 6.  Among their concerns, the Tenants were troubled that the proposed Consent Decree:

- Would be "business as usual" in that the monitor would be charged with working with NYCHA's current administration and would not take any steps to change the deeply-ingrained culture of corruption at NYCHA.

- Charged the fox with guarding the henhouse by permitting NYCHA itself to convene a "compliance committee" and by not providing for an independent third party to participate in the process of evaluating NYCHA's compliance.

- Would provide only a fraction of the funding necessary to remedy the pervasive health and safety problems at NYCHA.

- Did not adequately include residents as stakeholders, as required by federal law, despite establishing a decision-making apparatus that could affect residents for a decade or longer.

*Id.* Exs. 5 & 6.  As an initial suggestion to address some of these concerns, the Tenants proposed adding a third party to the "compliance committee" that the proposed Consent Decree would establish, to provide a check on NYCHA and to give residents a voice in evaluating whether NYCHA was fulfilling its obligations.  *Id.* Ex 5.

10

The Government never responded to these suggestions. *Id.* ¶ 23. Rather, the Tenants first learned of the specifics of the proposed Consent Decree when the rest of the City did—after the Government filed suit on June 11. Barber Decl. ¶ 14; Hecht Decl. ¶ 23.

## IV.   The Consent Decree Is Inadequate

The proposed Consent Decree filed by the Government has many of the shortcomings the Tenants feared. *See* Barber Decl. ¶ 14-15; Hecht Decl. ¶¶ 24-25. Most significantly, it provides no meaningful role for residents in the ongoing process of overseeing NYCHA's compliance, and does not permit residents to participate in NYCHA's management and operations under the decree, contrary to federal law. *See* Proposed Consent Decree, ECF No. 5-1. Additionally, nowhere does the Consent Decree mention Section 3 or the obligation to provide employment and economic opportunities to residents, *see id.*, despite the facts that the City's funding commitment (insufficient though it is) guarantees that there will be economic opportunities throughout NYCHA under the decree; that federal law requires a portion of those opportunities be directed to low- and very low-income individuals, such as NYCHA residents; and that NYCHA just advised HUD that it is "currently examining" its non-compliance with Section 3. Hecht Decl. Ex. 3.

Indeed, the proposed Consent Decree provides only one opportunity for resident input. In Paragraph 15, residents are provided a discretionary, toothless, one-time role: "The United States in its discretion will also provide an opportunity for other stakeholders, including . . . tenant groups, including the Citywide Council of Presidents, to provide views on selection of a Monitor." Proposed Consent Decree at 6, ECF No. 5-1. Despite providing a detailed framework for the monitor's work—a framework that will involve oversight of NYCHA's operations and management for years to come—the proposed Consent Decree does not provide residents *any* further role once the monitor is selected. Although the monitor is charged with developing

Performance Requirements, Action Plans, Organizational Plans, Operational Plans, and with supervising NYCHA's compliance—all matters going to the core of NYCHA's management and operations, with respect to which federal law guarantees residents a voice—residents are completely excluded from this process.

Finally, the funding provided by the proposed Consent Decree is inadequate. Under the terms of the proposed Consent Decree, the City will allocate $2 billion over 10 years to carry out the aims of the decree. Proposed Consent Decree Ex. A, ECF No. 5-1. But NYCHA's *annual* budget for the 2018 fiscal year is $8.6 billion. *Adopted Budget for FY 2018 And The Four Year Financial Plan FY 2019-2022*, N.Y.C. HOUS. AUTH.,

https://www1.nyc.gov/assets/nycha/downloads/pdf/nycha-fy2018-budget-book.pdf (last visited Aug. 9, 2018). Adding only 2.3 percent to NYCHA's budget cannot possibly solve the systemic, pervasive problems that afflict NYCHA's facilities.

## ARGUMENT

Rule 24 of the Federal Rules of Civil Procedure enables an interested party to intervene in an action. The Rule outlines two types of intervention: intervention of right, which is governed by Rule 24(a), and permissive intervention, which is governed by Rule 24(b).[2]

---

[2] The Tenants are cognizant that, pursuant to Fed. R. Civ. P. 24(c), a motion to intervene is generally accompanied by a pleading setting forth the intervenor's claims. Here, the Tenants already have claims pending against NYCHA in another forum. *See* Tenants' Pet. (annexed as Exhibit 1 to the Hecht Decl.). The Tenants' Petition in the state-court action, this submission, and the accompanying Declarations make the Tenants' position "quite clear" such that they constitute the "substantial equivalent" of a new pleading and the parties will suffer no prejudice from the lack of a formal pleading. *Patton Boggs LLP v. Chevron Corp.*, No. 12 Civ. 9176 (LAK), 2016 WL 7156593, at *6 n.22 (S.D.N.Y. Dec. 7, 2016) (waiving pleading required by Rule 24(c)); *Tachiona ex rel. Tachiona v. Mugabe*, 186 F. Supp. 2d 383, 393 n.8 (S.D.N.Y. 2002) (where movant's position was "apparent" and opposing party would not be prejudiced, "Rule 24(c) permits a degree of flexibility with technical requirements"). Where the moving papers set forth an intervenor's position clearly, courts will take a "lenient approach" and waive the pleading requirement. *In re Tribune Co. Fraudulent Conveyance Litig.*, 291 F.R.D. 38, 42

Under Fed. R. Civ. P. 24(a), a party is entitled intervene of right where it "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Under Fed. R. Civ. P. 24(b), a party that does not satisfy the standard for intervention of right may nevertheless be permitted to intervene, in the Court's discretion, if the party "has a claim or defense that shares with the main action a common question of law or fact" and intervention "will not unduly delay or prejudice the adjudication of the original parties' rights."

## I.   The Tenants Are Entitled to Intervene of Right

Intervention of right must be granted when a proposed intervenor (1) files a timely motion and (2) demonstrates an interest in the litigation (3) that may be impaired by the disposition of the action, (4) where the interest is not adequately protected by the parties to the action.  *See Floyd v. City of New York*, 770 F.3d 1051, 1058 (2d Cir. 2014).  This four-part test is "flexible and discretionary," and "courts generally look at all four factors as a whole rather than focusing narrowly on any one of the criteria."  *S&S Kings Corp. v. Westchester Fire Ins. Co.*, No. 16 Civ. 2016 (RA), 2017 WL 396741, at *1 (S.D.N.Y. Jan. 27, 2017) (citing *Tachiona*, 186 F. Supp. 2d at 394).

### A.  This Motion is Timely

The timeliness element on an intervention motion is "flexible" and "entrusted to the district judge's sound discretion."  *United States v. Yonkers Bd. of Educ.*, 801 F.2d 593, 594-95 (2d Cir. 1986).  "Among the most important factors in a timeliness decision is 'the length of time the applicant knew or should have known of his interest before making the motion.'"  *Catanzano*

n.3 (S.D.N.Y. 2013).  Accordingly, the Tenants respectfully request that the Court waive the Rule 24(c) pleading requirement in this case.

*v. Wing*, 103 F.3d 223, 232 (2d Cir. 1996) (citing *Farmland Dairies v. Comm'r*, 847 F.2d 1038,

1044 (2d Cir. 1988)).  Other factors include potential prejudice to the movant or the existing

parties, and the presence of any "unusual circumstances militating for or against a finding of

timeliness."  *United States v. New York*, 820 F. 2d 554, 557 (2d Cir. 1987).

There can be no plausible dispute that this motion is timely.  The Complaint in this

matter, and the proposed Consent Decree resolving it, were both filed on June 11, 2018.  *See*

Compl., ECF No. 1; Proposed Consent Decree, ECF No. 5-1.  The Tenants filed their pre-motion

letter seeking to intervene a mere eight days later.  Letter, ECF No. 14.  Moreover, the Tenants

had no notice of the specific contents of the proposed Consent Decree before it was filed, other

than false assurances from the Government that they would be "significant stakeholders" under

the terms of the Consent Decree.  Barber Decl. ¶¶ 11, 13-14; Hecht Decl. ¶¶ 14, 20, 23.  Once the

proposed Consent Decree was filed, however, the Tenants realized that, among other

shortcomings, the proposed Consent Decree does not provide residents with any meaningful

participatory role in the management of the NYCHA facilities—a role to which they are entitled

by federal statute and regulation.  Barber Decl. ¶ 14; Hecht Decl. ¶ 24.  The Tenants then

promptly sought to intervene.  *See EEOC v. Local 638*, No. 71 Civ. 2877 (RLC), 2003 WL

21767772, at *1 (S.D.N.Y. July 30, 2003) (intervention application timely when filed less than

four months after court issued preliminary approval of proposed consent order, and less than one

month after intervenors received actual notice of proposed consent order).

The other relevant considerations do not defeat a finding of timeliness.  In fact, any

prejudice that might result from a delay because of the Tenants' intervention would inure not to

the parties to this action—the Government and NYCHA—but rather to *the Tenants themselves*.

And yet, the Tenants have concluded that a slight delay is preferable to the entry of a Consent

Decree that treats residents' involvement as a side-show.  Indeed, permitting the Tenants an active role in this litigation may lead to the entry of a consent decree that provides more robust involvement for NYCHA residents than the decree proposed by the Government and NYCHA. Because the Tenants' involvement could substantially improve the Consent Decree—a document whose very purpose is to protect their interests, *see* Proposed Consent Decree ¶ 14, ECF No. 5-1—this benefit far outweighs any prejudice the Tenants might suffer as a result of a delay owing to their intervention.

### B.  The Tenants Have an Interest in this Litigation

To intervene of right, a party's interest in the litigation must be "direct, substantial, and legally protectable."  *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 130 (2d Cir. 2001) (quotation and citation omitted).  Both CCOP and At-Risk have such an interest.

### 1.  CCOP's Interest

The Consent Decree (and the monitorship for which it provides) will undisputedly have a direct and substantial impact on the health, safety, and welfare of every NYCHA resident— which are guaranteed to residents by HUD's physical condition standards.  *See* 42 U.S.C. § 1437d; 24 C.F.R. § 5.703.  Indeed, that is the *very purpose* of the Consent Decree.  *See* Proposed Consent Decree ¶ 14, ECF No. 5-1.  Where a proposed intervenor is the victim of conduct that a consent decree seeks to remedy, that proposed intervenor has an interest in the litigation warranting intervention of right.  *See Local 638*, 2003 WL 21767772, at *1 (where Government brought litigation resulting in consent decree to address racial discrimination by union, individual union members who "are the ones who have been the victims of discrimination" had interest that is direct, substantial, and legally protectable).

Each of the parties to this action—and the Court—confirmed the paramount interest that NYCHA residents have in this matter during the July 10, 2018 status conference.  Counsel for the Government acknowledged the vital "health and safety issues" at the heart of this case and the "need for buy in and support from community residents."  July 10 Tr. at 6-7.  Counsel for NYCHA recognized that residents have "an important role" and "are interested in conditions at NYCHA, to be sure."  *Id.* at 39.  New York City's Corporation Counsel recognized the importance of "inclu[ding] NYCHA residents them themselves [*sic*] in assisting with us achieving the objectives of the decree" and stated that residents should "play a prominent role in assisting this process."  *Id*. at 46.  Finally, the Court itself observed that this case "lays bare the deplorable conditions of the tenants' space" and concluded that "there is no case of greater public importance pending before this Court."  *Id*. at 4.

Granting the Tenants' motion to intervene is the way to transform these words into action.  As the elected body representing every NYCHA resident city-wide, CCOP shares each individual resident's interest in this lawsuit and is entitled to intervene on behalf of its constituents.  *See United States v. Simmonds Precision Prods., Inc.*, 319 F. Supp. 620, 621 (S.D.N.Y. 1970) (union permitted to intervene on employees' behalf to object to entry of consent judgment in antitrust suit brought by government); *ADAPT of Phila. v. Phila. Hous. Auth.*, No. Civ. A. 98-4609, 2004 WL 1858345, at *2-*4 (E.D. Pa. Aug. 10, 2004) (resident advisory board representing and advocating for all Philadelphia public housing residents permitted to intervene on residents' behalf in suit against public housing authority).

As for whether CCOP's interest is legally protectable, an interest need not "implicate any cognizable property right" to warrant intervention, particularly where the issues in the case involve "substantial public policy issues."  *Tachiona*, 186 F. Supp. 2d at 395; *see also Brennan*,

16

260 F.3d at 130 ("Rule 24(a)(2) requires not a property interest but, rather, 'an interest relating to the property or transaction which is the subject of the action.'"); *Gautreaux v. Pierce*, 548 F. Supp. 1284, 1287 (N.D. Ill. 1982) (permitting intervention of right where party has "a strong interest in the interpretation and construction" of a consent decree).

That said, CCOP does have actionable claims against NYCHA.  Barber Decl. ¶¶ 7-8; *see* Tenants' Pet.  In a suit pending before the New York State Supreme Court for New York County, the Tenants seek declaratory and injunctive relief (including the appointment of a monitor, as the Government also seeks here) in order to address a wide array of concerns affecting residents' health and safety (some of which are also the subject of the Government's claims in this case).  *See* Tenants' Pet.  Specifically, in their state-court action, the Tenants are seeking relief regarding the presence of lead paint, insufficient heat and hot water, NYCHA's failure to abide by its obligation under Section 3 to provide employment and economic opportunities to residents, and its failure to permit residents to meaningfully participate in operations and policy matters.  Justice Edmead has recognized that the Tenants have actionable claims and issued a preliminary injunction on the Tenants' behalf in connection with certain of these claims.  *See* Hecht Decl. Ex. 4.  The fact that CCOP has viable claims against NYCHA regarding some of the same conduct at issue in this case is further evidence that its interest is legally protectable—in addition to being direct and substantial—warranting its intervention of right.

Further, NYCHA's residents have an on-going economic interest—which none of the parties in this action has given voice to—in that they pay rent, month in and month out, in order to remain in apartments that are woefully inadequate.  (Ironically, the rent-collection function is one aspect of the NYCHA bureaucracy that seems to work seamlessly.  Barber Decl. ¶ 16.)

Were they living in developments with private landlords, NYCHA residents would surely be permitted to recover some of the vast sums they have collectively paid in rent during NYCHA's years of inaction.

### 2. At-Risk's Interest

At-Risk, like CCOP, has an interest in this action that is direct, substantial, and legally protectable: At-Risk is a plaintiff in the state-court action along with CCOP, asserting claims that address many of the same issues in this case, *see* Tenants' Pet., and Justice Edmead's preliminary injunction also granted relief to At-Risk, *see* Hecht Decl. Ex. 4.

Additionally, At-Risk is a non-profit that is devoted to helping NYCHA residents secure safe and habitable living conditions, through advocacy, educational, and legal efforts undertaken on behalf of residents. *See id.* ¶¶ 2-5. Federal courts often permit advocacy groups to intervene in actions that pertain to a group's "core mission." *Am. Farm Bureau Fed'n v. EPA*, 278 F.R.D. 98, 107 (M.D. Pa. 2011). Thus, for example, an environmental group engaged in "legal, educational, and physical efforts geared toward protecting and restoring" Chesapeake Bay had a protectible interest entitling it to intervene of right in an action challenging water quality standards for the Bay. *Id.* Similarly, the National Rifle Association was permitted to intervene of right in an action regarding the use of lead ammunition on federal land, after the court found that it had an interest in the litigation given its history of advocacy on behalf of hunting rights. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 266 F.R.D. 369, 373 (D. Ariz. 2010); *see also W. Energy All. v. Zinke*, 877 F.3d 1157, 1165 (10th Cir. 2017) (conservation groups' "record of advocacy" established an interest in litigation regarding oil and gas drilling on public lands entitling it to intervention of right).

The issues in this action go straight to the core of At-Risk's mission: to ensure human rights and economic justice for NYCHA residents by demanding that NYCHA provide habitable homes and treat residents with dignity and respect. *See Mission*, AT-RISK COMMUNITY SERVICES, INC., http://atriskcommunityservices.org (last visited Aug. 9, 2018).

As such, At-Risk has an interest enabling it to intervene of right in this case.

**C.  These Interests May Be Impaired By the Proposed Consent Decree**

An intervenor's "interest" is "intimately related" to the potential for "impairment," such that these two factors are often examined "in tandem." *CBS Inc. v. Snyder*, 136 F.R.D. 364, 367 (S.D.N.Y. 1991).

**1.  The Tenants' Interests Will be Impaired Because the Proposed Monitor Will Oversee Significant Aspects of NYCHA's Operations, and Federal Law Guarantees Tenants a Right to Participate In Such Matters**

Federal statutes and regulations guarantee NYCHA residents an active role in policy matters. Among these, resident councils—such as CCOP—have a right to "actively participate" in "all aspects of public housing operations." 24 C.F.R. § 964.100. Additionally, NYCHA is required to consult with and consider the recommendations of resident advisory boards—such as CCOP—in determining operational goals. 42 U.S.C. § 1437c-1. NYCHA itself ostensibly concedes this point, asserting on its website that "CCOP works with senior NYCHA staff on the issues affecting life in NYCHA developments, engaging with government at all levels (local, state, and federal)." *Engagement*, N.Y.C. HOUS. AUTH., https://www1.nyc.gov/site/nycha/residents/getting-involved-as-a-resident.page (last visited Aug. 9, 2018). Moreover, under Section 3 of the Housing and Urban Development Act of 1968, NYCHA is obligated to offer low-income individuals, such as NYCHA residents, employment and other meaningful economic opportunities. 12 U.S.C. § 1701u.

The proposed Consent Decree neither recognizes these rights nor provides a mechanism for their exercise.  While the proposed Consent Decree provides for the development of Performance Requirements, Action Plans, Organizational Plans, and Operational Plans, nowhere does it provide a role for CCOP—or indeed for NYCHA residents in any capacity—in the development, evaluation, or execution of these plans, as is necessary to give teeth to their right to active participation.  Nor does the proposed Consent Decree refer to NYCHA's obligation to provide residents with access to jobs and economic opportunities, despite the fact that such opportunities are a certainty, given the purpose of the decree and the funding commitment from the City.

The parties may claim that the Tenants still possess these rights, and that the proposed Consent Decree will not impair them.  But this is cold comfort to the Tenants, who have grown accustomed to NYCHA disregarding residents' right to active participation in favor of unilateral action and meaningless opportunities for resident "input" when decisions have already been made.  Tenants' Pet. ¶¶ 191-92; Barber Decl. ¶ 6.

Additionally, the notion that the Tenants will retain these rights in theory denies the fundamental reality that, should a monitor be put in place as described in the proposed Consent Decree, that monitor will become the powerful center of gravity for NYCHA's management and operations for at least the next five years—and likely much longer.  Federal law guarantees residents a voice in such matters, as well as the right to have access to economic opportunities.  These rights exist regardless of whether NYCHA's operations are overseen by NYCHA alone (as is now the case) or whether they are overseen by a monitor working in conjunction with NYCHA (as would be the case under the proposed Consent Decree).  By failing to provide any explicit, ongoing role for residents under the terms of the proposed Consent Decree, the

20

Government (and NYCHA) have ignored these rights, and proposed a system where, as a practical matter, New York City's public housing developments will be operated without any resident input whatsoever for years to come.  Likewise, by contemplating *billions* in spending—but nowhere even referencing Section 3—the proposed Consent Decree will impair the Tenants' interest in ensuring that residents have access to the economic opportunities that will be available under the proposed Consent Decree.

Indeed, if the Tenants are not permitted to intervene, residents' voices will be peripheral to the paradigm shift that will happen through the Court-appointed monitor—contrary to federal law.  Moreover, the message to residents will be that no one speaks for them—not even CCOP, despite the fact that NYCHA itself purports to recognize CCOP as the democratically-elected, unified voice of residents for the purpose of engaging with government at every level.  The Tenants are (rightfully) distrustful of NYCHA given NYCHA's long history of "indifference," Mem. & Order at 3, *Baez*, No. 13 Civ. 8916, ECF No. 88, and "its apparent willingness to agree to anything without regard to whether it can comply," Mem. & Order at 3, *Baez*, No. 13 Civ. 8916, ECF No. 167, and they fear that this moment will be just another empty promise unless they have a seat at the table.  For this reason, too, it would be insufficient to permit the Tenants to intervene on a limited basis, or simply to submit comments on the proposed Consent Decree. The Tenants' rights to active participation and economic opportunities are on-going; what the parties have offered the Tenants in the proposed Consent Decree is a one-off opportunity to comment on the selection of the monitor.  Federal law guarantees them more than this.

These shortcomings in the proposed Consent Decree will, as a practical matter, impair the Tenants' rights under federal law, justifying their intervention here.  *See Wilder v. Bernstein*, No. 78 Civ. 957 (RJW), 1994 WL 30480, at *2 (S.D.N.Y. Jan. 28, 1994) (it is not necessary for

proposed intervenor to demonstrate that ruling would be "legally binding" upon them, if they demonstrate "their interests might, 'as a practical matter' be impaired by the action" (citation omitted)).

### 2. The Tenants' Interests Will Be Impaired by Spending on "Parallel Machinery"

During the July 10 conference, this Court recognized the enormity of the problems and deficiencies at NYCHA. July 10 Tr. at 4-5. Some of those issues are the subject of the *Baez* matter, where a monitor has been put in place to address the pervasive mold problem at NYCHA. And, a number of the issues in this case are also the basis of the claims in the Tenants' state-court lawsuit, where they seek declaratory and injunctive relief and the appointment of a monitor.

The Court is rightly concerned about the potential waste of establishing "parallel machinery" to address these system-wide problems. *Id.* at 5. It observed that "every dollar spent on bureaucracy is one less dollar for repairs and systemic reform." *Id.* at 5. Though the Government was unable to provide an estimate of the costs associated with the proposed monitorship—a concern in and of itself—the Government concedes that it will be "a substantial amount of money." *Id.* at 8. Moreover, without intervention, there will likely be not just *two* parallel bureaucracies to pay for—and to which NYCHA must answer—but *three*: the *Baez* monitor, the monitor the parties seek here, and the monitor sought by the Tenants in their state-court action. Those multiple parallel bureaucracies will dilute the (already scarce) resources available to remediate the pervasive health and safety problems that directly affect residents, making it even more likely that it will be "business as usual" at NYCHA under the proposed Consent Decree. NYCHA will be obliged to spend ever more money navigating competing bureaucratic demands and answering to three monitors with potentially differing priorities,

leaving less money available to remediate the health and safety concerns that are the root of the problem, thus directly impairing the Tenants' interests in addressing these concerns. It may also permit NYCHA to stymy progress by claiming that the direction of one monitor is inconsistent with that of another, or will necessitate time-consuming (and expensive) litigation regarding NYCHA's obligations under the various monitorships.

Excluding the Tenants from this case makes this outcome all the more likely. In the event that the Consent Decree entered in this case does not provide sufficient substantive relief and the opportunity for residents' ongoing involvement in the management of their homes—and the proposed Consent Decree is nowhere near adequate in these regards—the Tenants will continue to press those claims in their state-court action. By contrast, the Tenants' participation in this case may result in a Consent Decree with more robust protections, and may obviate some of the claims in their state-court suit, reducing the likelihood of yet another parallel bureaucracy absorbing funds that could be used to remediate the problems plaguing NYCHA residents today.

### D.  The Tenants' Interests Are Not Adequately Protected By the Parties to this Litigation

The showing required to establish inadequate representation "should be treated as minimal." *CBS*, 136 F.R.D. at 368. That said, where the Government has brought suit in *parens patriae*, "a greater showing that representation is inadequate" may be required. *United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 985 (2d Cir. 1984). That requirement is not insurmountable, however, and is satisfied where there is "a strong affirmative showing that the sovereign is not fairly representing the interests of the applicant." *Id.* Moreover, the heightened *Hooker* standard applies only "in cases where the applicant has no independent right to sue." *Id.* That is not the case here: the Tenants *do* have actionable claims of their own against NYCHA, which they are pursuing in the state-court action. *See* Tenants' Pet. Hence, only a minimal

showing of inadequacy is required, rather than the heightened *Hooker* standard.  In any event, the
Tenants can make not only a minimal showing of inadequacy, but also the heighted showing that
would be required by *Hooker*, if that standard applied.

First, the very terms of the proposed Consent Decree prove that the parties do not
adequately represent the Tenants' interests.  The Consent Decree sets forth a procedural and
substantive framework for a monitor's management of NYCHA for years to come, but excludes
the Tenants in violation of their right to active participation.  The Tenants have a legal right to a
seat at the table, but are provided none under the terms of the proposed Consent Decree.  Further,
the Consent Decree's financial remedy is wholly inadequate:  adding only 2.3 percent to
NYCHA's annual budget cannot possibly solve the systemic, pervasive problems in NYCHA's
facilities and operations.  Where, as here, the terms of a proposed compromise "fall far short" of
what the victims of the misconduct might seek, "the congruity of . . . interests" between the
Government and the proposed intervenors is "less apparent," and intervention is proper.  *Local
638*, 2003 WL 21767772, at *2.

Additionally, if the Tenants are not permitted to intervene, there will be no party to this
case opposing entry of the proposed Consent Decree.  "Without any party opposing [the relief
sought], this factor weighs in favor of the Proposed Intervenors' application." *Eddystone Rail
Co., LLC v. Jamex Transfer Servs.*, 289 F. Supp. 3d 582, 592 (S.D.N.Y. 2018) (Pauley, J.).
Moreover, the Tenants are likely to make a far more "vigorous presentation" of their interests
than the Government—particularly with respect to their interests in active participation and
economic opportunities, which the Government has all but ignored.  *See NYPIRG v. Regents of
the Univ. of the State of N.Y.*, 516 F.2d 350, 352 (2d Cir. 1975) (state did not adequately
represent society of pharmacists in suit challenging state regulation regarding advertising of

prescription drugs given that pharmacists will make "a more vigorous presentation" than the state with respect to certain interests).

Indeed, the Government's conduct in the weeks prior to filing this suit reflects the inadequacy of its representation.  After nearly a year of negotiating, it brought the Tenants into the process at the eleventh hour—surely long after the substantive framework of the decree had been negotiated with NYCHA and the City.  *See* Barber Decl ¶ 9; Hecht Decl. ¶¶ 10, 13.  It never provided the Tenants an advance copy of the Consent Decree, but offered assurances that the Tenants would be "significant stakeholders" under the proposed Consent Decree—which turned out to be nothing more than empty promises.  *See* Barber Decl. ¶¶ 11, 13-14; Hecht Decl. ¶¶ 14, 20, 24.  And the Government all but ignored the concerns raised by the Tenants during and following that meeting, *see* Barber Decl. ¶¶ 13-14; Hecht Decl. ¶¶ 15-23; indeed those are some of the very concerns that entitle the Tenants to intervene.  Where there is no "satisfactory client relationship" between the Government and a proposed intervenor—and, to be sure, there is none here—the intervenor's interests "would be more adequately protected by allowing them to intervene."  *EEOC v. N.Y. Times*, No. 92 Civ. 6548 (RPP), 2000 WL 307408, at *2 (S.D.N.Y. Mar. 24, 2000).

## II.   Alternatively, the Tenants Satisfy the Requirements for Permissive Intervention

Even if the Tenants somehow did not satisfy the standard for intervention of right, the Court should grant the Tenants permissive intervention.  Permissive intervention is appropriate if an intervenor "has a claim or defense that shares with the main action a common question of law or fact" and intervention will not "unduly delay or prejudice" the case.  Fed. R.Civ. P. 24(b); *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 73 (2d Cir. 1994).  Rule 24(b) is to be "liberally construed," *Degrafinreid v. Ricks*, 417 F. Supp. 2d 403, 407 (S.D.N.Y. 2006), and a court has

"broad discretion" to permit intervention, *Peterson v. Islamic Rep. of Iran*, 290 F.R.D. 54, 57 (S.D.N.Y. 2013) (citing *St. John's Univ. v. Bolton*, 450 F. App'x 81, 84 (2d Cir. 2011)). Moreover, the standard governing permissive intervention is flexible:  "[t]he words claim or defense are not to be read in a technical sense, but only require some interest on the part of the applicant."  *Louis Berger Grp., Inc. v. State Bank of India*, 802 F.Supp.2d 482, 488 (S.D.N.Y. 2011).  The factors considered on a permissive intervention motion are "substantially the same" as those considered on a motion for intervention of right, *In re Bank of N.Y. Derivative Litig.*, 320 F.3d 291, 300 n.5 (2d Cir. 2003), although "adequacy of representation" is "a minor factor at most" on a permissive intervention motion, *United States v. Columbia Pictures Indus., Inc.*, 88 F.R.D. 186, 189 (S.D.N.Y. 1980).

All of these considerations favor permissive intervention.  The Tenants' state-court lawsuit asserts claims that overlap substantially, on the facts and the law, with the claims brought by the Government and purportedly resolved by the proposed Consent Decree.  Namely, the Tenants, like the Government in this case, seek relief with respect to pervasive lead paint hazards that exist throughout NYCHA developments.  Tenants' Pet. ¶¶ 25-119, 197-206.

Moreover, as discussed *supra*, the Tenants' have interests in this suit—with respect to lead paint as well as other issues—that are likely to be impaired without their active participation.  Not only will this case (and the proposed Consent Decree, should it be entered without the Tenants' participation) have a direct effect on health and safety matters, but it will also likely to impact the Tenants' ability to exercise rights granted by federal law and regulations.  The Government is unable to adequately represent the Tenants' interests in this matter, as detailed *supra*.

Further, given the swift timing of this motion to intervene, there can be no claim of untimeliness, prejudice, or undue delay.  Indeed, the Tenants have every interest in having these matters addressed swiftly and comprehensively.  They have no interest in slowing this process down.  They merely want to ensure that the promise that this moment holds for all NYCHA residents is fulfilled.  There may never be another chance to so meaningfully and systematically improve the quality of life of NYCHA residents; but that improvement cannot and will not happen without the involvement of the residents themselves.

### III.   The Tenants' Involvement Is Likely to Improve the Proposed Consent Decree and the Outcome of this Case

There is precedent for permitting intervention in a circumstance such as this—and, in fact, this court has recognized that such intervention leads to better outcomes.

In *Wilder v. Bernstein*, a group of nineteen volunteer child care agencies were permitted to intervene to object to an initial proposed settlement regarding the provision of child care services in New York City, and then assisted the court in crafting a later settlement that the court ultimately approved.  *See* 645 F. Supp. 1292, 1350 (S.D.N.Y. 1986) (discussing history of case in connection with ruling approving settlement).  The *Wilder* court observed that the intervenors "offered by far the most comprehensive criticisms of the original settlement proposal" and had proven unique among the parties in their ability "to address freely and undistractedly the child care concerns that were prompted by the original settlement proposal."  *Id.*  Specifically, the intervenors' "direct participation" in the foster care system and "ongoing contact with the children in care" gave them the ability "to comment authoritatively on the likely impact of the [original proposed] settlement" on children.  *Id.*  The Court concluded that it—and the original parties—had "benefited immeasurably" from the intervenors' "insights into the operation of the child care system," and that the original settlement "undeniably benefitted from the intervenors'

constructive criticism and suggestions." *Id.* When it considered the fairness of a revised

settlement proposal—one that took the intervenors' concerns into consideration—the court noted

that the intervenors had "withdrawn their clinical objections" and "voluntarily consented" to the

revised proposal, and weighed this fact "significantly" in approving the revised proposal. *Id.*

The Tenants can play a similar valuable and constructive role here. In their roles as the

duly-elected body representing all NYCHA residents, and as a non-profit working directly with

NYCHA residents to help them obtain safe and habitable housing, the Tenants are uniquely able

to comment on the impact that the proposed Consent Decree will have on the residents

themselves. They wish to bring this experience and expertise to the table, to aid the parties—and

the Court—in fashioning a Consent Decree that will best protect the interests of NYCHA

residents. We respectfully submit that the Tenants' participation would not prejudice the parties

or be a burden on the Court, but, rather, that their constructive criticism would benefit this

process immeasurably and prevent NYCHA from again evading its obligations merely by

maintaining a "façade of action." Mem. & Order at 3, *Baez*, No. 13 Civ. 8916, ECF No. 167.

The Tenants note that this case is unlike *United States v. City of New York*, 198 F.3d 360

(2d Cir. 1999), where the court declined to permit an advocacy group to intervene in an action by

the federal government to require water filtration by the City under the federal Safe Drinking

Water Act and Surface Water Treatment Rule. In that case, the proposed intervenor opposed

filtration entirely—directly contrary to the mandate, "firmly established in federal law," that the

Government sought to enforce. *Id.* at 365. Consequently, the court deemed the intervenor's

interest in preventing filtration altogether as collateral to the Government's compliance action.

*See id.* By contrast, the Tenants here seek to protect an interest that is not collateral to this

action, but inherent in it. Additionally, the court in *United States v. City of New York* criticized

the intervenors for failing to directly challenge the stipulation, entered years earlier, under which the Government brought its enforcement suit.  *Id.* at 366.  That is precisely what the Tenants are doing here:  seeking to be included in the Consent Decree at the outset, rather than waiting to challenge it collaterally at a later date, after some operational plan has been put in place and ignored by NYCHA.

Likewise, *SEC v. Bear, Stearns & Co.*, No. 03 Civ. 2937 (WHP), 2003 WL 22000340 (S.D.N.Y. Aug. 25, 2003), is clearly distinguished from this case.   In that case, this Court declined to permit individuals with securities law claims to intervene in an SEC enforcement action, holding that there was no indication that those individuals represented all of the allegedly aggrieved investors—numbering over 12,000—and concluding that a contrary ruling could "open the floodgates to a multitude of potential intervenors with the same claim to intervention." *Id.* at *4.  That is not a concern here.  CCOP is the elected representative of NYCHA residents, and At-Risk is their dedicated advocate; these parties *do* give a unified voice to the interests of residents, and can participate in this action on their behalf, without threatening to overrun this proceeding with "swarms of potential intervenors."  *Id.*

## **CONCLUSION**

For the reasons stated herein, the Court should grant the Tenants' motion to intervene.

29

Dated: New York, New York
      August 10, 2018

CLARICK GUERON REISBAUM LLP

_____
Nicole Gueron
Emily Reisbaum
Melissa C. Holsinger
220 Fifth Avenue, 14th Floor
New York, New York 10001
Phone: (212) 633-4310
Fax: (646) 478-9484
Email: ngueron@cgr-law.com

*Attorneys for City-Wide Council
of Presidents, Inc. and At-Risk
Community Services, Inc.*