UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                 :

   UNITED STATES OF AMERICA,      :
                                 :

               Plaintiff,      :

                                 :     18cv5213

       -against-              :

                                 :     <u>OPINION & ORDER</u>

   NEW YORK CITY HOUSING     :
   AUTHORITY,                  :

                                 :

               Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM H. PAULEY III, Senior United States District Judge:

          The United States of America (the "Government") moves for approval of a proposed consent decree touted by the parties to bring organizational reform to the New York City Housing Authority ("NYCHA") and correct its systemic violations of federal health and safety regulations. On September 26, 2018, scores of NYCHA tenants, elected officials, and representatives of community organizations appeared for a fairness hearing to assist this Court in assessing the proposed decree. One after another, they rendered harrowing accounts of the squalid conditions in their apartments and the indifference of NYCHA management, called for the firing or prosecution of NYCHA officials, and urged greater tenant participation in the negotiation and enforcement of the proposed consent decree. Two of these community organizations, the City-Wide Council of Presidents and At-Risk Community Services (the "Intervenors"), also filed formal opposition briefs.

          This human dimension cannot be ignored despite the parties' attempts to limit the Court to a perfunctory review of the validity and form of the settlement. For decades, Congress has addressed the importance of ensuring that public housing residents live in decent, safe, and

sanitary conditions.  Congress vested the U.S. Department of Housing and Urban Development ("HUD") with broad authority and responsibility to monitor the performance of public housing agencies receiving federal funds and to aggressively reform those agencies that misuse them. But the parties' proposed decree sidelines HUD and displaces the congressional framework for remedying public housing failures with a parallel framework to be managed by the judiciary. And aside from general directives to comply with applicable statutes and regulations, the proposed decree does not offer any specificity as to NYCHA's required or enjoined conduct. Rather, it contemplates the future elaboration of the terms of the injunction through the development of performance requirements and plans.  These performance requirements and plans are not subject to this Court's approval, but will be developed by a monitor, approved by the Government, and subject to judicial review only under an arbitrary and capricious standard.

Because the record reveals a substantial basis to conclude that this proposed decree is not fair, reasonable, or consistent with the public interest, the Government's motion to approve the consent decree is denied.

## BACKGROUND

This case is about the disastrous human toll resulting from a complete bureaucratic breakdown of the largest public housing agency in the United States.  NYCHA's stated mission is to provide safe, decent, and affordable housing for the 400,000 or more low- and moderate-income New Yorkers who live in approximately 175,000 apartments in 326 housing developments.  NYCHA's reported population alone places it within the fifty most populous cities in the Nation.  But NYCHA's size is paralleled by its organizational disarray in providing any semblance of adequate housing for some of the most vulnerable members of

society and its systemic cover-up of a host of fundamental health and safety issues.[1]  More than two years ago, the Government began investigating NYCHA's violations of federal health and safety requirements and its deception of federal regulators as to its compliance with those requirements.  The breathtaking scope of NYCHA's deficiencies came into public focus through the accretion of media scrutiny, the high-profile departures of some of NYCHA's top leadership, and federal and state court class actions by NYCHA's own tenants to remedy some of the same housing conditions at issue in this action.

On June 11, 2018, the Government's investigation culminated in the filing of a complaint and proposed settlement (the "Complaint" and "Proposed Consent Decree").  The Complaint, which seeks the appointment of a monitor and other injunctive relief, asserts three claims against NYCHA.  First, the Government claims that NYCHA substantially defaulted on its covenants and obligations under its "Annual Contributions Contract" with HUD, which incorporates federal lead-paint safety regulations and NYCHA's obligation under 24 C.F.R. § 5.703 to provide "decent, safe, and sanitary housing."  (Compl., ECF No. 11, ¶¶ 268-271 (citing 42 U.S.C. § 1437d(j)(3)).)  Second, it asserts a claim under the federal Anti-Fraud Injunction Act to enjoin NYCHA's ongoing or imminent false statements to federal regulators about its housing conditions and its compliance with federal law in violation of 18 U.S.C. § 1001.  (Compl. ¶¶ 272-276 (citing 18 U.S.C. § 1345).)  Finally, the Government brings a claim under the Toxic Substances Control Act of 1976 to restrain NYCHA's failure to comply with federal lead-based paint regulations.  (Compl. ¶¶ 277-282.)

---

[1]  The plight of one tenant typifies NYCHA's beadledom.  At the September 26, 2018 hearing, she described the trauma and heartbreak that overwhelmed her every day when she entered and exited the apartment building where her 16-year-old son was murdered in November 2017.  (See Sept. 26, 2018 Hr'g Tr. at 92-94.)  For more than ten months, she sought to be transferred to another building without success.  In a personal note postmarked October 22, 2018, the tenant informed this Court that NYCHA moved her to a new apartment.  (See ECF No. 63.)  While this Court commends NYCHA for acting expediently after the hearing, it should not take a public admonishment from a federal judge to spur NYCHA to perform an act of basic human decency.

Because the determination of whether the Proposed Consent Decree should be approved requires an examination of the terms of the settlement and the claims brought in this action, a brief overview is warranted.

I.    The Complaint

This action may present the rare instance in which the allegations in the complaint are understated.  As the Complaint alleges, and as numerous tenants testified from first-hand knowledge, NYCHA's apartments and buildings are literally falling apart—and NYCHA knows it.  In March 2018, the New York State Department of Public Health found that 83% of inspected units contained some condition that could pose a health hazard to tenants.  (Compl. ¶ 161.)  Somewhat reminiscent of the biblical plagues of Egypt, these conditions include toxic lead paint, asthma-inducing mold, lack of heat, frequent elevator outages, and vermin infestations.

A.  Lead Paint

Contrary to NYCHA's public assurances that lead paint was not widely used in NYCHA and that the vast majority of its developments did not have lead paint, the Government alleges that NYCHA's own documents reveal that more than half of NYCHA's developments contain lead paint somewhere.  (Compl. ¶¶ 54-56.)  At minimum, NYCHA's assertions indicate that roughly 51,000 apartments in at least 1,200 buildings in at least 92 developments have lead paint on their walls, floors, ceilings, windows, doors, radiators, or pipes.[2]  (Compl. ¶¶ 54, 57.)  Approximately 173,000 residents, of which 11,500 are children under 6, live in these 92 developments.  (Compl. ¶ 57.)  But these numbers are only the tip of the iceberg—City and New York State health inspections have identified lead paint in developments that NYCHA previously

---

[2]    As of October 30, 2018, NYCHA's estimate of apartments to be inspected for lead paint increased to 140,000 of its 175,000 apartments, as reported by the media.  See Greg B. Smith, Oops! NYCHA suddenly discovers 10,000 more lead-paint apartments it needs to inspect, N.Y. Daily News (Oct. 30, 2018), http://www.nydailynews.com/new-york/ny-metro-nycha-lead-paint-more-apartments-20181030-story.html.

declared to be lead free.  (Compl. ¶ 56.)

Despite the prevalence of lead paint in NYCHA's apartments, NYCHA inexplicably failed to conduct required inspections and evaluations for years.  For instance, NYCHA conducted less than 25% of the biennial risk assessment evaluations it should have conducted in the 92 developments with lead paint between 2010 and 2017.  (Compl. ¶ 60.)  For 50 of these 92 developments, NYCHA failed to conduct a <u>single</u> evaluation during that period. (Compl. ¶ 60.)  NYCHA's senior management knew that these evaluations were not being conducted as early as 2011.  (Compl. ¶ 95.)  Even where NYCHA found a child with elevated blood lead levels who lived in a development previously determined to be lead free, it still—in defiance of all common sense—did not conduct risk assessments of that development.  (Compl. ¶¶ 78-79.)  Further, NYCHA simply stopped performing legally required annual visual assessments for lead paint hazards in 2012.  (Compl. ¶¶ 64-67.)  NYCHA's senior management allegedly knew that these assessments were not being conducted as early as 2013.  (Compl. ¶ 96.)  Although NYCHA partially restarted inspections in May 2016, the 4,000 visual assessments it conducted generated 3,900 work orders to abate lead paint hazards.  (Compl. ¶¶ 66-67.)  When extrapolated, this rate of work orders underscores the prevalence of lead paint hazards in NYCHA housing.  (<u>See</u> Compl. ¶ 68 (alleging that more than 80% of the 9,000 apartments inspected in 2017 contained potential lead paint hazards).)  And when NYCHA did perform maintenance work, the majority of that work was performed by employees who did not have proper training in lead-safe work practices and did not safely abate lead paint hazards. (Compl. ¶¶ 70-75, 80.)  This, too, was known to NYCHA's management.  (Compl. ¶¶ 99-100.)

Importantly, these statistics underscore the tangible impact of NYCHA's apathy on residents.  Lead is toxic to all humans.  (Compl. ¶¶ 31-32.)  Even small amounts of lead may

lead to cancer, hypertension, kidney failure, and other serious health conditions.  (Compl. ¶ 32.)
Young children who unwittingly ingest even small amounts of lead paint flakes and lead dust
may suffer irreversible neurological problems.[3]  (Compl. ¶ 32.)  The Government alleges that
between 2010 and 2016, the City's Department of Health confirmed that at least 19 children had
elevated blood lead levels while living in lead-riddled apartments.  (Compl. ¶¶ 82-85.)  Despite
senior management's knowledge, NYCHA refused to provide any information or report these
cases to HUD.  (Compl. ¶¶ 76-77, 101.)  Moreover, as the Complaint alleges, this number
massively understates the actual number of children afflicted with elevated blood lead levels for
at least two reasons.[4]  (See Compl. ¶ 82.)  First, NYCHA employed an obstructionist and
counterintuitive policy of immediately contesting every order by the Department of Health to
abate lead paint following an inspection.  (Compl. ¶ 85.)  These challenges often resulted in the
Department of Health's retraction of findings of lead paint and withdrawal of abatement orders,
rendering under-counting all but certain.  (Compl. ¶¶ 84-87.)  Second, only a subset of children
for whom exposure to lead paint could cause deleterious health effects were tested for elevated
blood lead levels.  (Compl. ¶ 88.)  As a NYCHA spokesperson intimated in a July 29, 2017 press
release, even one child with elevated lead levels is one too many.

### B. Mold, Heat, Elevators, and Vermin

Endemic mold, insufficient heat during the wintertime, broken elevators, and

---

[3]     A recent policy statement published by the American Academy of Pediatrics' Council on Environmental
Health confirms that there is no safe level of lead in blood and that even blood lead concentrations below 5 µg/dL
(50 ppb) are "a causal risk factor for diminished intellectual and academic abilities, higher rates of neurobehavioral
disorders," and lower birth weight in children.  The authors also note that no effective treatments exist to
"ameliorate the permanent developmental effects of lead toxicity."  Bruce Perrin Lanphear, et al., Prevention of
Childhood Lead Toxicity, 138 Pediatrics, no. 1, 2016, at 1.

[4]     The City later revealed that since 2012, a total of 1,160 children under the age of 18 living in NYCHA
housing had elevated blood lead levels.  See Luis Ferré-Sadurní, Little Decline in Number of Children in Public
Housing With High Lead Levels, Report Says, N.Y. Times (Aug. 30, 2018), https://www.nytimes.com/2018/08/30/
nyregion/nyc-public-housing-lead.html.

infestations of rats, mice, and cockroaches are also a part of daily life for NYCHA tenants.[5]

(Compl. ¶¶ 159-160.)  Between 2013 and 2016, for example, NYCHA tenants made between

18,000 and 28,000 complaints about mold growth every year.  (Compl. ¶ 164.)  During that same

period, tenants lodged between 117,000 and 146,000 complaints each year about flooding and

leaks, which contribute to mold growth.  (Compl. ¶ 166.)  These annual numbers of complaints

are increasing.  (Compl. ¶¶ 164, 166.)  And even where NYCHA claims to have addressed mold,

it reoccurs 30% of the time.[6]  (Compl. ¶¶ 171, 176.)  Similarly, the 825,000 heating complaints

that NYCHA's tenants made between 2011 and 2016 bear testament to its widespread and

persistent inability to provide sufficient heat during frigid New York winters.  (Compl. ¶¶ 177-

186.)  For example, during the winter of 2015-2016, roughly 43,000 residents made over

155,000 complaints of insufficient heat.  (Compl. ¶ 181.)  Two years later, more than 323,000

residents—or over 80% of NYCHA's population—suffered heating outages lasting an average of

48 hours.[7]  (Compl. ¶ 183.)

As for NYCHA's elevators, the Government alleges that NYCHA experienced an

average of 94 outages per elevator between 2011 and 2016.  (Compl. ¶ 188.)  In 2016, nearly

---

[5]      These conditions do not tell the whole story.  For instance, the Complaint also alleges that NYCHA failed
to inspect smoke and carbon monoxide detectors in its apartments and that the majority of NYCHA's playgrounds
were found to contain hazardous conditions.  (Compl. ¶ 161.)  At the September 26, 2018 hearing, a representative
of the New York Environmental Law & Justice Project described how arsenic from the City Department of Health's
rat-control efforts, along with lead, contaminates the soil around NYCHA buildings at the Governor Alfred E. Smith
Houses just one block from the Daniel Patrick Moynihan U.S. Courthouse.  He testified that the children were
moved to an adjacent playground in which the City's Department of Parks & Recreation was observed using Round-
Up to kill weeds, which itself becomes more toxic when combined with heavy metals.  (Sept. 26, 2018 Hr'g Tr. at
118-19.)

[6]      Many of these issues are the subject of a 2013 class action brought by NYCHA tenants suffering from
asthma as a result of mold and excessive moisture in their apartments.  See Baez v. N.Y.C. Hous. Auth., 2015 WL
9809872 (S.D.N.Y. Dec. 15, 2015).

[7]      Media outlets recently reported that 35,475 tenants have already endured insufficient heat or hot water
since October 18, 2018—and winter has not yet arrived.  See, e.g., Yoav Gonen & Georgett Roberts, Over 35K
NYCHA residents are suffering without heat, hot water, N.Y. Post (Oct. 24, 2018), https://nypost.com/2018/10/24/
over-35k-nycha-residents-are-suffering-without-heat-hot-water.

70% of buildings with at least one elevator had no working elevators at some time—an occurrence apparently so common that NYCHA refers to it by the colloquialism "double-header." (Compl. ¶¶ 190, 193.) Finally, cockroaches, mice, and rats are legion in NYCHA housing. Between 2010 and 2016, NYCHA tenants lodged over 280,000 complaints about cockroaches, more than 130,000 complaints about mice, and almost 15,000 complaints about rats—numbers that are also increasing. (Compl. ¶¶ 200, 202.)

These statistics, while helpful in understanding the scope of NYCHA's failures, are given meaning by the toll that these physical conditions take on NYCHA residents. Mold may release toxins and allergens correlated with respiratory problems, contributing to NYCHA residents' disproportionate rate of asthma hospitalizations and forcing tenants to remove sheets of mold themselves. (Compl. ¶¶ 165, 172.) Frigid apartments give tenants no choice but to leave their stoves and ovens on all night for heat. (Compl. ¶ 184.) Broken elevators trap residents for hours, put the elderly and disabled to the dilemma of waiting in lobbies or clambering up flights of stairs, and tragically, sometimes kill NYCHA residents. (Compl. ¶¶ 191-197.) And plainly, pests can carry disease, exacerbate respiratory conditions, and contaminate food and water. (Compl. ¶ 203.) While aware of these conditions, NYCHA ignored tenant complaints or only nominally addressed them because of incompetence or apathy. (See Compl. ¶¶ 166-168, 175-176 (describing NYCHA's closing of mold work orders without remediation); Compl. ¶ 186 (alleging NYCHA management's awareness of insufficient heat); Compl. ¶¶ 192-195 (alleging NYCHA's management's awareness of broken elevators); Compl. ¶¶ 204-210, 212-214 (detailing NYCHA's practices of arbitrarily closing out work orders or faking exterminations by spraying water).)

C.  NYCHA's Deception

The Complaint alleges more than NYCHA's callous indifference to the well-being of its tenants, but that it whitewashed these deficiencies for years.  According to the Government, NYCHA's deception was entrenched within its culture, from top-level management downward.  In March 2016, for example, NYCHA's Chair testified before the New York City Council that NYCHA regularly performed visual assessments of lead paint as legally required.  (Compl. ¶ 111.)  Despite learning in April 2016 that NYCHA did not perform these visual assessments, NYCHA's Chair did nothing.  (Compl. ¶ 97.)  The false testimony by NYCHA's Chair is emblematic of NYCHA's pattern of deceiving anyone who it needed to falsely assure, whether it be elected officials, NYCHA's tenants, the general public, or HUD.  (See Compl. ¶¶ 103-117.)  Indeed, between 2010 and 2016, NYCHA falsely certified its compliance with HUD's lead-paint safety regulations and its obligation to provide "decent, safe, and sanitary" housing in certifications submitted to HUD, amendments to its Annual Contributions Contract with HUD, and in drawing down operating funds provided by HUD.  (Compl. ¶¶ 92, 241-264.)

NYCHA also lied to HUD and the public to allay concerns over a work order backlog spinning out of control.  Between 2010 and 2012, NYCHA faced mounting pressure from HUD and criticism from the media to address its backlog of 400,000 work orders, which the media blamed as the source of NYCHA's decaying apartments.  (Compl. ¶¶ 215-220.)  As of August 2012, NYCHA was on pace to exceed the 170,000 work orders that its 2011 inspections had generated.  (Compl. ¶ 221.)  Thus, it sought to engineer a backlog reduction.  First, it suspended annual inspections between August 2012 and the summer of 2014.  (Compl. ¶¶ 221-228.)  Even though some of its executives expressed misgivings that a lengthy moratorium on inspections would run afoul of its obligations under the U.S. Housing Act of 1937, those

concerns went unaddressed.  (Compl. ¶ 225.)  This scheme allowed NYCHA to move 200,000 work orders off its books during the suspension.  (Compl. ¶ 226.)  Second, in February 2013, NYCHA revived a policy allowing staff to close work orders by reporting that the tenant was not home.  (Compl. ¶¶ 233-235.)  NYCHA's executives explicitly made this change to reduce the number of open work orders, which allowed them to close another 200,000 work orders in 2013.  (Compl. ¶¶ 233-234.)  Nonetheless, NYCHA triumphantly—but falsely—claimed to HUD and the public that it reduced its backlog based on initiatives to improve efficiency and productivity.  (Compl. ¶¶ 229-232, 236-240.)

Finally, NYCHA sought to game HUD's public housing inspection system in order to avoid the additional scrutiny that came with low inspection scores, including more frequent inspections, corrective action plans, and the potential of a federal receivership.  (See Compl. ¶¶ 121-132.)  These inspections evaluate four "indicators" of a public housing agency's performance—physical conditions, financial condition, management, and capital funding.  See 24 C.F.R. part 902 subpart A.  A public housing agency receives an overall score, as well as separate scores for each indicator.  24 C.F.R. §§ 902.9, 902.11.  In stark contrast to its lethargic attitude when it came to the health and safety of its tenants, NYCHA approached its inflation of HUD inspection scores with tactical precision and a take-no-prisoners approach.  (See Compl. ¶ 156.)

On the eve of inspections, NYCHA transformed its developments into veritable Potemkin villages.  The Complaint alleges that NYCHA's management circulated dossiers on individual inspectors so that its staff could identify and patch over specific conditions that certain inspectors were known to scrutinize.  (Compl. ¶¶ 133-135.)  And during inspections, NYCHA staff raced ahead of inspectors to address any unforeseen deficiencies.  (Compl. ¶¶ 153-155.)

NYCHA also employed a panoply of stratagems designed to temporarily conceal the crumbling physical conditions of its housing. These practices, which NYCHA's management knew about or actively directed, included (1) temporarily shutting off a building's water supply to hide water leaks; (2) plugging holes in walls and ceilings with newspaper and cork before painting over the hole; (3) building fake walls to conceal broken doors and dilapidated rooms; (4) locking doors and posting "danger" signs to keep inspectors away from rooms with dangerous or unsanitary conditions; and (5) hiding improperly stored hazardous materials. (See Compl. ¶¶ 137-148.) Remarkably, NYCHA indoctrinated its staff in these deceptive tactics through internal guidelines, including the decade-long distribution of a "Quick Fix Tips" guide on how to conceal problematic conditions from HUD inspectors. (Compl. ¶¶ 149-152.)

II.     The Proposed Consent Decree

The Proposed Consent Decree is the product of months of negotiations among the Government, NYCHA, and the City of New York,[8] all of whom are signatories to the agreement. In broad strokes, the proposed decree contains factual admissions by NYCHA, provisions regarding the selection of a monitor and the monitor's powers and responsibilities, provisions for funding by the City, and provisions for injunctive relief.

A.     Factual Admissions

Under the Proposed Consent Decree, NYCHA admits that between 2010 and 2016, it falsely certified its compliance with federal statutory and regulatory requirements—including those relating to lead paint safety—to HUD. (Proposed Consent Decree ¶ 7(a)-(c).) NYCHA also admits that its inspections revealed that lead paint exists on the premises of more than half of its developments, including in the apartments of 92 developments. (Proposed

---

[8]     While the City is a signatory to the Proposed Consent Decree, the Government did not name it as a defendant in the action.

Consent Decree ¶ 7(d).)  These admissions also indicate that in the first half of this decade,

NYCHA failed to conduct legally required lead paint risk assessment evaluations or visual

assessments, failed to ensure that its staff use lead-safe work practices, and failed to provide

HUD with any information regarding children living in NYCHA developments found to have

elevated blood lead levels.  (Proposed Consent Decree ¶ 7(e)-(h).)

   Similarly, NYCHA makes admissions regarding many of the appalling conditions

of its apartments.  These include 300 cases between 2014 and 2016 in which NYCHA staff

verified mold growth covering more than 100 square feet and a mold reoccurrence rate

exceeding 30%; 825,000 complaints of insufficient heat between 2011 and 2016; the loss of heat

for 80% of NYCHA's residents during the winter of 2017-2018; the majority of NYCHA

elevator buildings experiencing at least one period with no functioning elevators in 2016; and

more than 260,000 work orders for roaches, more than 90,000 work orders for mice, and nearly

36,000 work orders for rats between 2013 and 2016.  (Proposed Consent Decree ¶ 7(i)-(q).)  And

despite these conditions, NYCHA admits that it reported to HUD between 2012 and 2013 that it

had made significant progress in reducing its work order backlog, while obscuring the fact that it

generated substantially fewer work orders by suspending annual inspections.  (Proposed Consent

Decree ¶ 7(r).)  Finally, the Proposed Consent Decree contains admissions that NYCHA

artificially inflated its HUD inspection scores, including through its distribution of a list of

"Quick Fix Tips" to deceive HUD inspectors.  (Proposed Consent Decree ¶ 7(s)-(u).)

 B. <u>Monitor Provisions</u>

   The Government characterizes the monitorship as the "centerpiece" of the

Proposed Consent Decree.  Even though the Government suggests that the direction NYCHA's

obligations may take will depend on who the monitor is, it still—more than five months after

filing the proposed decree—has not identified any candidate who it might nominate to be the monitor. (See July 10, 2018 Hr'g Tr. at 8 (statement by Government counsel that applicants for monitor may "have different ideas and structures for what they would bring to that process").) Thus, this Court's evaluation of whether the Proposed Consent Decree should be approved must necessarily occur with incomplete knowledge of its key monitorship component.[9]

In any event, the monitor will be proposed by the Government in consultation with the City and NYCHA and—at the Government's discretion—with stakeholders such as New York State, the New York City Council, the City-Wide Council of Presidents, and other tenant groups. (Proposed Consent Decree ¶ 15.) The monitor is subject to this Court's supervision as an officer of the court. (Proposed Consent Decree ¶ 40.) NYCHA bears the burden of paying "all reasonable fees and costs" of the monitor. (Proposed Consent Decree ¶ 53.) The proposed decree provides no cap on the costs of the proposed monitorship, and the Government could not offer any estimate, recognizing only that "it will be a substantial amount of money" that "is hard to estimate until the monitor is in place." (See July 10, 2018 Hr'g Tr. at 8-9.)

Ultimately, the monitor's purpose is to "ensure that NYCHA (1) complies with all Lead Paint Laws, (2) provides housing that is decent, safe, sanitary, and in good repair, . . . (3) does not make false or misleading statements to the United States, and (4) implements the terms of the Consent Decree." (Proposed Consent Decree ¶ 14.) To that end, the Proposed Consent Decree requires the monitor to ensure that NYCHA complies with federal, state, and local lead

---

[9]     The same day that this Court issued an order scheduling a status conference for July 10, 2018, the U.S. Attorney's Office announced its NYCHA monitor application process and fixed July 11, 2018 as the deadline for monitor applications to be received. At the July 10, 2018 conference, this Court scheduled a fairness hearing for September 26, 2018. The following day, the Government extended the monitor application deadline to September 12, 2018. On September 12, 2018, the Government again extended the time to submit a monitor application—this time, to the date this Court approves the Proposed Consent Decree.

paint laws, including EPA and HUD regulations relating to lead-paint inspections, work practices, and disclosures.  (Proposed Consent Decree ¶ 18(a).)  Similarly, the monitor must ensure that NYCHA complies with HUD health and safety standards relating to mold, heating, elevators, and pests.  (Proposed Consent Decree ¶ 18(b)-(e).)  To address NYCHA's false or misleading statements to federal regulators, the Proposed Consent Decree requires NYCHA to consult with the monitor to create a Compliance Department, a Quality Assurance Department, and an Environmental Health and Safety Department.  (Proposed Consent Decree ¶¶ 18(g), 63-65.)

The Proposed Consent Decree contemplates the future development and implementation of frameworks to assist NYCHA in achieving compliance with the requirements set forth in paragraph 18(b)-(f).  Performance Requirements are "objective quantitative benchmarks" to be developed by the monitor, in consultation with NYCHA and the City, and approved by the Government.  (Proposed Consent Decree ¶¶ 13(p), 23.)  After a Performance Requirement becomes effective, NYCHA and the monitor must prepare an Action Plan that includes "specific actions" to bring NYCHA into compliance with the Performance Requirement and paragraph 18's mandates, "a date certain" to satisfy those requirements, and "interim milestones with specific completion dates."  (Proposed Consent Decree ¶ 27.)  Action Plans may also provide for policies, procedures, systems, or structures for NYCHA to adopt to comply with the decree.  (Proposed Consent Decree ¶ 34.)  Apart from Action Plans, NYCHA must also work with the monitor to develop an Operational Plan that "clearly delineat[es]" the respective spheres of NYCHA's Chair, General Manager, and Board, as well as an Organizational Plan directed toward implementing changes to NYCHA's structure.  (Proposed Consent Decree ¶¶ 28, 29.)

To assist in achieving the goals of the monitorship, the Proposed Consent Decree

permits the monitor full access to NYCHA's documents, data, and other information. (Proposed Consent Decree ¶ 19.) The decree also grants the monitor full access to NYCHA's services, programs, facilities, and premises. (Proposed Consent Decree ¶ 19.) Additionally, the monitor may communicate with NYCHA's personnel without any prior notice to or permission by NYCHA. (Proposed Consent Decree ¶ 20.) The monitor may also engage any third parties at its discretion to assist in performing its responsibilities. (Proposed Consent Decree ¶ 17.) Finally, the monitor may seek "extraordinary relief" from this Court, "including the authority to enter into contracts on NYCHA's behalf," upon a showing of "compelling evidence" that NYCHA's inability to comply with an Action Plan frustrates the purpose of the proposed decree. (Proposed Consent Decree ¶ 37.)

Evaluation of the monitor and NYCHA's progress occurs through reporting and feedback mechanisms. The monitor must submit a quarterly report to the Government, NYCHA, and this Court setting forth the work performed by the monitor and NYCHA's progress and compliance. (Proposed Consent Decree ¶¶ 41-44.) After the Proposed Consent Decree has been in place for five years, these periodic reports must also assess whether NYCHA meets the requirements for termination of the decree. (Proposed Consent Decree ¶¶ 43, 97.) Separately, NYCHA community leaders and representatives may provide feedback through a Community Advisory Committee that meets at least twice a year to discuss the achievement of the monitorship's purposes and to advise the monitor on the prioritization of projects. (Proposed Consent Decree ¶ 21.) Outside of the Community Advisory Committee, the monitor must also formulate procedures through which residents and other NYCHA stakeholders may provide input. (Proposed Consent Decree ¶ 22.)

C. Funding

To assist NYCHA in complying with the Proposed Consent Decree and the to-be-determined Performance Requirements and plans, the City commits to providing almost $3 billion in previously budgeted capital and expense funding, as well as an additional $1 billion in capital funding over the next four years and $200 million in capital funding each subsequent year.[10] (Proposed Consent Decree ¶ 54.) If the City fails to furnish the capital funds during the period prescribed in paragraph 54, those funding obligations will be carried over to the next fiscal year. (Proposed Consent Decree ¶ 57.) Similarly, capital funds that NYCHA fails to spend will be "carried over and added to each subsequent fiscal year until spent." (Proposed Consent Decree ¶ 57.) Unbelievably, despite NYCHA's $31.8 billion capital needs deficit and its widely publicized heating crisis last winter,[11] the Government attests that NYCHA already left unspent roughly $377 million of the $483 million in capital funding provided by the City for fiscal year 2018, which will be carried over into fiscal year 2019. (Declaration of Monica P. Folch in Support of the United States' Motion to Enter the Proposed Consent Decree, ECF No. 45 ("Folch Decl."), ¶ 3.)

These funding provisions are somewhat malleable. With respect to the City's funding obligations, the City retains the option to authorize additional capital or expense

---

[10]    While these sums are not insignificant, they pale in comparison to NYCHA's estimated $31.8 billion in unmet capital needs. To put such a lofty figure in more understandable terms, NYCHA's capital needs amount to an expenditure of over $180,000 per apartment. But even assuming that the proposed decree lasts through fiscal year 2027 (the final year for which the City had previously allocated capital funding), the City's funding would only cover roughly $23,000 of each apartment's unmet capital needs. At the rate of the City's funding obligation—which is the only committed source of capital funds in the Proposed Consent Decree—NYCHA's current capital needs would not be met until the year 2166. This estimate also assumes that NYCHA's housing stock will not deteriorate further over the next 148 years.

[11]    On October 18, 2018, the Mayor announced that boilers in twelve NYCHA developments had been replaced since last winter and that NYCHA was ready to deploy five mobile boilers for heating emergencies. This Court wonders how many other boilers could have been replaced if NYCHA had committed some of the $377 million it left on the table.

spending to NYCHA, although the City's counsel confirmed that the City had no plans to allocate additional funding at present. (Proposed Consent Decree ¶ 60; Sept. 26, 2018 Hr'g Tr. at 188.) However, the Proposed Consent Decree also sets forth procedures for the City to delay or be relieved by this Court of its funding obligations in the event of undue financial hardship that renders it unable to pay some or all of the amounts prescribed in paragraph 54. (Proposed Consent Decree ¶¶ 61-62.) Moreover, the proposed decree notes that $550 million in state resources "may be available,"[12] in addition to ongoing operating and capital funds from HUD, which will not be offset by the amount that NYCHA is slated to receive from the City.[13] (Proposed Consent Decree ¶¶ 38, 52; see Compl. ¶ 18 (alleging that roughly $900 million of NYCHA's operating budget comes from HUD and that HUD provides over $300 million per year in capital funding).)

D. Injunctive Relief

The Proposed Consent Decree requires NYCHA to take certain specified actions without waiting for the effective date of the proposed decree, the appointment of a monitor, or the issuance of an Action Plan. (Proposed Consent Decree ¶ 66.) For instance, NYCHA must comply with HUD and EPA regulations relating to lead-safe work practices and abatement. (Proposed Consent Decree ¶ 67.) Under the Proposed Consent Decree, NYCHA must also take steps to notify residents of lead paint to which they may be exposed. In particular, NYCHA must notify residents if their apartments or common areas in their buildings have been identified

---

[12]     Of course, this observation says nothing about whether these funds will in fact be released, and the State of New York is not a signatory bound by the proposed decree. The parties' agreement that the $550 million in state resources "are important to the success of [the Proposed Consent Decree]" is similarly aspirational. (Proposed Consent Decree ¶ 38.)

[13]     The City expressed concern that HUD might reduce its capital funding contribution to NYCHA if HUD included the City's funding under the Proposed Consent Decree in its funding formula. This "very technical" provision was included to ensure that HUD could not do so. (Sept. 26, 2018 Hr'g Tr. at 200-01.)

as containing lead paint no later than November 8, 2018—or if a child under 6 resides in such an apartment, no later than September 9, 2018. (Proposed Consent Decree ¶ 68.) Finally, NYCHA must keep at each development's management office physical copies of all materials required to be disclosed by HUD and EPA's lead-disclosure regulations. (Proposed Consent Decree ¶ 69.) Those materials must be present and available for inspection no later than October 9, 2018 and must be sent to each resident no later than December 8, 2018. (Proposed Consent Decree ¶ 69.) To date, this Court has not received any update from the parties as to whether NYCHA has complied with the obligations for which the proposed decree sets a specific deadline.

## DISCUSSION

The Second Circuit recognizes a "strong federal policy favoring the approval and enforcement of consent decrees." SEC v. Citigroup Glob. Mkts., Inc., 752 F.3d 285, 292 (2d Cir. 2014) (citation and quotation marks omitted). A district court only "has the power to enter or reject such a judgment, not to alter it." SEC v. Petro-Suisse Ltd., 2013 WL 5348595, at *3 (S.D.N.Y. Sept. 25, 2013). Although a district court is not merely a "rubber stamp" for a government agency seeking the entry of a consent decree, see Citigroup, 752 F.3d at 293, its review of a proposed consent decree is—for better or worse—more deferential in the context of a government enforcement action, see SEC v. Caledonian Bank Ltd., 317 F.R.D. 358, 374 n.15 (S.D.N.Y. 2016) (citing SEC v. Citigroup Glob. Mkts. Inc., 34 F. Supp. 3d 379, 380-81 (S.D.N.Y. 2014)).

The "proper standard for reviewing a proposed consent judgment involving an enforcement agency requires that the district court determine whether the proposed consent decree is fair and reasonable, with the additional requirement that the 'public interest would not be disserved,' in the event that the consent decree includes injunctive relief." Citigroup, 752

18

F.3d at 294 (internal citations omitted). Absent a "substantial basis in the record" to conclude

that the consent decree is not fair and reasonable or that the public interest would be disserved,

"the district court is required to enter the order," irrespective of the adequacy of the consent

decree. Citigroup, 752 F.3d at 294. While this deferential standard arose in the context of an

SEC enforcement action, courts in this circuit have since extended it to other government

enforcement contexts. See, e.g., U.S. Commodity Futures Trading Comm'n v. Deutsche Bank

AG, 2016 WL 6135664, at *2 (S.D.N.Y. Oct. 20, 2016); United States v. Int'l Bus. Machs.

Corp., 2014 WL 3057960, at *1 (S.D.N.Y. July 7, 2014).

But two aspects of this action cast doubt over whether Citigroup ought to apply

here. The first aspect relates to the nature of the claims asserted by the Government. Certainly,

an action on behalf of the EPA to address violations of the Toxic Substances Control Act falls

within the Government's enforcement purview. See, e.g., United States v. Accolade Constr.

Grp., Inc., 2017 WL 2271462, at *1 (S.D.N.Y. May 23, 2017) (citing 15 U.S.C. § 2601 et seq.).

But whether actions brought under the Anti-Fraud Injunction Act, 18 U.S.C. § 1345 or the U.S.

Housing Act, 42 U.S.C. § 1437d(j) are properly characterized as government enforcement

actions within Citigroup's ambit is a thornier question.[14]  In particular, 18 U.S.C. § 1345 simply

provides a procedural vehicle for the Government to enjoin substantive violations of enumerated

federal fraud statutes or restrain the fruits of such violations during the pendency of a criminal

prosecution. See 18 U.S.C. § 1345. The legislative history corroborates the procedural nature of

§ 1345 as allowing "the Attorney General to put a speedy end to a fraud scheme by seeking an

---

[14]      This action also raises the issue of Citigroup's applicability to a proposed consent decree that purports to
resolve an action that asserts prototypical government enforcement claims and other claims that do not fit the typical
government enforcement model.  Nonetheless, this Court need not wade into these uncertain waters because its
decision is binary—it only has the power to enter or reject the Proposed Consent Decree.  See Petro-Suisse Ltd.,
2013 WL 5348595, at *3.

injunction in federal district court" based on Congress' concern that "innocent people" may continue to be victimized during the pendency of an investigation of a fraudulent scheme before the case is ready for prosecution, which "often takes months, if not years." See S. Rep. No. 98-225, at 401-02 (1984), as reprinted in 1984 U.S.C.C.A.N. 3182, 3539-40.

Likewise, the Government's "claim" under § 1437d(j)(3) arguably falls outside the archetypical government enforcement framework. In that paradigm, a statutory regime (such as the Toxic Substances Control Act or the federal securities laws) proscribes certain conduct and prescribes penalties and remedies to punish and address statutory violations. Cf. Nat'l Res. Def. Council, Inc. v. FDA, 760 F.3d 51, 168 (2d Cir. 2014) (describing the "traditional model of administrative or judicial enforcement" as featuring "an investigation by executive or administrative personnel, followed by the issuance of a case-initiating document that sets forth the conclusions or charges reached by the prosecuting authority," followed by an administrative hearing or lawsuit that results in an adjudication by the agency or a court that leads to the imposition of remedies and penalties). By contrast, § 1437d(j) merely enumerates various administrative remedies that HUD may employ to remedy a public housing agency's "substantial default." See 42 U.S.C. § 1437d(j)(3). Put differently, 18 U.S.C. § 1345 and 42 U.S.C. § 1437d(j) do not directly govern the conduct of the enforced party, but set forth procedures addressed to the enforcing authority.

The second aspect relates to the broader nature of this action. In particular, Citigroup's focus on judicial deference to a government agency's consent decree is somewhat in tension with a court's quasi-managerial role in implementing a consent decree to reform a state or local institution. See Thompson v. U.S. Dep't of Housing & Urban Dev., 404 F.3d 821, 827 (4th Cir. 2005) (citing Navarro-Ayala v. Hernandez-Colon, 951 F.2d 1325, 1338 (1st Cir. 1991))

(observing that "[i]n overseeing broad institutional reform litigation, the district court becomes in many ways more like a manager or policy planner than a judge"); Angela R. *ex rel.* Hesselbein v. Clinton, 999 F.2d 320, 326 (8th Cir. 1993) (recognizing that the entry of such a consent decree "is often only the beginning of extended judicial involvement"). The role of the court in these so-called "institutional reform" cases typically entails ordering broad relief to remedy the legal violations of an institution, which unavoidably requires a court to grapple with policy considerations. By contrast, a court's role in the Citigroup context is constrained to ensuring the legal and procedural propriety of the proposed decree in deference to the government agency's exercise of discretion—such as the SEC's decision to settle with a private party for a certain sum of money. Nonetheless, because neither the parties nor Intervenors disputes Citigroup's applicability or articulates another standard that should apply, this Court assumes that Citigroup governs.

I.      Fairness and Reasonableness

        In reviewing a government agency's consent decree for fairness and reasonableness, a court should at minimum "assess (1) the basic legality of the decree; (2) whether the terms of the decree, including its enforcement mechanism, are clear; (3) whether the consent decree reflects a resolution of the actual claims in the complaint; and (4) whether the consent decree is tainted by improper collusion or corruption of some kind." Citigroup, 752 F.3d at 294-95 (internal citations omitted). Though the Second Circuit recognized without providing further guidance that a district court "may need to make additional inquiry to ensure that the consent decree is fair and reasonable" depending on the decree, the "primary focus of the inquiry . . . should be on ensuring the consent decree is procedurally proper, using objective measures similar to the factors set out above, taking care not to infringe on the [agency's] discretionary

authority to settle on a particular set of terms." <u>Citigroup</u>, 752 F.3d at 295.

A.  <u>Basic Legality</u>

A proposed consent decree is legal "so long as it is within the Court's authority to enter the decree and within the Plaintiff's authority to enforce it." <u>Caledonian Bank</u>, 317 F.R.D. at 370 (quotation marks omitted).  For instance, a proposed consent decree may not satisfy the basic legality requirement if a statute prohibits its entry in the absence of statutorily required findings.  <u>See</u> <u>Citigroup</u>, 752 F.3d at 294-95 (citing <u>Benjamin v. Jacobsen</u>, 172 F.3d 144, 158 (2d Cir. 1999) (en banc) (discussing the Prison Litigation Reform Act's need-narrowness-intrusiveness requirement for prospective relief)).  Indeed, courts in this circuit analyzing this factor have looked to whether the relevant statutes under which the action was brought permit the relief requested in the consent decree.  <u>E.g.</u>, <u>Caledonian Bank</u>, 317 F.R.D. at 370 (examining whether the proposed decree's injunctive relief and disgorgement provisions fell within the SEC's authority under the federal securities laws); <u>Int'l Bus. Machs.</u>, 2014 WL 3057960, at *2 (determining whether the provisions for IBM's reimbursement of "response costs" incurred by the EPA and IBM's agreement to take future remedial action comported with CERCLA).

Here, the Government's legality argument posits that while the statutes under which this action was brought do not explicitly authorize a monitor, a court may do so in its broad equitable discretion because those statutes authorize equitable relief.  But such a labored argument is unnecessary.  Certainly, "[t]he power of the federal courts to appoint special masters to monitor compliance with their remedial orders is well established." <u>City of N.Y. v. Mickalis Pawn Shop, LLC</u>, 645 F.3d 114, 145 (2d Cir. 2011) (citation omitted); <u>see, e.g.</u>, <u>United States v. Apple</u>, 992 F. Supp. 2d 963, 280 (S.D.N.Y. 2014) (collecting cases).  This uncontroversial precept is beside the point, however, because the relief is <u>not</u> the monitor in the first instance, but

the remedial action that this Court requires NYCHA—the enjoined defendant—to take.

While not entirely clear, a generous read of the Proposed Consent Decree suggests the following essential provisions: (1) a requirement that NYCHA comply with federal, state, and local lead paint statutes and regulations, (Proposed Consent Decree ¶ 18(a)); (2) a requirement that NYCHA comply with federal regulations requiring HUD housing to be decent, safe, sanitary, and in good repair, (Proposed Consent Decree ¶ 18(b)-(f)); (3) injunctive relief requiring NYCHA to establish a Compliance Department, Environmental Health and Safety Department, and Quality Assurance Unit in consultation with the monitor, (Proposed Consent Decree ¶¶ 63-65); and (4) injunctive relief requiring NYCHA to comply with federal regulations and rules relating to lead-safe work practices, lead abatement, lead paint disclosure and notification, and prioritization of lead paint hazards, (Proposed Consent Decree ¶¶ 66-70). As an initial matter, the Toxic Substances Control Act expressly confers upon district courts the authority to restrain any violation of certain prohibited acts, including the failure to comply with the federal lead-based paint rules promulgated by the EPA in 40 C.F.R. part 745. See 15 U.S.C. §§ 2616, 2689. And even to the extent that the proposed decree's injunctive relief is not expressly contemplated by the relevant provisions on which this action is premised, federal courts undoubtedly possess the authority to order relief for state and local officials and agencies' failure to comply with federal law. Cf. New York v. United States, 505 U.S. 144, 179 (1992). Nothing in those statutes—i.e., the U.S. Housing Act, the federal Anti-Fraud Injunction Act, and the Toxic Substances Control Act—precludes the exercise of such authority.

In their opposition papers, Intervenors deploy the same arguments they asserted in seeking intervention—namely, that certain federal statutes and regulations confer participation and economic rights on NYCHA tenants. See United States v. N.Y.C. Housing Auth., 326

F.R.D. 411, 415 (S.D.N.Y. 2018).  This time, however, Intervenors repackage them in support of their contention that to pass <u>Citigroup</u>'s basic legality test, a consent decree that implicates NYCHA's management must explicitly provide participation and economic opportunities for tenants.  As an initial matter, Intervenors' contentions rest on the faulty premise that the Proposed Consent Decree—merely by omission—encroaches upon the tenant opportunities contemplated by 24 C.F.R. § 964.135, 42 U.S.C. § 1437c-1, and 12 U.S.C. § 1701u.  But more to the point, Intervenors' arguments reveal a fundamental misunderstanding of <u>Citigroup</u>'s "basic legality" factor, which focuses on this Court's authority to enter the Proposed Consent Decree and the Government's authority to enforce it.  Whatever the nature of NYCHA tenants' statutory or regulatory rights or interests in managerial or economic opportunities,[15] the statutes and regulations that Intervenors cite simply have no bearing on the legality of the proposed decree.

B.  <u>Clarity of the Proposed Decree</u>

The Proposed Consent Decree's indefiniteness as to NYCHA's obligations and the enforcement mechanism forecloses approval of the settlement at this juncture.  <u>Cf.</u> <u>Int'l Bus. Machs.</u>, 2014 WL 3057960, at *3 (finding consent decree sufficiently clear where the decree detailed "specific enforcement mechanisms" and detailed "Defendants' responsibilities under the decree").  The case that <u>Citigroup</u> cites for this factor illustrates why.  <u>Citigroup</u>, 752 F.3d at 295 (citing <u>Angela R. *ex rel.* Hesselbein v. Clinton</u>, 999 F.2d 320 (8th Cir. 1993)).  In <u>Clinton</u>, which involved a "comprehensive revision of the child welfare system in Arkansas," the Eighth Circuit found that the district court abused its discretion in entering a consent decree that did not properly define its enforcement mechanisms.  <u>Clinton</u>, 999 F.2d at 322, 325 (describing ambiguities in which parties could enforce which provisions of the consent decree).  The Eighth

---

[15]    NYCHA's records indicate that 2,537 out of 11,182 NYCHA employees are NYCHA residents, as of October 1, 2018.  (ECF No. 213, <u>Baez v. N.Y.C. Hous. Auth.</u>, 13cv8916 (S.D.N.Y.).)

Circuit explained that "[u]nless [the enforcement] mechanism is clearly defined—in terms of who may bring an enforcement action, for what kinds of violations, and so forth—it is impossible to determine," as relevant here, "the burden that approval of the decree will impose upon the federal judiciary." Clinton, 999 F.2d at 325 (citing Schmidt v. Lessard, 414 U.S. 473 (1974)) (referencing the specificity requirements of Rule 65(d)); cf. United States v. Microsoft Corp., 56 F.3d 1448, 1461-62 (D.C. Cir. 1995) ("[T]he district judge who must preside over the implementation of the decree is certainly entitled to insist on that degree of precision concerning the resolution of known issues as to make his task, in resolving subsequent disputes, reasonably manageable.").

            The concerns over vague enforcement mechanisms are fully animated in this case. In relevant part, the Government reserves "all legal and equitable remedies available to enforce the provisions of [the] Consent Decree," which expressly provides for this Court's continuing jurisdiction in "effectuating or enforcing compliance with [its] terms." (Proposed Consent Decree ¶¶ 73, 84.) At the other end of the spectrum, the Proposed Consent Decree provides that it "shall not be construed to . . . grant any cause of action to[] anyone not a Party to [the] Consent Decree." (Proposed Consent Decree ¶ 78.) But these broad contours merely memorialize the Government's non-waiver of its enforcement authority and the uncontroversial proposition that a court possesses the authority to ensure compliance with its orders, including consent decrees. See Handschu v. Special Servs. Div., 2007 WL 1711775, at *11 (S.D.N.Y. June 13, 2007) (citing Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir. 1985)). Put differently, they offer scant precision on the provisions or obligations (to the extent that they are defined) that are enforceable, the types of violations that may be enforced, or the mechanisms by which noncompliance with the Proposed Consent Decree may be addressed.

To be sure, the indeterminacy of the enforcement provisions goes hand in hand with the indeterminacy of NYCHA's obligations under the proposed decree generally. For instance, the injunctive relief includes a requirement that NYCHA "comply in all respects with the lead-safe work practices" required by HUD and EPA regulations "and with the Abatement Rule, 40 C.F.R. part 745, subpart L." (Proposed Consent Decree ¶ 67.) This requirement, however, is not "specific and definite enough to apprise [NYCHA] of the conduct that is being proscribed." Ronnie Van Zant, Inc. v. Cleopatra Records, Inc., 906 F.3d 253, 258 (2d Cir. 2018); see also Schmidt, 414 U.S. at 476 (observing that "[s]ince an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed"). Stated differently, even though the substantive legal requirements with which NYCHA must comply may be identifiable, whether its obligations are sufficiently determinate is a separate analytical issue. Accord Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 748 (2d Cir. 1994) (rejecting injunctive provisions as insufficiently specific even where they had identified the "particular laws and contracts upon which [plaintiff] had based its action" that defendant was enjoined from violating).

The parties' own papers illustrate the formlessness of NYCHA's obligations. In reiterating the urgent need for a monitor, the Government claims that NYCHA has already violated paragraph 67 of the Proposed Consent Decree by failing to "immediately" comply with its obligations regarding lead-safe work practices even before the approval of the proposed decree. (See Memorandum of Law in Support of the United States' Motion to Enter the Proposed Consent Decree, ECF No. 44 ("Gov't Brief"), at 13-16; Folch Decl. ¶¶ 4-8.) Unsurprisingly, NYCHA disputes that it violated paragraph 67, explaining that it has been making efforts to comply that involve many complex and interrelated steps, which take time to

implement.  (See NYCHA's Memorandum of Law in Support of Motion to Enter the Consent Decree, ECF No. 46 ("NYCHA Brief"), at 4 n.11; Folch Decl., Ex. C.)  Whatever the merits of the parties' positions, NYCHA's evident—and facially reasonable—belief that it is not in breach of the Proposed Consent Decree suggest that its terms are not sufficiently clear.

Moreover, even assuming that the obligations the Proposed Consent Decree imposes on NYCHA to comply with various health and safety regulations may fairly be construed as injunctive relief—which, as noted below, may not be entirely clear—those terms are similarly amorphous.  In relevant part, the agreement provides that NYCHA shall comply with (1) federal, state, and local lead paint safety statutes and regulations; and (2) federal regulations requiring HUD housing to be decent, safe, sanitary, and in good repair with respect to mold, heating, elevators, and pests.  (Proposed Consent Decree ¶ 18(a)-(f).)  These provisions also require NYCHA to (1) make its housing free of lead paint "within an accelerated timeframe"; (2) "remedy the conditions described in the Complaint" related to mold, heating, elevators, and pests "and prevent recurrence of those conditions"; and (3) "attempt to avoid and promptly address any other health and safety issue that arises."  (Proposed Consent Decree ¶ 18(a)-(f).)  Finally, the Proposed Consent Decree requires NYCHA to, "[a]s soon as practicable after the Monitor's appointment," create certain plans "collaboratively" or "in consultation with" the monitor "for the achievement of" or "to achieve sustained compliance with" subdivisions (a)-(g) of paragraph 18.  (See generally Proposed Consent Decree ¶¶ 27-34.)

At the outset, the body of statutes and regulations with which NYCHA must comply is not entirely defined.  In relevant part, paragraph 18 requires NYCHA to "comply in all respects with Lead Paint Laws," (Proposed Consent Decree ¶ 18(a)(7)), which is defined to mean "federal, state or local lead paint safety statutes and regulations," (Proposed Consent Decree

¶ 13(*l*)).  While the proposed decree lists several federal statutes and regulations that are included

within this definition, it does not indicate which state or local statutes and regulations would

form the basis for NYCHA's obligations.  And even though paragraph 18 requires more than a

naked directive to comply with the laws it does identify, its instructions to remedy and prevent

recurrence of various health and safety conditions described in the Complaint as well as those

that may arise still fail to specify "the ways in which [NYCHA] must alter [its] behavior."  See

Mickalis Pawn Shop, 645 F.3d at 144 (finding insufficient for Rule 65(d) an obligation to "act

'in full conformity with applicable laws pertaining to firearms,' and to 'adopt[] appropriate

prophylactic measures to prevent violation' of those laws, without specifying which laws are

'applicable' or identifying the ways in which the defendants must alter their behavior to comply

with those laws"); accord Perez v. Danbury Hosp., 347 F.3d 419, 424 (2d Cir. 2003) (reiterating

the "well-established principle that the language of a consent decree must dictate what a party is

required to do and what it must refrain from doing").

Additionally, the Proposed Consent Decree's definition of NYCHA's obligations

by reference to the Complaint "is expressly prohibited by Rule 65(d), which provides that

'[e]very order granting an injunction' must 'describe in reasonable detail—and not by referring

to the complaint or other document—the act or acts restrained or required.'"  Mickalis Pawn

Shop, 645 F.3d at 146 (quoting Fed. R. Civ. P. 65(d)(1)(C)) (emphasis in original).  These are

not simply "technical requirements," but are meant to "prevent uncertainty and confusion on the

part of those faced with injunctive orders, and to avoid the possible founding of a contempt

citation on a decree too vague to be understood."  Schmidt, 414 U.S. at 476.  While the

temptation to define NYCHA's remedial obligation by reference to the Complaint is certainly

understandable given the breadth of the wrongdoing alleged in the pleading, the risk of

uncertainty and confusion is magnified precisely for that reason.

Nor are these deficiencies cured by the Proposed Consent Decree's extensive provisions setting forth the powers and responsibilities of the monitor in developing and implementing the plans and performance requirements that NYCHA must follow.  (See Proposed Consent Decree ¶¶ 18-37.)  As the Second Circuit has explained, a consent decree's "sweeping delegations of power to the Special Master violate[s] Rule 65(d)" because "[a] court is required to frame its orders so that those who must obey them will know what the court intends to forbid."[16]  Mickalis Pawn Shop, 645 F.3d at 145-46 (citing Diapulse Corp. of Am. v. Carba, Ltd., 626 F.2d 1108, 1111 (2d Cir. 1980)) (emphasis in original); accord United States v. Armour & Co., 402 U.S. 673, 682 (1971).  To be fair, the directive that NYCHA must formulate plans to achieve and sustain compliance with federal health and safety regulations offers more clarity than other previously described provisions.  Still, its ambiguity as to when those plans must be developed or how much cooperation with the monitor is necessary does not allow this Court to meaningfully determine when those provisions have been violated.  Accord King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995) (explaining that to issue a contempt order, a movant must establish that the order "leaves 'no uncertainty in the minds of those to whom it is addressed,' who 'must be able to ascertain from the four corners of the order precisely what acts are forbidden'" (internal citations omitted)).

Ultimately, many of NYCHA's obligations relating to the health and safety conditions at the core of this litigation are too indeterminate for this Court to approve the Proposed Consent Decree.  And in this Court's view, the lack of clarity is compounded by the

---

[16]     Likewise, the Government and the monitor's ability to enforce these plans and performance requirements is a step removed from the ability to enforce the provisions of the Proposed Consent Decree itself and thus adds no additional clarity to the decree's enforcement mechanisms.  (See Proposed Consent Decree ¶¶ 24, 30.)

more basic question of whether subsections (a)-(f) of paragraph 18 of the proposed decree affirmatively enjoin NYCHA or merely set forth the <u>monitor</u>'s duty to ensure that NYCHA complies with federal health and safety standards—a distinction implied by the parties' briefs. (<u>Compare</u> Gov't Brief, at 21-22 (framing the decree's relief in terms of the monitor provisions), <u>with</u> NYCHA Brief, at 4 (framing the decree's requirements in terms of NYCHA's obligations).) Without additional concreteness, NYCHA cannot possibly know the acts that are restrained or required, and this Court cannot fulfill its duty to enforce compliance with its orders.

This is not to say that the Proposed Consent Decree must painstakingly detail every act that NYCHA must take or forbear from taking. Indeed, such an attempt would almost certainly be a fool's errand in the context of institutional reform litigation, for which injunctions "are not so much peremptory commands to be obeyed in terms[] as they are future-oriented plans designed to achieve broader public policy objectives in a complex, ongoing fact situation." <u>N.Y. State Ass'n for Retarded Children Inc. v. Carey</u>, 706 F.2d 956, 970 n.17 (2d Cir. 1993) (quoting Abram Chayes, <u>Public Law Litigation and the Burger Court</u>, 96 Harv. L. Rev. 4, 56 (1982)). But <u>Citigroup</u> fairly suggests that even consent decrees that implement broad institutional reform—such as the comprehensive revision of Arkansas' child welfare system—require <u>some</u> threshold of clarity. <u>Citigroup</u>, 752 F.3d at 295 (citing <u>Clinton</u>, 999 F.3d at 325). Whether that threshold ought to be higher based on the lasting nature of injunctive relief in institutional reform litigation, or lower to account for more dynamic factual circumstances, need not be resolved on this motion. The current failure of the Proposed Consent Decree to sufficiently define its injunctive relief and enforcement mechanism precludes its approval.

C. <u>Resolution of Actual Claims</u>

A consent decree that settles a government enforcement action must also reflect a

resolution of the "actual claims in the complaint." <u>Citigroup</u>, 752 F.3d at 295. Few post-

<u>Citigroup</u> cases in this circuit have examined when a consent decree would or would not reflect a

resolution of the actual claims asserted. This sparseness of case authority may in part be

attributable to decrees that order relief that plainly resolves the asserted claims. For instance,

another judge in this district found that a consent decree requiring the defendant "to reimburse

EPA for past-response costs and to take certain remedial actions" in the decree "directly

resolve[d]" two claims "seeking reimbursement for Plaintiff's past-response costs pursuant to 42

U.S.C. § 9607(a), and . . . seeking remedial actions from Defendant pursuant to 42 U.S.C.

§ 9606(a)." <u>Int'l Bus. Machs.</u>, 2014 WL 30357960, at *3; <u>see</u> 42 U.S.C. § 9606(a) (authorizing

"such relief as may be necessary to abate" an "imminent and substantial endangerment to the

public health or welfare or the environment because of an actual or threatened release of a

hazardous substance from a facility" and "such relief as the public interest and the equities of the

case may require").

   Certainly, a consent decree that orders relief authorized by the statutory regime

under which a claim is brought satisfies this factor, even if that relief is less than that which

could have been obtained after trial. It should be uncontroversial, for example, that a proposed

consent decree in an SEC enforcement case that grants disgorgement and enjoins a defendant

from violating the federal securities laws clearly reflects a resolution of claims brought under the

anti-fraud provisions of those statutes. <u>E.g.</u>, <u>Caledonian Bank</u>, 317 F.R.D. at 369-70; <u>see</u>

<u>generally</u> <u>SEC v. Subaye, Inc.</u>, 2014 WL 4652578 (S.D.N.Y. Sept. 28, 2014); <u>SEC v. CR</u>

<u>Intrinsic Inv'rs, LLC</u>, 26 F. Supp. 3d 260 (S.D.N.Y. 2014). Likewise, the Proposed Consent

Decree's injunctive relief requiring NYCHA to comply with its lead-safe work practices, lead

abatement, and lead disclosure obligations under 40 C.F.R. part 745, subparts E, F, and L clearly

resolves the Government's Toxic Substances Control Act claim.

The Government's other claims raise the question of whether a consent decree that does not provide for any statutorily authorized relief, but separate injunctive relief that purports to address the underlying conduct, can be fairly said to reflect a "resolution of the actual claims in the complaint." Citigroup, 752 F.3d at 295. In particular, the Complaint asserts a claim for substantial default pursuant to 42 U.S.C. § 1437d(j)(3) and a claim to enjoin NYCHA's ongoing or impending false statements pursuant to 18 U.S.C. § 1345. Section 1437d(j)(3) authorizes the HUD Secretary to take a broad panoply of remedial actions if a public housing agency substantially defaults on its covenants or conditions under an annual contributions contract, or if a public housing agency designated by HUD as "troubled" substantially defaults on an agreement with HUD to improve its management performance. See 42 U.S.C. § 1437d(j)(3); see also 24 C.F.R. § 907.3 (enumerating bases for substantial default, including the violation of a federal statute or regulation). These remedies do not require the public housing agency's consent or contemplate judicial involvement, except that the HUD Secretary may petition a court for the appointment of a receiver, see 42 U.S.C. § 1437d(j)(3)(A)(ii), which the court "shall appoint" to conduct the public housing agency's affairs "upon a determination that a substantial default has occurred and without regard to the availability of alternative remedies," see 42 U.S.C. § 1437d(j)(3)(F). Separately, the Anti-Fraud Injunction Act authorizes the Attorney General to bring a federal civil action to enjoin ongoing or impending violations of enumerated federal criminal statutes, including 18 U.S.C. § 1001. See 18 U.S.C. § 1345(a)(1).

It bears underscoring that the Proposed Consent Decree does not seek the judicial appointment of a receiver or any of the other remedies set forth in 42 U.S.C. § 1437d(j)(3) or 24 C.F.R. § 907.7. In fact, HUD specifically reserves its right to "appoint, or to seek judicial

appointment of, a receiver for substantial default, as well as all other administrative remedies." (Proposed Consent Decree ¶ 81.) Moreover, the Proposed Consent Decree expressly disclaims the monitor's "responsib[ility] for NYCHA's day-to-day operations." (Proposed Consent Decree ¶ 35.) Instead, the Proposed Consent Decree purports to address NYCHA's violations of HUD's lead-paint safety regulations and its obligation under 24 C.F.R. § 5.703 to provide "decent, safe, and sanitary housing" by restating NYCHA's obligation to comply with those regulations and then providing a monitor to oversee and enforce compliance. The decree's relief as to NYCHA's alleged false statements to federal regulators is similarly oblique. Rather than seeking to directly enjoin such violations, the Proposed Consent Decree requires NYCHA to "ensure the integrity of [public housing inspections]" and to establish a Compliance Department charged with "[e]nsuring the accuracy of external reporting and statements by NYCHA" and the integrity of public housing inspections. (Proposed Consent Decree ¶¶ 18(g), 63(b) & (e).)

This Court nevertheless concludes that the Proposed Consent Decree reflects a resolution of the Government's "actual claims" under 42 U.S.C. § 1437d(j)(3) and 18 U.S.C. § 1345 because it addresses the conduct underlying those claims, despite providing for relief outside those statutory regimes. Admittedly, Citigroup's formulation of what a court must consider in evaluating the fairness and reasonableness of a government consent decree differs from prior circuit precedent reiterating the "standards controlling a court's authority to enter a consent decree" set forth by the Supreme Court. Kozlowski v. Coughlin, 871 F.2d 241, 244 (2d Cir. 1989) (citing Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland ("Firefighters"), 478 U.S. 501, 525 (1986)). Absent further clarification by the Second Circuit, however, this Court discerns no meaningful difference between Citigroup's requirement that a proposed decree reflect a resolution of the actual claims in the complaint and Firefighters' requirement that a

consent decree "spring from and serve to resolve a dispute within the court's subject matter-jurisdiction" and "come within the general scope of the case made by the pleadings." See Firefighters, 478 U.S. at 525 (citations omitted).

Of course, a proposed consent decree cannot be untethered from the conduct complained of because "a federal court is more than a recorder of contracts from whom parties can purchase injunctions; it is an organ of government constituted to make judicial decisions." Firefighters, 478 U.S. at 525 (citation and internal quotation marks omitted); accord Citigroup, 752 F.3d at 295 (requiring the reviewing court to still "establish that a factual basis exists for the proposed decree"). But it is ultimately "the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree." Firefighters, 478 U.S. at 522. In other words, a consent decree necessarily reflects a voluntary surrender of claims in exchange for certain bargained-for obligations. Cf. Citigroup, 752 F.3d at 295 ("'[C]onsent decrees are normally compromises in which the parties give up something they might have won in litigation and waive their rights to litigation.' Thus, a consent decree 'must be construed . . . as written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.'" (internal citations omitted) (alterations in original)). Accordingly, these principles indicate that a consent decree that addresses the conduct underlying the dispute between the parties may reflect a resolution of the asserted claims even if its remedies are not contemplated by the statutory regime under which the claims are brought. Cf. Firefighters, 478 U.S. at 525 (observing that the remedies provided by a consent decree may be broader than that which a court may grant after trial).

D. Improper Collusion or Corruption

In examining whether a proposed consent decree is "tainted by improper collusion

or corruption of some kind," post-Citigroup cases have considered whether the settlement resulted from arm's-length negotiation, the sophistication of the parties and competence of counsel, and the extent to which the proposed decree reflects adversarial negotiations.  E.g., Caledonian Bank, 317 F.R.D. at 373; Int'l Bus. Machs., 2014 WL 6057960, at *3.  Here, the parties represent that the Proposed Consent Decree resulted from months of intense negotiations among the Government, NYCHA, and the City.  (See Gov't Brief, at 22; NYCHA Brief, at 5; accord July 10, 2018 Hr'g Tr. at 9 (statement by Government counsel that initial negotiations began in August 2017 and intensified that winter).)  The parties also warrant—and the record reveals no basis to disagree—that the United States Attorney's Office, NYCHA's retained counsel, and the City's Corporation Counsel are highly competent and experienced.

II.     Whether the Public Interest Is Disserved

Where, as here, a proposed consent decree contains injunctive relief, a "district court must assure itself the 'public interest would not be disserved by the issuance of a permanent injunction."  Citigroup, 752 F.3d at 296 (citing eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).  In other words, this inquiry turns on "whether the public interest would be disserved by entry of the consent decree."  Citigroup, 752 F.3d at 296.  The Second Circuit instructs, however, that the Government's decision as to "whether the proposed . . . consent decree best serves the public interest . . . rests squarely with the [Government], and its decision merits significant deference."  Citigroup, 752 F.3d at 296.

Aside from two markers, Citigroup offers sparse guidance on the circumstances in which the entry of a government consent decree would disserve the public interest.  On one hand, a consent decree that "bar[s] private litigants from pursuing their own claims independent of the relief obtained under the consent decree" may disserve the public interest.  Citigroup, 752 F.3d at

297.  In that regard, this factor appears to reach further than whether a proposed decree's injunctive provisions directly disserve a substantive policy goal.  On the other hand, a court may not find that a consent decree disserves the public interest "based on its disagreement with the [Government's] decision on discretionary matters of policy," such as a decision to "bring the proper charges" or "settle without requiring an admission of liability."  Citigroup, 752 F.3d at 297.  Whatever the field of appropriate public interest considerations may be, the Second Circuit instructs that the inquiry must focus on the effect of the decree itself.  See Citigroup, 752 F.3d at 297 (citing Microsoft, 56 F.3d at 1459).

        This Court concludes that entry of the Proposed Consent Decree would disserve the public interest.  At heart, the proposed decree would bring about an unwarranted—and as far as this Court is aware, unprecedented—judicial usurpation of responsibilities that Congress has expressly entrusted to HUD, a Cabinet-level department of the Executive.  See Hedges v. Obama, 2012 WL 1721124, at *28 (S.D.N.Y. May 16, 2012) (recognizing the "strong public interest in . . . maintaining the appropriate separation of powers").  The Proposed Consent Decree also enables a judicial intrusion into the legislative and regulatory functions of the political branches by effectuating the purposes of the U.S. Housing Act in a way that operates in the shadows of the statutory scheme.  In doing so, the parties' proposed framework effectively rewrites the law.  Specifically, Section 6 of the U.S. Housing Act and the regulations promulgated thereunder set forth detailed procedures for HUD to evaluate the quality of public housing, see 42 U.S.C. § 1437d(f); 24 C.F.R. part 902 subpart B; 24 C.F.R. § 5.703; for HUD to evaluate a public housing agency's management performance, see 42 U.S.C. § 1437d(j)(1); 24 C.F.R. part 902 subpart D; for HUD to identify and assist public housing agencies whose performance is deficient, see 42 U.S.C. § 1437d(j)(2); 24 C.F.R. part 902 subparts A & G; and

for HUD to take action if a public housing agency is deemed to be in substantial default, see 42 U.S.C. § 1437d(j)(3); 24 C.F.R. part 907.

Consistent with HUD's primary regulatory responsibility, Congress endowed HUD with a robust arsenal of remedies to address a public housing agency's management and operational failures. For a public housing agency in substantial default—as the Government alleges here—HUD has the authority to (1) solicit proposals from other public housing agencies and private housing management agents to manage the public housing agency's housing or programs; (2) solicit proposals from other public housing agencies and private entities to oversee implementation of funds to assist the public housing agency with capital and management activities; (3) take possession of the public housing agency and, in certain circumstances, appoint an administrative receiver; or (4) require the public housing agency to make other arrangements for managing the public housing agency "acceptable to the Secretary and in the best interests of the public housing residents and families." 42 U.S.C. § 1437d(j)(3)(A), (j)(3)(B)(ii)(III)(bb). In addition to these remedies, HUD may also provide "technical assistance for existing [public housing agency] management staff" or "assistance deemed necessary, in the discretion of HUD, to remedy emergency conditions." 24 C.F.R. § 907.7(a).

While these statutory and regulatory remedies do not require the public housing agency's consent or contemplate judicial involvement, HUD may seek the judicial appointment of a receiver with broad remedial powers to correct the substantial default, 42 U.S.C. § 1437d(j)(3)(A)(ii), which a court must appoint upon a determination of substantial default, 42 U.S.C. § 1437d(j)(3)(F). The receiver may abrogate the public housing agency's contracts, demolish and dispose of the public housing agency's assets, establish new public housing agencies, consolidate the public housing agency into other public housing agencies, circumvent

certain state and local requirements relating to procurement or financial controls, and exercise additional powers granted by the court.  See 42 U.S.C. § 1437d(j)(3)(C).  Moreover, the HUD Secretary may make available to the receiver "such assistance as the Secretary determines in the discretion of the Secretary is necessary and available to remedy the substantial deterioration of living conditions in individual public housing projects or other related emergencies that endanger the health, safety, and welfare" of public housing residents.  42 U.S.C. § 1437d(j)(3)(E).  These drastic remedies have been deployed successfully to reform other public housing agencies, including HUD's takeover of the Chicago Housing Authority in the 1990s and the judicial appointment of receivers to oversee the Boston Housing Authority in the 1980s and the District of Columbia Housing Authority in the 1990s.

 The legislative history for 42 U.S.C. § 1437d(j) also corroborates HUD's primary responsibility to reform failing public housing.  Cf. Digital Realty Tr., Inc. v. Somers, 138 S. Ct. 767, 782 (2018) (Sotomayor, J., concurring) (arguing that even if "a statute's meaning can clearly be discerned from its text, consulting reliable legislative history can still be useful" in allowing a court to "corroborate and fortify [its] understanding of the text").  In relevant part, the Cranston-Gonzalez National Affordable Housing Act of 1990 overhauled Section 6(j) of the U.S. Housing Act to include substantially the same remedies set forth in the current version of § 1437d(j).  See Pub. L. No. 101-625, § 502(a), 104 Stat. 4079 (1990).  The conference committee report confirms Congress' intent for HUD to use its authority under § 1437d(j)(3) "to move aggressively to improve living conditions for tenants in severely troubled public housing," H.R. Rep. No. 101-943 (1990) (Conf. Rep.), as reprinted in 1990 U.S.C.C.A.N. 6070, 6119-20; accord S. Rep. No. 101-316 (1990), as reprinted in 1990 U.S.C.C.A.N. 5763, 5939-40 (explaining that these provisions were designed to enhance HUD's authority to reform public

housing management).

Subsequent amendments to 42 U.S.C. § 1437d(j)(3) that expand HUD's powers and mandates reaffirm HUD's affirmative responsibility to actually exercise its authority.  <u>See</u> Housing and Community Development Act of 1992, Pub. L. No. 102-550, § 113, 106 Stat. 3672 (1992).  The Senate committee report recognized that then-existing law "provide[d] HUD with a strong set of powers" that "if properly implemented, would go a long way towards reforming the management of troubled [public housing agencies] and improving the living conditions of tenants who reside in housing administered by these agencies."  S. Rep. No. 102-332, at 46 (1992).  But as Senate Report 332 explained, Section 6(j) needed to be bolstered because HUD "has rarely exercised these powers . . . ."  S. Rep. No. 102-332, at 46.  It reaffirmed HUD's role as follows:

> The Committee believes strongly that the federal government has an affirmative responsibility—to the residents of public housing, to the federal taxpayers—to use its resources to remedy the management deficiencies in those few local agencies that are troubled.  HUD cannot "shift the blame" to local malfeasance or incompetence; it ultimately has the responsibility to monitor the performance of recipients of federal aid and to act aggressively when such aid is being misused.

S. Rep. No. 102-332, at 46.  These passages do not suggest that Congress intended HUD to sit idly by and allow a district court to reform a public housing agency in the first instance.

Against this legislative backdrop, HUD's comparative abdication of its remedial responsibilities and powers under 42 U.S.C. § 1437d(j)(3) and 24 C.F.R. part 907 is particularly striking, especially given all of the Government's allegations regarding the deplorable conditions of NYCHA housing and NYCHA's deliberate attempts to pull the wool over HUD's eyes.  Indeed, the Proposed Consent Decree relegates HUD to a narrow, auxiliary role in relaxing its own regulatory constraints to allow NYCHA to comply with the decree, lifting its earlier "zero threshold" sanction requiring NYCHA to obtain HUD approval before drawing any federal

funds, agreeing not to offset federal funding by the amount of the City's funding obligation, and

meeting with the monitor and NYCHA to "discuss strategies to improve NYCHA's ability to

comply with its obligations under [the decree]." (Proposed Consent Decree ¶¶ 48-52.) The

inversion of roles contemplated by the Proposed Consent Decree is illustrated by the Corporation

Counsel's statement at the July 10, 2018 conference regarding the alignment of the Government,

NYCHA, and the City. Specifically, he shared the City's expectation that "because we are allied

in interests that we will have in the Government, in the U.S. Attorney's Office, an effective

advocate for NYCHA with Washington, and specifically with HUD." (July 10, 2018 Hr'g Tr. at

46.) But any role that functionally cabins HUD to getting out of the way of the monitor and

NYCHA contravenes the central role that Congress envisioned for HUD in enacting the very

statutory provisions that the Complaint and the Proposed Consent Decree seek to enforce.

Instead, to address NYCHA's management and operational deficiencies, the

proposed decree establishes an elaborate monitorship to bring about organizational reform under

the auspices of this Court and appropriates funding to assist in achieving the monitorship's

purposes. In particular, the Proposed Consent Decree obligates the monitor to develop

Performance Requirements directed toward addressing the health and safety conditions

referenced in paragraph 18. (Proposed Consent Decree ¶¶ 23-26.) Likewise, the Proposed

Consent Decree requires NYCHA, together with the monitor, to develop Action Plans, an

Operational Plan, and an Organizational Plan to remedy NYCHA's violations of the U.S.

Housing Act and HUD regulations. (Proposed Consent Decree ¶¶ 27-29.)

But such an arrangement implicates the fundamental separation of powers among

the branches of the Federal Government by commandeering a court's equitable powers to

fashion a comprehensive injunctive remedy parallel to—yet entirely unmoored from—the

existing statutory and regulatory framework.  See New York, 505 U.S. at 182 (explaining that

"[t]he Constitution's division of power among the three branches is violated where one branch

invades the territory of another, whether or not the encroached-upon branch approves the

encroachment").  To be clear, this case does not implicate the Executive's exercise of

enforcement discretion, see Citigroup, 752 F.3d at 297, such as the SEC's determination of what

charges to bring, against whom to bring them, and what penalty to seek,[17] cf. Massachusetts v.

EPA, 549 U.S. 497, 527-28 (2007); In re Aiken Cty., 725 F.3d 255, 266 (D.C. Cir. 2013)

(opinion of Kavanaugh, J.) (distinguishing prosecutorial discretion in "whether to initiate charges

for legal wrongdoing and to seek punishment, penalties, or sanctions against individuals or

entities who violate federal law" from "the discretion not to follow a law imposing a mandate or

prohibition on the Executive Branch").

   Stated differently, the text, structure, and legislative history of the U.S. Housing

Act do not indicate that HUD has discretion to select which deficient public housing agencies it

chooses to assist.  To the contrary, 42 U.S.C. § 1437d(j) reflects an affirmative legislative

mandate for HUD to oversee all public housing agencies that receive federal funds.  The

Proposed Consent Decree upsets Congress' balancing of priorities and its reasoned judgment

about how to remedy a public housing agency's institutional failure and who bears responsibility

for that undertaking.  Accord Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625 (1978)

(stating that where Congress "does speak directly to a question, the courts are not free to

'supplement' Congress' answer so thoroughly that the Act becomes meaningless").  HUD's

apparent acquiescence to a judicial encroachment upon legislative territory—and by extension,

---

[17]  In Citigroup, the Second Circuit found that the district judge abused his discretion by second-guessing the SEC's judgment in bringing certain claims and settling them on a particular set of terms.  See Citigroup, 752 F.3d at 295-97.  A court's substitution of its own judgment for that of a regulator is a raw exercise of judicial power.  By contrast, this Court's rejection of the Proposed Consent Decree does not animate those concerns.

41

HUD's congressionally conferred responsibilities—does not make it any less of an invasion.

Even aside from these unanswered separation-of-powers questions, the extent to which the Proposed Consent Decree vests the monitor with "discretion to determine the terms of the injunctions themselves" also raises substantial public concern. Mickalis Pawn Shop, 645 F.3d at 145. Here, absent objection by NYCHA or the Government, Performance Requirements "shall become binding" when the Government files them on the docket after its approval. (Proposed Consent Decree ¶ 24.) If NYCHA or the Government objects, the Performance Requirement may be modified or set aside, but only if found by this Court to be arbitrary or capricious—a highly deferential standard of review. (Proposed Consent Decree ¶¶ 24-25.) Similarly, for Action Plans, the Operational Plan, and the Organizational Plan that NYCHA must follow, the proposed decree for all intents and purposes removes this Court from the determination of what acts are required or prohibited. (Proposed Consent Decree ¶¶ 27-29.) In particular, a plan that NYCHA and the monitor agree upon and which the Government approves "shall be binding on NYCHA" on the date that the Government files the plan on the docket. (Proposed Consent Decree ¶ 30.) And if NYCHA, the monitor, or the Government disagree with or disapprove of a plan, the Proposed Consent Decree vests the monitor with the authority to unilaterally develop a plan to be approved by this Court—but also only under an arbitrary and capricious standard. (Proposed Consent Decree ¶ 31.)

The Supreme Court has "warned that '[t]he use of masters is to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause, and not to displace the court.'" Mickalis Pawn Shop, 645 F.3d at 145 (citing La Buy v. Howes Leather Co., 352 U.S. 249, 256 (1957)) (emphases added). At bottom, the proposed decree outsources the formulation of NYCHA's obligations—the violation of which is ostensibly subject to this

Court's contempt powers—to the monitor and the parties without any meaningful judicial review. In this regard, the Proposed Consent Decree's delegation of this Court's ultimate authority to determine the terms of the injunctive relief is closer to a displacement of judicial authority than a decree in which a monitor aids the court by developing reforms to be approved by the court. E.g., Floyd v. City of N.Y., 959 F. Supp. 2d 668, 677-78 (S.D.N.Y. 2013).

One additional observation is warranted. A government agency's eschewing of administrative remedies in favor of a consent decree and a federal court injunction is not always improper. Cf. Citigroup, 752 F.3d at 297 (noting that if the SEC does not wish to involve the courts, it may simply employ its own arsenal of remedies). The Government represented that it had considered a receivership but believed that a monitor "made the most sense" given NYCHA's size and "the need for buy in and support from community residents, from tenants to employees, from all the people who make NYCHA run." (July 10, 2018 Hr'g Tr. at 7.) It subsequently asserted that it opted for a monitor instead of a receiver because the latter would not have the benefit of the City's funding commitment under the proposed decree. (Sept. 26, 2018 Hr'g Tr. at 201-02; accord Sept. 26, 2018 Hr'g Tr. at 184 (statement by NYCHA's counsel).) The Government's initial reason—buy in from tenants—is arguably inconsistent on its face with public comments opposing the proposed decree. The parties also do not explain why the City may only commit to provide funding if this Court installs a monitor, as opposed to some other solution. To be certain, the "province of the court is . . . not to enquire how the executive, or executive officers, perform duties in which they have a discretion." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170 (1803). But now having "call[ed] upon the power of the courts in ordering a consent decree and issuing an injunction," the Government must demonstrate that it is fair and reasonable and that it does not disserve the public interest. Citigroup, 752 F.3d

at 297.  For the reasons set forth above, the Proposed Consent Decree fails to satisfy the

Citigroup standard.

PRUDENTIAL CONCERNS

This Court would be remiss if it did not share additional concerns that the

Proposed Consent Decree tests the limits of judicial legitimacy and capacity.  As our Founding

Fathers recognized, the judiciary "may truly be said to have neither force nor will but merely

judgment," and a court "disposed to exercise will instead of judgment" consequently substitutes

"[its] pleasure for that of the legislative body."  The Federalist No. 78 (A. Hamilton).  The

Second Circuit notes that "several commentators have discussed generally potential dangers of

resolving by consent decree class actions and so-called 'public interest' or 'institutional reform'

litigation."  Barcia v. Sitkin, 367 F.3d 87, 105 n.23 (2d Cir. 2004).  These scholarly criticisms of

broad injunctive relief in consent decrees as a policymaking tool include the debatable

legitimacy and authority of such judicial exercises of public power and the specter of

circumventing the political process.  Barcia, 367 F.3d at 105 n.23 (collecting authorities).

To be clear, this case differs fundamentally from institutional reform litigation

that seeks to remedy the constitutional or civil rights violations of a local school board, e.g.,

Brown v. Bd. of Educ. of Topeka, 347 U.S. 483 (1954), a state human services agency, e.g.,

Angela R. ex rel. Hesselbein v. Clinton, 999 F.2d 320 (8th Cir. 1993), or a municipal police

department, e.g., Floyd v. City of N.Y., 959 F. Supp. 2d 668 (S.D.N.Y. 2013).  As a general

matter, the enforcement and protection of constitutional rights is indisputably within the

authority of a federal court.  See Davis v. Passman, 442 U.S. 228, 242 (1979); accord United

States v. Ghailani, 686 F. Supp. 2d 279, 290 (S.D.N.Y. 2009) (citing Nixon v. Fitzgerald, 457

U.S. 731, 783 (1982)) ("Determining whether a person's constitutional rights have been violated

44

and fashioning appropriate relief is a core, traditional function of American courts.").  And upon finding a constitutional violation, a federal court may exercise its equitable remedial powers "to restructure the operation of local and state governmental entities," so long as the court "tailor[s] 'the scope of the remedy' to fit 'the nature and extent of the constitutional violation.'"  Hills v. Gautreaux, 425 U.S. 284, 293-94 (1976) (citations omitted).

Aside from this basic limitation on a federal court's equitable powers, however, the Supreme Court has long recognized a federal judge's broad authority to create sweeping relief to remedy a constitutional violation.  See Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of the district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); accord Hills, 425 U.S. at 297 (citations omitted) (reiterating that "in the event of a constitutional violation 'all reasonable methods be available to formulate an effective remedy,' and that every effort should be made by a federal court to employ those methods 'to achieve the greatest possible degree of [relief], taking into account the practicalities of the situation'" (alteration in original)).  Of course, institutional reform litigation that seeks to address constitutional violations requires some degree of flexibility in formulating equitable relief as a practical matter because the Constitution "does not 'partake of the prolixity of a legal code,'" but "speaks instead with a majestic simplicity."  Davis, 442 U.S. at 241 (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 407 (1819)).

But this is not an institutional reform case that seeks to remedy constitutional violations; nor is it one in which Congress has bestowed broad authority upon the courts to remedy violations of civil rights statutes.  See, e.g., Local 28 Sheet Metal Workers' Int'l Ass'n v. EEOC, 478 U.S. 421, 465 (1986) ("Congress deliberately gave the district courts broad authority

under Title VII to fashion the most complete relief possible."). To the contrary, Congress has committed to HUD the authority and responsibility to reform public housing agencies that receive federal funding. And to that end, it has established extensive remedies for HUD to aggressively address deficiencies in a public housing agency's management or the conditions of its housing. This Court has already discussed the concerns that the Proposed Consent Decree raises with respect to separation of powers and the delegation of equitable judicial authority. But the incongruity between the Complaint and the Proposed Consent Decree also raises doubts as to the legitimacy of any judicial imprimatur on the proposed decree. In particular, the Complaint asserts a "claim" under Section 6(j) of the U.S. Housing Act based on NYCHA's violations of its obligations under its Annual Contributions Contract, which incorporates federal lead-paint safety regulations and its obligation under 24 C.F.R. § 5.703 to provide decent, safe, and sanitary housing. While the Proposed Consent Decree in some general sense requires NYCHA to comply with these regulations, the Government has made clear that the focus of the proposed decree is a monitorship structured entirely by the parties. Cf. Firefighters, 478 U.S. at 536, 540 (Rehnquist, J., dissenting) (questioning whether a consent decree "may be structured almost entirely by the parties, even though the statute which the decree enforces may not authorize any such relief . . ." and expressing the view that the scope of a consent decree is "properly restrain[ed] . . . to that of implementation of the federal statute pursuant to which the decree is entered").

Questions of judicial legitimacy aside, the adversarial positions the parties have staked after signing the proposed decree and during the pendency of the motion for approval also portend this Court's de facto conscription into superintending NYCHA indefinitely—a role that judges are ill-equipped to assume. See Clinton, 999 F.2d at 326 (noting that "[f]ederal courts operate according to institutional rules and procedures that are poorly suited to the management

46

of state agencies").  In particular, the Government's moving papers claim that NYCHA has

already defaulted on its obligations to comply immediately with lead-safe work practices under

paragraph 67 of the Proposed Consent Decree.  (Gov't Brief, at 13-16.)  NYCHA disputes that it

violated the proposed decree, claiming that its efforts to comply had preceded the signing of the

proposed decree and accelerated after that.  (NYCHA Brief, at 4 n.11; Folch Decl. Ex. C.)  In a

similar vein, the Government has criticized NYCHA's unilateral appointment of a NYCHA

insider who never previously worked in a compliance department as Chief Compliance Officer

without consulting the Government.  (Gov't Brief, at 17.)  Though not outside the letter of the

Proposed Consent Decree—which only requires that the Chief Compliance Officer be appointed

in consultation with the monitor—NYCHA's counsel conceded that this appointment was not in

the spirit of the parties' agreement.  (Sept. 26, 2018 Hr'g Tr. at 176.)  When pressed at oral

argument, NYCHA's counsel contended that the proposed decree had not yet been approved and

that NYCHA believed that compliance work needed to continue.[18]  (Sept. 26, 2018 Hr'g Tr. at

175-77.)

Further, the parties' divergent characterizations of the Proposed Consent Decree's

key provisions—the monitorship, according to the Government, and NYCHA's obligations to

follow the law, according to NYCHA—betray a disagreement over the monitor's role that

evokes shades of the "Peerless" case familiar to first-year law students.  See Raffles v.

Wichelhaus, 159 Eng. Rep. 375 (Ex. 1864).  In addition to setting forth the general monitorship

framework, the Proposed Consent Decree clarifies that the monitor "shall not be responsible for

---

[18]     NYCHA's Interim Chair reportedly offered a more pointed response, stating "We are not in violation of the
consent decree.  There is no way on this earth that I was going to wait for the monitor's arrival to put a compliance
officer in place."  See Greg B. Smith, Pol rips de Blasio appointment of political insider to monitor NYCHA safety
compliance, N.Y. Daily News (Aug. 21, 2018), http://www.nydailynews.com/new-york/ny-metro-nycha-
compliance-violation-20180820-story.html.  Of course, whatever urgency NYCHA's Interim Chair perceived, the
unilateral nature of NYCHA's action undercuts the collaborative atmosphere the parties say they are cultivating.

NYCHA's day-to-day operations." (Proposed Consent Decree ¶ 35.) Aside from this limitation, there is much room for disagreement as to the monitor's role. (Cf. July 10, 2018 Hr'g Tr. at 8 (statement by Government counsel noting the uncertainty in the degree to which the monitor's operations will be integrated with NYCHA's current infrastructure and acknowledging that "as people apply or suggest that they should be monitor, they have different ideas and structures for what they would bring to that process").) In sum, the parties' statements on the record and subsequent public sniping tell a tale of two monitors.

The Government has consistently described the monitorship as the "centerpiece" of the proposed decree whose role is not simply to monitor compliance with the decree, but to "direct NYCHA to make overarching organizational and work force changes and to take specified steps to achieve health and safety improvements," including directing NYCHA to perform work through independent contractors, entering into contracts on NYCHA's behalf, and creating Performance Requirements and various organizational and operational plans. (Gov't Brief, at 1; see, e.g., Sept. 26, 2018 Hr'g Tr. at 151-52 (representing that the monitor will "help NYCHA fix its problems and, where necessary, step in to fix them"); July 10, 2018 Hr'g Tr. at 6 (describing the monitor as "not your ordinary monitor in some significant respects" and that the monitor has "its own authority laying out plans for improving NYCHA and for reorganizing the organization").) While NYCHA's papers say little about how it envisions the monitor's role, its counsel's statements at the fairness hearing suggest a constrained view of the monitor as merely facilitating collaboration and providing increased accountability. (See Sept. 26, 2018 Hr'g Tr. at 177, 180-81.) Given NYCHA's active deceit of federal regulators, however, whether such a passive role can assure any meaningful accountability is doubtful.

The public skirmishing between NYCHA's Interim Chair and the U.S. Attorney

reveals the wide chasm between the parties' expectations for the monitor. Only two weeks after NYCHA's tenants testified at length about the need for greater oversight, NYCHA's Interim Chair—who was nowhere to be found during the public testimony by tenants—expressed his concerns "about what could be a creeping monitorship that's more in the operational mode, as opposed to a monitor who monitors." Janaki Chadha, Brezenoff raises doubts about NYCHA monitor under federal consent decree, Politico (Oct. 10, 2018), https://www.politico.com/states/ new-york/city-hall/story/2018/10/10/brezenoff-raises-doubts-about-nycha-monitor-under-federal-consent-decree-642333. He also criticized the proposed monitorship "because it's much more actively constructed, where there's more of a management role, at least in vision," calling it "a prescription for difficulty, if not disaster." He lamented that when he signed the proposed decree, he "saw it as more of a monitorship, and in some of the interactions that are going on, [he] see[s] the possibility that others might have a different view." One of these "others" is the U.S. Attorney, who retorted that NYCHA's Interim Chair "should be getting on board with the monitorship he signed off on" and that NYCHA's belated resistance to anything more than a milquetoast monitor was "not a smart move." See Nolan Hicks, Feds blast top NYCHA management as a 'real disaster', N.Y. Post (Oct. 30, 2018), https://nypost.com/2018/10/30/feds-blast-top-nycha-management-as-a-real-disaster.

In the end, NYCHA may be correct that whatever sluggishness the Government perceives in NYCHA's efforts to comply with the lead-safe work practices requirement does not fall outside the letter of the Proposed Consent Decree. And it may be that NYCHA's haste to appoint a compliance officer does not logically violate a decree that has yet to be judicially approved. Such actions, however, evince a troubling propensity for NYCHA to do what it wants, when it wants. The point is that NYCHA's unilateral actions and statements decrying the

49

monitor's role while this Court considers whether to approve the proposed decree—a time in which one would expect NYCHA to be on its best behavior—unearth fissures in the parties' collaborative front and foreshadow the beginning of prolonged judicial management of NYCHA through a monitorship whose costs may be limitless.

Ultimately, whether the parties choose to address this public emergency through a judicially managed consent decree, a receivership under the U.S. Housing Act, or in some other way, it appears that half-measures that merely maintain the status quo while shielding the powers-that-be from politically unpalatable solutions are doomed to fail. As discussed, HUD is not blameless. The City's equivocal role in this settlement also bears mention. It is a non-party claiming to be bound only by its funding obligations while also maintaining that it has no legal obligation to provide any funds at all. At the same time, the City's Corporation Counsel extolled the "unprecedented" nature of the proposed decree's "item by item" negotiation that personally involved Corporation Counsel, the U.S. Attorney, and the Mayor of the City. (July 10, 2018 Hr'g Tr. at 44.) Indeed, New York law puts the City much closer to the center of the action in granting the Mayor the power to control NYCHA by appointing its chairperson and board, who serve at his pleasure. Paige v. N.Y.C. Hous. Auth., 2018 WL 3863451, at *13 (S.D.N.Y. Aug. 14, 2018) (citing N.Y. Pub. Hous. Law § 402(3)). Finally, the State of New York lurks in the wings with $550 million that may help fund NYCHA's capital needs. The Governor—having previously overhauled the Chicago Housing Authority during his tenure as HUD Secretary—may well understand better than others what is at stake.

To be sure, this Court shares the parties' doubts that any solution will offer an immediate panacea, in large part due to NYCHA's crippling $31.8 billion capital deficit and its inexplicable dysfunction in leaving untouched hundreds of millions of dollars allocated to it by

the City.  But desperate times call for desperate—and sometimes politically unpopular—measures, whether that be exploring public-private housing partnerships, infill development, or the sale of air rights.  Other measures may be necessary and even less palatable, such as replacing NYCHA's management or abrogating collective-bargaining agreements and vendor contracts.  Any of these measures requires political will at all levels, from the HUD Secretary, to the Governor, to the Mayor, and to NYCHA's Interim Chair.  The well-being of more than 400,000 New Yorkers depends on it.

## CONCLUSION

This Court does not reject the Proposed Consent Decree lightly.  The rejection of this decree will likely delay sorely needed relief for NYCHA tenants while the parties decide whether to re-negotiate, seek administrative remedies, litigate, or appeal, and a court's refusal to accept a proposed consent decree may have "practical consequences for the government's ability to negotiate future settlements."  Microsoft Corp., 56 F.3d at 1456.  But as it stands, the proposed decree suffers from fatal procedural flaws, including its formless injunctive relief and enforcement mechanisms.  The proposed decree also raises serious concerns implicating the separation of powers and the delegation of equitable judicial power, which appear attributable at least in part to the parties' sidestepping of the existing statutory scheme to address public housing failures.  And on a more basic level, the nature of the claims asserted by the Government raises questions as to the scope and applicability of Citigroup.

Any judicial decree entered in this action will have a direct, tangible, and long-lasting impact not only on the parties, but most importantly on NYCHA's tenants.  Because the Proposed Consent Decree is not fair and reasonable, and because its entry would disserve the public interest, the Government's motion for approval is denied.  The parties are directed to

submit a joint status report by December 14, 2018 detailing their respective positions on how they wish to proceed.  That status report should also advise this Court regarding NYCHA's compliance to date with its obligations under paragraphs 67-70 of the Proposed Consent Decree. The Clerk of Court is directed to terminate the motion pending at ECF No. 43.

Dated: November 14, 2018
     New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.